# Table of Contents

THE BASIS FOR APPELLATE JURISDICTION ...................................................... 1

ISSUES PRESENTED........................................................................................... 1

STANDARD OF APPELLATE REVIEW................................................................. 1

STATEMENT OF THE CASE................................................................................. 2

STATEMENT OF FACTS ...................................................................................... 4

    The Substitute Receiver Order.......................................................................... 5

    The Receiver Statutes ....................................................................................... 8

    The Lockbox ...................................................................................................... 9

    GE's Diversion Of The Substitute Receiver's Funds And Receivables ............. 10

    GE Diverts The Medicaid Retroactive Adjustment ........................................... 11

    The Cash Collateral Order ................................................................................. 11

    The Final Sale Order.......................................................................................... 12

    The Proceedings Below ..................................................................................... 12

POINT I   ............................................................................................................... 15

    THE BANKRUPTCY COURT MISREAD THE SRO AND IGNORED SIMILAR
    STATUTORY LAW BY ALLOWING GECC TO DIVERT THE SUBSTITUTE
    RECEIVER'S FUNDS AND RECEIVABLES TO PAY ITSELF, PRIOR TO THE
    PAYMENT OF ALL RECEIVERSHIP EXPENSES ....................................... 15

    A.    The SRO Precluded GECC From Taking The Substitute Receiver's Funds And
    Receivables Prior To Payment Of All Receivership Expenses ........................... 15

    B.    New York Statutory Law Precluded GECC From Taking The Substitute Receiver's
    Funds And Receivables Prior To Payment Of All Receivership Expenses......................... 16

POINT II ............................................................................................................. 20

THE BANKRUPTCY COURT IGNORED SUPREME COURT PRECEDENT
PRECLUDING GECC WAS FROM TAKING INTEREST AND FEES FROM THE
DEBTORS, SINCE ITS DEBT WAS UNDER SECURED ............................................... 20

POINT III ............................................................................................................ 21

NEITHER THE LOCKBOX, CCO OR FINAL SALE ORDER PERMITTED GECC TO
TAKE THE SUBSTITUTE RECEIVER'S FUNDS AND RECEIVABLES PRIOR TO
PAYMENT OF ALL RECEIVERSHIP EXPENSES ....................................................... 21

A.       The Lockbox Agreement ......................................................................... 21

B.       The CCO ................................................................................................. 22

C.       The Final Sale Order ............................................................................. 23

POINT IV ............................................................................................................ 23

EVEN UNDER THE BANKRUPTCY COURT'S ERRONEOUS INTERPRETATION OF
THE ORDERS GECC STILL DIVERTED THE SUBSTITUTE RECEIVER'S FUNDS. 23

POINT V .............................................................................................................. 24

THE BANKRUPTCY COURT IMPROPERLY DISMISSED THE ADVERSARY
PROCEEDING BY MAKING A FACTUAL DETERMINATION REGARDING THE
TIMING OF THE COMPLAINT ............................................................................... 24

POINT VI ............................................................................................................. 26

THE SUBSTITUTE REECEIVER DID NOT, AND COULD NOT, WAIVE ITS CLAIMS
26

CONCLUSION ...................................................................................................... 27

# TABLE OF AUTHORITIES

## CASES

*Airco Inc. v. Niagara Mohawk Power Corp.*, 76 A.D.2d 68, 430 N.Y.S.2d 179, 187 ................ 25

*Angell v. Landefeld, 32 Misc. 2d 1070, 223 N.Y.S.2d 850 (Sup 1961),*
  judgment aff'd, *16 A.D.2d 951, 230 N.Y.S.2d 676* (2d Dep't 1962)........................................ 18

*Aris-Isotoner Gloves, Inc. v. Berkshire Fashions, Inc.*,
  792 F. Supp. 969, 973 (S.D.N.Y. 1992)................................................................................... 26

*Bank of Tokyo Trust Co. v. Urban Food Malls Ltd.,*
  229 A.D.2d 14, 650 N.Y.S.2d 654 (1st Dep't 1996) ............................................................... 19

*Bein v. Heath*, 47 U.S. 228, 247, 12 L. Ed. 416 (1848)................................................................ 26

*Bradford Financial Corp. v. Clark West Realty Corp.,*
  43 Misc. 2d 927, 252 N.Y.S.2d 580 (Sup. Ct., N.Y. Co., 1964) ............................................ 18

*Cohen v. Krantz*, 227 A.D.2d 581, 643 N.Y.S.2d 612, 614 (2d Dep't 1996) .............................. 25

*Constellation Bank, N.A. v. Binghamton Plaza, Inc.,*
  236 A.D.2d 698, 653 N.Y.S.2d 208 (3d Dep't 1997) .............................................................. 15

*Copeland v. Saloman,* 56 N.Y.2d 222, 451 N.Y.S.2d 682 (1982)................................................ 15

*Corn Exchange Bank Trust Co. v. Bankers Trust Co., 268 N.Y. 224, 197 N.E. 259 (1935)* ........ 18

*D'Guardia v Piffath* 180 A.D.2d 630, 579 N.Y.S.2d 447 (2d Dep't 1992) .................................. 19

*Eton Centers, Co. v. McNally (In re McNally*),
  2003 U.S. Dist. LEXIS 25856, at *3 (S.D.N.Y. June 2, 2003)................................................. 2

*Farmers' Loan & Trust Co. v. Bankers' & Merchants' Tel. Co.,*
  148 N.Y. 315, 42 N.E. 707 (1896).......................................................................................... 19

*Fourth Federal Savings Bank v. 32-22 Owners Corp.,*
  236 A.D.2d 300, 653 N.Y.S.2d 588 (1st Dep't 1997) ............................................................. 18

*Harvis Trien & Beck, P.C. v. Federal Home Loan Mortg. Corp. (In re Blackwood Assocs., L.P.),*
    153 F.3d 61, 65-66 (2d Cir. 1998)........................................................................ 2

*In re Arochem Corp.,* 176 F.3d 610, 620 (2d Cir. 1999) ................................................ 1

*In re Atlas Iron Const. Co.,* 19 A.D. 415, 46 N.Y.S. 467 (1st Dep't 1897)..................................... 18

*In re Bennett Funding Group, Inc.,* 146 F.3d 136, 138 (2d Cir. 1998)........................................... 2

*In re Ionosphere Clubs, Inc.,* 922 F.2d 984, 988 (2d Cir. 1990) .................................................. 1

*In re Maitlen,* 658 F.2d 466, 470 (7th Cir. 1981) ......................................................................... 1

*In re Porges*, 44 F.3d 159, 162 (2d Cir. 1995).............................................................................. 2

*In re Southold Development Corp.,* 134 Bankr. 705, 708 (E.D.N.Y. 1991)................................. 1

*In re Vouzianas*, 259 F.3d 103, 107 (2d Cir. 2001) ..................................................................... 1

*International Asset Recovery Corp. v. Thomson McKinnon Secs., Inc.,*
    335 B.R. 520 (S.D.N.Y. 2005)........................................................................ 20

*Jacynicz v. 73 Seaman Associates,* 270 A.D.2d 83, 704 N.Y.S.2d 68 (1st Dep't 2000)............... 19

*Kaplan v. 2108-2116 Walton Ave. Realty Co.,*
    74 A.D.2d 786, 425 N.Y.S.2d 817 (1st Dep't 1980) ................................................ 16

*Lopresti v. Terwilliger,* 126 F.3d 34, 41 (2d Cir. 1997) ................................................ 24

*Love v. Spector*, 215 A.D.2d 733, 627 N.Y.S.2d 87, 88 (2d Dep't 1995).................................... 25

*Meisel v. Grunberg*, 651 F. Supp. 2d 98, 122, Ft. 13 (S.D.N.Y. 2009)........................................ 27

*Moses v. Martin*, 360 F.Supp.2d 533, 541 (S.D.N.Y. 2004) ........................................................ 24

*Mumford v. Crouch*, 8 A.D. 529, 538 (4th Dep't 1896) ................................................ 27

*N.Y. City Dep't of Fin. v. 310 Assocs., L.P. (In re 310 Assocs., L.P.),*
  282 B.R. 295, 298 (E.D.N.Y. 2002) ............................................................. 2

*NWL Properties, Inc. v. 401 East 89th Street Owners, Inc.,*
  1995 U.S. Dist. LEXIS 4722 (S.D.N.Y., April 12, 1995 ............................... 17

*Parnes v. Mast Property Investors, Inc.*, 776 F. Supp. 792, 795 (S.D.N.Y. 1991) ..................... 27

*Ripple's of Clearview, Inc. v. Le Havre Associates,*
  88 A.D.2d 120, 452 N.Y.S.2d 447 (2d Dep't 1982) ................................... 15

*Robins Island Preservation Fund, Inc., v. Southhold Development Corp.*,
  959 F.2d 409, 424 (2d. Cir. 1992) .............................................................. 25

*Rosenzweig v. Zirkatz Realty Corp., 145 Misc. 653, 260 N.Y.S. 118 (Sup 1932)* ................. 18

*Schwartzberg v. Whalen*, 96 A.D.2d 974, 466 N.Y.S.2d 846 (3d Dep't 1983). .............. 17

*Security Pacific Mortgage & Real Estate Servs. v. Republic of the Philippines,*
  *962 F.2d 204 (2d Cir. 1992* ............................................................... 15, 18

*United Sav. v. Timbers of Inwood Forest*, 484 U.S. 365 (1988) ................................. 1, 4

*Vigilant Ins. Co. of America v. Housing Auth. City of El Paso, Texas,*
  87 N.Y.2d 36, 44 (1995) ......................................................................... 24

**STATUTES**

28 U.S.C. 158(a)(1) ................................................................................. 1
Fed. R. Bankr. P. 8013 ............................................................................ 1
Pub. Health Law § 2810(2)(c) ........................................................ 1, 8, 9, 18
RPAPL § 1325(2) .......................................................................... 1, 3, 8, 17

**TREATISES**

*Bergman on New York Mortgage Foreclosures § 10.16* ............................ 18

## THE BASIS FOR APPELLATE JURISDICTION

This Court has jurisdiction to hear this appeal pursuant to 28 U.S.C. 158(a)(1),  since it is an appeal from a final order of the bankruptcy court which dismissed appellants' adversary complaint in its entirety.

## ISSUES PRESENTED

Whether the bankruptcy court erred in permitting the creditor to pay itself from the funds and receivables of the Substitute Receiver which was operating the Debtors' skilled nursing facilities prior to the payment of all receivership expenses as required under both the  Substitute Receiver Order and New York statutory law governing receivers under RPAPL 1325(2) and Public Health Law 2810(2)(c)?

Whether the Bankruptcy Court erred in permitting the under secured creditor to pay itself post-petition interest and fees from the Debtors' funds and receivables despite contrary controlling precedent in *United Sav. v. Timbers of Inwood Forest*, 484 U.S. 365 (1988)?

## STANDARD OF APPELLATE REVIEW

A district court hearing an appeal from a bankruptcy court reviews conclusions of law under the de novo standard,  *In re Vouzianas*, 259 F.3d 103, 107 (2d Cir. 2001), while findings of fact are reviewed under the "clearly erroneous" standard, Fed. R. Bankr. P. 8013. The bankruptcy court's conclusions regarding mixed questions of law and fact, however, are reviewed *de novo.  See In re Maitlen,* 658 F.2d 466, 470 (7th Cir. 1981); *In re Arochem Corp.,* 176 F.3d 610, 620 (2d Cir. 1999);  *In re Ionosphere Clubs, Inc.,* 922 F.2d 984, 988 (2d Cir. 1990), *cert. denied,* 112 S. Ct. 50 (1991); *In re Southold Development Corp.,* 134 Bankr. 705, 708 (E.D.N.Y. 1991) (holding that "we review the bankruptcy court decision independently, accepting its factual findings unless clearly erroneous but reviewing its conclusions of law de

novo [citation omitted]"); *In re Bennett Funding Group, Inc*., 146 F.3d 136, 138 (2d Cir.

1998) (same) (citations omitted); *see also In re Porges*, 44 F.3d 159, 162 (2d Cir. 1995) (same)

(citations omitted). Since review of a statute is a question of law, it is also reviewed *de novo.  See*

*generally*, *N.Y. City Dep't of Fin. v. 310 Assocs., L.P. (In re 310 Assocs., L.P.),* 282 B.R. 295,

298 (E.D.N.Y. 2002) (Ruling of a bankruptcy court regarding interpretation of statute reviewed

*de novo*).  A review of a court order is likewise reviewed *de novo*, particularly where, as here, the

Orders were drafted by the parties and not the court.  *Harvis Trien & Beck, P.C. v. Federal*

*Home Loan Mortg. Corp. (In re Blackwood Assocs., L.P.)*, 153 F.3d 61, 65-66 (2d Cir. 1998).

Since this appeal is based solely on the bankruptcy court's misreading of relevant court

orders and law governing receivers appointed pursuant to the New York Public Health Law and

Real Property and Proceeding Law ("RPAPL"), the issues are purely conclusions of law and

must be reviewed under the de novo standard.  Moreover, "[o]n appeal, a district court may

affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with

instructions for further proceedings." *Eton Centers, Co. v. McNally (In re McNally)*, 2003 U.S.

Dist. LEXIS 25856, at *3 (S.D.N.Y. June 2, 2003) (citing Fed. R. Bankr. P. 8013).

## <u>STATEMENT OF THE CASE</u>

Appellants EF Consulting, LLC ("EF" or the "Substitute Receiver") and Oasis HC LLC

("Oasis") (collectively, the "Appellants") submit this brief in support of their appeal from the

Bankruptcy Court's bench ruling, dated February 11, 2011, as memorialized by written order,

dated February 23, 2011 (the "Dismissal Order"), granting defendant General Electric Capital

Corporation's ("GECC") motion to dismiss the adversary complaint ("Adversary Complaint")

under Adversary Proceeding number 10-90175.

Appellants brought the Adversary Proceeding to recover approximately $3 million diverted by GECC during the course of a State Court receivership and Chapter 11 bankruptcies. The essence of Appellants claim is that GECC diverted the funds in violation of both the order appointing the Substitute Receiver and applicable New York statutes governing receivers, which both required the payment of all receivership expenses, including patient care expenses, prior to any payment of interest or other expenses to the secured creditor.

Appellants are EF, the Substitute Receiver; and Oasis, the ultimate purchaser of the debtors' assets, which included skilled nursing facilities. GECC was the debtors' major creditor and secured lender. At the closing of Oasis' purchase of the debtors' assets, the Substitute Receiver was left with over $9 million in outstanding accounts payable while GECC recouped over $23 million of its debt. Appellants discovered that GECC was paying itself from the Substitute Receiver's funds and receivables that were placed in a lockbox, prior to the payment of all of the receivership expenses which created the shortfall.

Both GECC and the bankruptcy court acknowledged that certain receivership expenses (e.g., property expenses) had to be paid prior to any payment to GECC. Nevertheless, the bankruptcy court dismissed the Adversary Complaint, essentially ruling that the secured creditor could pay itself from receivership funds and receivables ahead of certain other receivership expenses, including patient care or medical expenses.

The bankruptcy court erred on numerous grounds. Primarily, since both the terms of the order appointing the Substitute Receiver and New York statutory law governing receivers under RPAPL 1325(2) and Public Health Law, precluded the secured creditor from paying itself from the Substitute Receiver's funds and receivables prior to the payment of all receivership expenses.

3

Secondarily, since GECC was an under secured creditor, e.g., its debt exceeded the value of its collateral, and therefore it was not entitled to receive any post-petition interest and fees from the Debtors' funds and receivables under *United Sav. v. Timbers of Inwood Forest*, 484 U.S. 365 (1988).

Accordingly, as set forth more fully below, it is respectfully submitted that the bankruptcy court's Dismissal Order should be reversed.

## STATEMENT OF FACTS

Highgate LTC Management, LLC ("Highgate LTC") was the operator of three skilled nursing facilities in the Albany region and the City of Cortland with a total of over 500 beds (the "Facilities"). Highgate Manor Group, LLC ("Highgate Manor") was the owner of the real properties (the "Properties") upon which the Facilities were located. DE 1, Complaint ¶ 7[1] (Highgate LTC and Manor are collectively, the "Debtors"). On or about May 26, 2005, the Debtors and GECC entered into three agreements: (a) a Loan and Security Agreement pursuant to which GECC provided the Debtors with a revolving line of credit of up to $4 million to operate the Facilities (the "LSA" or "Line of Credit"); (b) a Lockbox Account Agreement (the the "Lockbox" or "Lockbox Agreement") whereby all the Debtors' income was directed to a Lockbox; and (c) a Loan Agreement for up to $23,500,000, secured by mortgages (collectively, the "Loan Documents").  DE 1, Complaint ¶ 8.

In April 2006, the Debtors defaulted on their obligations to GECC. On October 11, 2006 GECC commenced an action against the Debtors in New York Supreme Court, Rennselaer County, entitled *General Electric Capital Corp. v. Highgate Manor Group, LLC et al, (Sup. Ct.*

---

[1]        References to "DE " refer to the docket entry numbers of the Adversary Proceeding; while references to an "Ex." refer to the exhibit number contained within the docket entry.

4

Rennselaer County), Index No. 2193393-06 (the "Foreclosure Action"), seeking to foreclose the mortgages and to appoint a receiver to operate and manage the Debtors' businesses.  DE 1, Complaint ¶ 9.  On November 29, 2006, the State Court issued an order (the "Initial Receiver Order") appointing Long Hill Alliance Company as the initial Receiver ("Long Hill" or "Initial Receiver"). On November 3, 2008, the State Court issued an order appointing EF as the Substitute Receiver (the "Substitute Receiver Order"). DE 5, Ex. 10.

On April 16, 2007, the Debtors filed joint Chapter 11 bankruptcy petitions in the United States Bankruptcy Court for the Northern District of New York, Albany Division, under Case No.'s 07-11068 & 07-11069, jointly administered under 07-11068. By order dated August 28, 2008 (the "Final Sale Order"), the Court-appointed bankruptcy trustee was authorized to sell most of the Debtors' assets. The Final Sale Order provided that Oasis would purchase the Debtors' assets and EF would replace Long Hill as the Substitute Receiver.  DE 1, ¶ 11; DE 5, Ex. 9.  On or about August 30, 2010, Oasis closed on its purchase of the Debtors' assets.  DE 1, ¶ 12.  Pursuant to the Final Sale Order, the Substitute Receiver and Oasis were responsible for all of the Debtors' account payables which were owed at the time of the sale. DE 1, ¶ 13; DE 5, Ex. 9.  At the closing, the Facilities owed over $10 million to trade creditors, which the Appellants were liable for. DE 1, ¶ 14, DE 5, Ex. 9.

**The Substitute Receiver Order**

As stated, on November 3, 2008, the State Court issued the SRO appointing EF as the Substitute Receiver of the Properties and Facilities.  Pursuant to the SRO, the Substitute Receiver was subject to the laws governing Receivers under both the RPAPL and the Public Health Law:

> ORDERED, … the powers, rights, duties and obligations of the Substitute Receiver shall include those accorded a receiver appointed under an action to foreclose a mortgage on real property

5

and in equity, and the Substitute Receiver shall also have the
powers, duties, rights and obligations as if appointed under Section
2810(2) of the <u>Public Health Law</u> … DE 1, ¶ 16; DE 5, Ex. 10, p.
15.

Thus, the SRO gave the Substitute Receiver the power (like all receivers) to collect all the

Debtors' income and account receivables:

> ORDERED, … that, EF… referred to herein as the Substitute
> Receiver, be and hereby is appointed receiver of the Mortgaged
> Premises … with the usual powers and directions, including the
> authority to act as interim operator of the Facility and including the
> power to collect all rents, issues, fees, revenues, profits, and all
> other monies and proceeds now due and unpaid or to become due
> … and issuing from the Mortgaged Premises, including, but not
> limited to, all rents and other payments now due and unpaid or to
> become due from or on behalf of all residents, patients, medical
> insurance providers, including without limitation, Medicare and
> Medicaid … DE Ex. 10, pp. 6-7;

and required the Substitute Receiver (like all receivers) to pay all the expenses of the Properties

and Facilities necessary for their continued operation:

> ORDERED, that the Substitute Receiver … (a) shall have the
> responsibility and obligation to pay and discharge all obligations
> incurred by Long Hill … (b) shall fund all operations at the
> Facility … and (c) shall have the liability and responsibility to pay
> any shortfall out of its own funds if the income generated at the
> Facility is insufficient to meet the expenses of the Facility… DE 1,
> Complaint ¶ 15, DE 5, Ex. 10, pp. 8-9;

> ORDERED, … that the Substitute Receiver (a) shall pay in the
> ordinary course all of the obligations and Expenses, as defined,
> including all payables, liabilities or obligations of any kind
> incurred by the Substitute Receiver from the inception of its
> receivership, and (b) shall pay in the ordinary course, all of the
> obligations and Expenses incurred by Long Hill in its performance
> of Long Hill's obligations under the Receivership Order. DE 1,
> Complaint ¶ 15, DE 5, Ex. 10, p. 11.

The SRO also provided the Substitute Receiver (and not GECC) with sole control over all bank accounts containing the Debtors' assets:

> ORDERED, … 2. … The Substitute Receiver shall have full control over and take full responsibility for all accounts and bookkeeping with the Facility during the term of its receivership hereunder, … DE 1, ¶ 16; DE 5, Ex. 10, p. 15;

and authorized the Substitute Receiver to utilize **all** of the Facilities' accounts receivable to meet its obligations:

> ORDERED, that the Substitute Receiver *shall be entitled to utilize all accounts receivable* cash existing at the Facility as of the date of the commencement of its appointment as receiver to meet Substitute Receiver's obligations hereunder …. DE 1, ¶ 26; DE 5, Ex. 10, p. 9 (emphasis added).

Moreover, the SRO required that all existing cash, income and incoming payments be directly applied to the expenses of the Properties and Facilities:

> ORDERED, … 4. The Substitute Receiver shall collect incoming payments from all sources **and apply them to the costs incurred in the performance of its functions and obligations hereunder.** DE 1, ¶ 17; DE 5, Exhibit 10, p. 16 (emphasis added).

The SRO further required the Substitute Receiver to comply with all governmental and municipal requirements, which would include all medical regulations and patient expenditures, and provided that GECC could only be paid interest after all other expenses were paid:

> ORDERED, that the Substitute Receiver be, and hereby is, authorized and directed: (a) to keep the Mortgaged Premises insured against loss or damage by fire and in repair; (b) to pay the taxes, assessments, water charges, sewer rents, electric bills, and other charges on the Mortgaged Premises, in a manner consistent with the provisions of this Order; (c) **to comply with all requirements of any municipal department or authority having jurisdiction over the Mortgaged Premises**; (d) to procure, if necessary, such insurance and liability insurance against claims for

losses or injuries to persons and property, which may be asserted by persons on, near or about the Mortgaged Premises, as may be necessary; and (e) to pay to Appellant monthly, ***out of funds remaining in the custody of the Substitute Receiver***, all interest accrued on the Revolving Credit Note, provided that any unpaid interest shall continue to accrue on the Real Estate Loan, Senior Promissory Note and Revolving Credit Documents secured by its Consolidated and Leasehold Mortgages. " DE 1, ¶ 18-19; DE 5, Ex. 10, p. 25 (emphasis and italics added).

Thus, the Substitute Receiver Order prohibits the payment of ***any*** money to GE aside from accrued interest under the Line of Credit. Moreover, GE was only entitled to be paid "interest" from "funds remaining" in the Substitute Receiver's "custody" and after it first discharged its duty to pay all of the Facilities' operating costs and expenses, which would include all patient expenses.  DE 1, Complaint ¶ 20, DE 5, Ex. 10, p. 25.  Since the Debtors had millions of dollars in outstanding operating expenses,  DE 1, Complaint ¶ 24, GECC was not permitted to use any of the Debtors' funds in the Lockbox to pay down the Line of Credit.  DE 1, ¶ 23; DE 5, Ex. 10.  Thus, GE violated the SRO by taking funds from the Lockbox prior to the Substitute Receiver's payment of all its expenses.  DE 1, ¶ 27.

**The Receiver Statutes**

The SRO is written to comply with the well-established legal obligations of a Receiver of both real property and a skilled nursing facility. Indeed, under the terms of the Initial Receiver Order and SRO, the Receivers are bound by the laws governing them under both New York's RPAPL, including RPAPL § 1325(2), and Public Health Law § 2810(2)(c).

Like the SRO, RPAPL § 1325(2) prevents a Receiver from paying accrued interest to a secured creditor, until all the expenses are paid ("due provision shall have been made for the payment of taxes, administration expenses, fees and charges").

8

Public Health Law § 2810(2)(c) incorporates all the powers of a Receiver in a mortgage foreclosure action. Moreover, Public Health Law § 2810(2)(c) provides the Receiver with yet additional powers, including to guarantee the patient's safety and health care, and to collect all payments and apply them to all costs incurred  in maintaining the facility:

> Any receiver appointed to this subdivision shall have all of the powers of a receiver appointed in an action to foreclose a mortgage on real property, together with such additional powers and duties as are herein granted and imposed … He [the receiver] shall … operate the facility in such a manner as to guarantee safety and adequate health care for such patients. … He [the receiver] shall collect incoming payments from all sources and apply them to the costs incurred in the performance of his functions as receiver.

Thus, aside from violating the SRO, GECC violated the Receiver Statutes by taking funds from the Lockbox prior to the Substitute Receiver's payment of all of its expenses.

**The Lockbox**

The Lockbox arrangement was created prior to both the Initial Receivership and Bankruptcy filings, and is embodied by the Lockbox Agreement. The Lockbox Agreement does not permit GE to utilize any of the Facilities' income to pay principal, interest or fees.  DE 1, ¶ 33, DE 5, Ex. 3. Rather, the Lockbox Agreement, like most lock box arrangements, was simply a *mechanism* for GE to ensure that all accounts receivable were properly collected. DE 1, ¶ 30. Thus, the Lockbox Agreement merely provides that all accounts receivable collected by the lockbox are to be placed in a "Concentration Account" designated by GE. DE 1, Complaint ¶ 31; DE 5, Ex. 3. Moreover, the Debtors had the explicit authority to modify this arrangement. DE 1, ¶ 32; DE 5, Ex. 3, p. 3.

9

**GE's Diversion Of The Substitute Receiver's Funds And Receivables**

*Prior* to the Debtors' default under the Loan Documents and their Bankruptcy filings, GECC would place money deposited into the Lockbox into the Concentration Account to pay down its outstanding Line of Credit. In this way, the Line of Credit would have new funds available to disburse to the Debtors. Once the Bankruptcies were filed, however, GECC could no longer pay down its pre-petition LSA debt.

Moreover, despite the Substitute Receiver's appointment, GECC continued to operate the Lockbox as if nothing had changed and the Debtors were still compliant borrowers. Thus, GECC continued to take the Lockbox funds as if it was a dollar-for-dollar pay down of the outstanding money owed under its Line of Credit. DE 1, ¶ 34. GECC still unlawfully controlled the Lockbox and the funds; and misrepresented to the Substitute Receiver that it was merely operating the Lockbox pursuant to court order and passing through each dollar collected through the Lockbox to the Substitute Receiver.  DE 1, ¶ 35. GECC required the Substitute Receiver to formally request funds as if it were somehow a pre-petition borrower, like the Debtors, and the Line of Credit was still in full force and effect.  DE 1, Complaint ¶ 37.

Once in control of the Substitute Receiver's funds, GE unlawfully manipulated the Lockbox and diverted the funds by taking money as its alleged expenses and interest on a regular basis, while misleading the Substitute Receiver as if it was maintaining the status quo and operating the Lockbox pursuant to court order.  DE 1,  Complaint ¶ 39.  Since the Bankruptcy filings, GECC has taken the Debtors' income and paid down its Line of Credit in the amount of $785,561.04.  DE 1, Complaint ¶ 43. However, GECC never moved the bankruptcy court for an order, and the Bankruptcy Court never entered an order, to lift the automatic stay to  permit the repayment of the GECC Line of Credit.  DE 1, Complaint ¶ 44. Moreover, since the entry of the

SRO, GECC has taken the Debtors' income and paid itself purported fees in the amount of $843,467.39.  DE 1, Complaint ¶ 47; and since the entry of the Initial Receiver Order, GECC has taken the Facilities' income and paid itself purported interest in the amount of $845,709.90.  DE 1, Complaint ¶ 52). The Substitute Receiver, however, did not pay all of its day-to-day expenses incurred for patient care and owed significant payables.  DE 1, ¶ 51; DE  5, Ex. 10.

**GE Diverts The Medicaid Retroactive Adjustment**

On or about April 7, 2010, Medicaid made a $610,218.18 rate-adjustment payment to the Facilities.  The payment was due to Medicaid's regular practice of retroactively adjusting its per-patient reimbursement rate based on the patient's actual condition and treatment. Although it is difficult to predict when such Medicaid adjustments will be received, the rate adjustments are part of a nursing facility's regular income. DE 1, ¶ 54. The Medicaid check was deposited in the Lockbox. On or about May 6, 2010, after the check cleared, EF's comptroller requested GECC to pay $1,127,028.78 which should have been available due to the deposit of the $610,218.18 rate adjustment. GECC, however, refused the Substituted Receiver's request, and retained the Medicaid funds in violation of the SRO. Consequently, on June 3, 2010, the Substitute Receiver moved in the State Court Foreclosure Action for the return of this money. The State Court denied the Substitute Receiver's motion without prejudice and with leave to seek relief in the bankruptcy court. Thereafter, Appellants filed the Adversary Proceeding. DE 1, ¶ 59.

To date, it appears that GECC has unlawfully diverted approximately $3 million as interest, fees, and the Medicaid adjustment. DE 1, ¶ 62.

**The Cash Collateral Order**

The Cash Collateral Order ("CCO"), which GECC cited to extensively below is dated May 14, 2007. The CCO, like all cash collateral orders, gives super priority to liens

11

incurred post-petition. The CCO, however, does not allow GECC to pay itself.

Moreover, there were numerous stipulations and order modifying the COO (the "Modification Orders").  GECC does not cite to any of them because <u>their attached budgets do not provide for payments of interest, fees or principal to GECC in the amounts that it took</u>.

## The Final Sale Order

 Pursuant to the Final Sale Order, Oasis purchased the Debtors' assets free and clear of all liens and encumbrances and without any successor liability. Moreover, the Final Sale Order did not allow for the unrestrained payments of interest, fees or principal to GECC.

## The Proceedings Below

After discovering GECC's improper conduct, Appellants filed the Adversary Proceeding on December 7, 2010.  DE 1. On January 6, 2011, GECC moved to dismiss the adversary complaint.  DE  5. On February 9, 2011, Appellant's submitted opposition. DE 18.

Notably, in its reply papers, GECC admitted that certain of the receivership expenses had to be paid, which included the Properties' expenses (DE 21, p. 9).

On February 11, 2011, the Court held oral argument. During the oral argument, the bankruptcy court repeatedly recognized that GECC admitted that certain receivership expenses had to be paid prior to any payment to GECC (DE 24, Tran. pp. 16, 19-20 & 27). Thus, the bankruptcy court ultimately framed the issue as to whether GECC was precluded from receiving payments from the Substitute Receivers' funds/receivables until after payment of those certain admitted receivership expenses or after payment of all receivership expenses:

> THE COURT: So, if I understand your position now, this case, your adversary, really boils down to whether or not GE[CC] had the ability to access those funds, and, I guess, that poses the question of – and GE[CC] admits that there were certain expenses that had to be paid first. This comes down to a question of law as

to whether GE[CC's] position is correct that it was going to be insurance, taxes, certain enumerated items that operated to actually protect their position—

Mr. Backenroth: Right.

THE COURT: … or whether you're correct, and literally, the money was subject to being used for all the expenses to run the entire facility and that until the last band-aid was paid for, GE[CC] wasn't entitled to anything (DE 24, Tran, pp. 19[22-25]-20[1-10]).

The bankruptcy court ruled that GECC was permitted to take the Substitute Receivers' funds prior to the payment of all receivership expenses, including patient care expenses. Thus, the bankruptcy court granted GECC's motion to dismiss.

In reaching its ruling, the bankruptcy court ignored the clear language subjecting the bankruptcy court orders to the Substitute Receiver Order and applicable Statutes:

THE COURT: Well, I don't have to look at anything?...We're looking at Court orders. We're looking at Federal Court orders. Final Federal Court orders. If somebody disagreed with my order, or I find the supremacy clause indicates anything in a Federal Court order, trumps state law. If you disagreed with it, why didn't somebody appeal it? … So what in the state receivership order indicates that you could pay all the expenses, you could pay the band-aids, the cost of the band-aids from the lockbox? … Don't all of the orders, either the -- of this Court or the State Court -- the initial receiver order, the substitute receiver order, all of those agreements refer back to the basic underlying agreements that the case started with and then continued to honor along the way; the lockbox, the revolver, the loan agreements, all of that? Even the substitute receiver agreement makes a specific provision that nothing in that agreement was going to abrogate anything that had happened before any of the orders of this Court, any of the agreements of the parties. It was all subject -- those were the ground rules from which everyone would go forth with

(DE 24,  Tr. pp. 11[14-25],  12[1-13]).

Moreover, the Court read the SRO inconsistently with the statutory law governing receivers:

13

THE COURT "To me, to this Court, it seems very clear, and that's why I'm going to grant Mr. Hamroff's motion and dismiss this adversary proceeding, that the orders, the documents, all reference back to the initial premise that the -- it's not all the expenses -- the receiver orders, this Court orders, always reference back to the underlying documents, the revolver, the lockbox agreement, all of that, with the expectation and the result acknowledging GE's position in this case. ....not a situation where,literally, the last band-aid is paid by GE directly from the accounts receivable. That simply wasn't the way it all  operated, and, frankly, it seems to me, very, very, clear under all of the documents, that Mr. Hamroff is absolutely correct.So, all I'm going to do today, is for all of the reasons and arguments stated on the record, indicate that his motion is granted under either theory under 12 or 9.Certainly, there's not specificity there that would back up any of the fraud or other allegations, but, more importantly, there's simply no basis for the underlying adversary proceeding, in this Court's mind." Tr 51-52

The bankruptcy court's ruling was also improper, since it was based on its displeasure with the timing or delay in filing the Adversary Proceeding ("The most troubling thing in all of this really is…the timing" )(DE 24, Tr. p. 40 [9-11]), as opposed to its merits.

On February 23, 2011, the Court signed the Dismissal Order dismissing the adversary proceeding. DE 26.

## ARGUMENT

## POINT I

**THE BANKRUPTCY COURT MISREAD THE SRO AND IGNORED SIMILAR STATUTORY LAW BY ALLOWING GECC TO DIVERT THE SUBSTITUTE RECEIVER'S FUNDS AND RECEIVABLES TO PAY ITSELF, PRIOR TO THE PAYMENT OF ALL RECEIVERSHIP EXPENSES**

**A.    The SRO Precluded GECC From Taking The Substitute Receiver's Funds And Receivables Prior To Payment Of All Receivership Expenses**

It is well-settled that a receiver is an agent of the Court with only the powers given to it by the order appointing the receiver.  *Copeland v. Saloman,* 56 N.Y.2d 222, 451 N.Y.S.2d 682 (1982) ("A receiver…acts as the hand of the court"); *Constellation Bank, N.A. v. Binghamton Plaza, Inc.,* 236 A.D.2d 698, 653 N.Y.S.2d 208 (3d Dep't 1997) ("A receiver acts as the hand of the court with only those powers provided in the appointment order and may perform only those acts expressly authorized therein"); *Security Pacific Mortgage and Real Estate Services, Inc. v. The Republic of the Philippines,* 962 F.2d 204 (2d Cir. 1992)(*citing Daro Indus. v. RAS Enters.,* 44 N.Y.2d 969, 408 N.Y.S.2d 329 [1978])) ("[a]s a court-created entity, a receiver has only those powers provided for in the appointment order and may perform only those acts expressly authorized by the appointing court").

It is equally well-settled that a receiver is an officer of the court and does not work for the mortgagee.  *Ripple's of Clearview, Inc. v. Le Havre Associates,* 88 A.D.2d 120, 452 N.Y.S.2d 447 (2d Dep't 1982) ("[c]ase law clearly provides that a receiver is an officer of the court and cannot be considered the agent of the owner or mortgagee [citations omitted]"); *Kaplan v. 2108-*

*2116 Walton Ave. Realty Co.,* 74 A.D.2d 786, 425 N.Y.S.2d 817 (1st Dep't 1980) ([a] Receiver

is an officer of the court and not an agent of the mortgagee or the owner... [citations omitted]").

      Thus, the Substitute Receiver is bound and governed by the terms of the SRO which

appointed it. Moreover, the bankruptcy court, after lengthy oral argument, repeatedly

acknowledged that the SRO required the payment of, at the very least, certain receivership

expenses prior to any payment to GECC (DE 24, Tran. pp. 16, 19-20 & 27). The bankruptcy

court, however, decided to read the Substitute Receiver Order more restrictively than Appellants,

and ruled that the expenses preserving the Properties -- as opposed to preserving the patients --

were the only things that primed the payments to GECC.

      The bankruptcy court erred, however, since GECC retained money it had in its own

custody before it ever reached the hands of the Substitute Receiver. Moreover, the SRO provided

the Substitute Receiver with the sole authority to collect the Debtors' account receivables (the

Lockbox income) and maintain its bank accounts. Conversely, the Substitute Receiver Order

does not allow GECC to maintain or collect any of the Debtors' funds. In fact, GECC was

merely entitled to interest under the LSA, but only from funds in the Substitute Receiver's

custody and only after EF <u>paid</u> all of its operating expenses, which never occurred since the

Receivers' outstanding accounts payable for post-petition expenses was over $10 million. Thus,

the bankruptcy court should be reversed on this ground alone.


**B.**     **New York Statutory Law Precluded GECC From Taking The Substitute**
        <u>**Receiver's Funds And Receivables Prior To Payment Of All Receivership Expenses**</u>

      Aside from violating the SRO, GECC's diversion of the Lockbox funds also violates

New York statutory law governing Receivers. As set forth below, the applicable statutory law,

like the SRO, requires a receiver, as a Court officer, to apply the funds it collects to caring for patient needs and the property's expenses *before* paying fees, or interest to the secured lender.

The Initial Receiver and Substitute Receiver were both agents of the Court bound by New York's statutory law. Under the Initial Receiver and Substitute Receiver Orders, the Receivers are bound by the laws governing them, as found in New York's RPAPL. Even without the SRO, EF, as a receiver in a mortgage foreclosure action, is bound by the RPAPL.

RPAPL § 1325(2) essentially prevents a Receiver from paying accrued interest to a secured creditor, until all the operating expenses are paid ("due provision shall have been made for the payment of taxes, administration expenses, fees and charges"); *see also NWL Properties, Inc. v. 401 East 89th Street Owners, Inc.,* 1995 U.S. Dist. LEXIS 4722 (S.D.N.Y., April 12, 1995).  A receiver can only pay accrued interest to the mortgagee: (a) pursuant to an explicit court order; and (b) *after* all the expenses are paid.  *East New York Savings Bank v. 520 West 50th Street, Inc.,* 160 Misc. 2d 789, 611 N.Y.S.2d 459 (Sup. Ct., N.Y. Co., 1994).  All other distributions of receiver assets are made at the conclusion of the receivership.  RPAPL § 1371; *CFSC Capital Corp. XXVII v. W.J. Bachman Mechanical Sheet Metal Co., Inc.,* 177 Misc. 2d 652, 676 N.Y.S.2d 832 (Sup. Ct., Nassau Co., 1998).

Thus, RPAPL 1325 limits the court's authority to pay the secured creditor from the receiver's funds: *only after* the payment of the Facilities' expenses can the court order the payment of accrued interest, and even then, no payments other then accrued interest.

Moreover, since the Debtors' owned and operated skilled nursing facilities, the New York Public Health Law also applies.  *Schwartzberg v. Whalen,* 96 A.D.2d 974, 466 N.Y.S.2d 846 (3d Dep't 1983).  The Public Health Law further limits the Receiver's ability to apply its funds to anything other than the maintenance of its health facilities. The Public Health Law

17

requires the receiver to protect and guarantee the safety and health care of the patients and

property. *See* Pub. Health Law § 2810(2)(c) (Receiver "shall … operate the facility in such a

manner as to guarantee safety and adequate health care"); *Fourth Federal Savings Bank v. 32-22

Owners Corp.,* 236 A.D.2d 300, 653 N.Y.S.2d 588 (1st Dep't 1997) (receiver has a legal duty to

maintain the property); *Bradford Financial Corp. v. Clark West Realty Corp.,* 43 Misc. 2d 927,

252 N.Y.S.2d 580 (Sup. Ct., N.Y. Co., 1964) (receiver is appointed solely to protect property

from waste).

Moreover,  a receiver is an officer of the Court and is not appointed to benefit the

mortgagee/debtor.  *Bergman on New York Mortgage Foreclosures § 10.16* ("A receiver is an

officer of the court, not an agent of the mortgagee or the owner"); *Security Pacific Mortgage &

Real Estate Servs. v. Republic of the Philippines, 962 F.2d 204 (2d Cir. 1992)* (as a court-created

entity, a receiver enjoys only the powers the appointment order provided for, and may perform

only those acts the appointing court expressly authorizes).

Furthermore, the receivership's necessary expenses include the receiver's commissions

and obligations incurred in the discharge of its duties, which constitute a first charge or lien

against the receivership property and funds. *Corn Exchange Bank Trust Co. v. Bankers Trust

Co., 268 N.Y. 224, 197 N.E. 259 (1935); Angell v. Landefeld, 32 Misc. 2d 1070, 223 N.Y.S.2d

850 (Sup 1961),* judgment aff'd, *16 A.D.2d 951, 230 N.Y.S.2d 676* (2d Dep't 1962);  *In re Atlas

Iron Const. Co., 19 A.D. 415, 46 N.Y.S. 467* (1st Dep't 1897); *Rosenzweig v. Zirkatz Realty

Corp., 145 Misc. 653, 260 N.Y.S. 118 (Sup 1932).*  In other words, the ***first thing a receiver must

do*** is pay its necessary expenses.

Also, receiver expenditures may be authorized for preserving or caring for the property

which will have priority over preexisting liens of mortgagees.  *Farmers' Loan & Trust Co. v.

18

*Bankers' & Merchants' Tel. Co.,* 148 N.Y. 315, 42 N.E. 707 (1896). It is the primary duty of a receiver to preserve and protect the property in his or her possession for the benefit of all the parties interested in the estate of which he or she is appointed receiver. *Jacynicz v. 73 Seaman Associates,* 270 A.D.2d 83, 704 N.Y.S.2d 68 (1st Dep't 2000); *Bank of Tokyo Trust Co. v. Urban Food Malls Ltd.,* 229 A.D.2d 14, 650 N.Y.S.2d 654 (1st Dep't 1996); *See also, Farmers' Loan & Trust Co. v. Bankers' & Merchants' Tel. Co., 148 N.Y. 315, 42 N.E. 707 (1896)* (Costs and expenses of a receivership are to be paid, as a general rule, out of income first, and when income is inadequate, out of the corpus); *D'Guardia v Piffath* 180 A.D.2d 630, 579 N.Y.S.2d 447 (2d Dep't 1992) .

Moreover, the bankruptcy court, after lengthy oral argument, repeatedly acknowledged that certain receivership expenses must be paid prior to any payment to GECC (DE 24, Tran. pp. 16, 19-20 & 27). The bankruptcy court ignored, however, the applicable statutory law governing receivers under both the N.Y. RPAPL and Public Health Law which requires payment of all receivership expenses prior to any interest payments to GECC, the secured creditor.[2]

---

[2]    GECC argues that the Substitute Receiver somehow assumed all of the Debtors' Loan Agreement. It is well settled, however, that a receiver ***does not*** assume the debtor's agreements:

> "As an overriding general rule, a receiver is not bound to adopt the contracts or otherwise step into the shoes of the owner if the receiver believes it would be unprofitable or undesirable to follow such a path … So it has been held that pursuant to New York law, a receiver is not bound by contracts of the entity over which his stewardship has been ordered. A receiver is not privy to prior contracts made by the property owner and when the receiver has neither signed nor ratified such agreements, they cannot be enforceable against him -a conclusion inherent in the very nature of a receivership. Indeed, a receiver must be granted freedom of action to perform acts most beneficial to the estate and so it would be inconsistent to compel specific performance for obligations predating the receivership, a particularly apt maxim where a

Thus, by diverting the Substitute Receiver's funds and receivables prior to the payment of all receivership expense, GECC violated both the SRO and New York statutory law governing receivers, which sets forth a claim for, at the very least, conversion (see also, Point IV) or for a declaratory determination that GECC violated the foregoing SRO and Statutes.

## POINT II

### THE BANKRUPTCY COURT IGNORED SUPREME COURT PRECEDENT PRECLUDING GECC FROM TAKING INTEREST AND FEES FROM THE DEBTORS, SINCE ITS DEBT WAS UNDER SECURED

As shown, GECC's liability stems from its diversion of the Substitute Receiver's funds and receivables to pay itself interest and fees prior to payment of all receivership expenses.

Under well established Bankruptcy law, as enunciated by the Supreme Court of the United States, an unsecured or under secured creditor is not entitled to post-petition interest and fees on a pre-petition claim. *United Sav. v. Timbers of Inwood Forest*, 484 U.S. 365 (1988); *see also International Asset Recovery Corp. v. Thomson McKinnon Secs., Inc.,* 335 B.R. 520 (S.D.N.Y. 2005) ("The general rule regarding post-petition interest is clear: unsecured or under-secured creditors are not entitled to post-petition interest on a pre-petition claim").

Here, the value of GECC's collateral (e.g., the Facilities and Properties) was worth far less than its outstanding debt. Thus, the bankruptcy court wrongly ignored that GECC was an

---

receiver functions as receiver of the property of fee owners rather than of an operating corporation ... "

*Bergman on New York Mortgage Foreclosures § 10.16*

under secured creditor and was precluded from taking any post-petition interest and fees from the Debtors.

<div align="center">

**POINT III**

***NEITHER THE LOCKBOX, CCO OR FINAL SALE ORDER PERMITTED GECC TO TAKE THE SUBSTITUTE RECEIVER'S FUNDS AND RECEIVABLES PRIOR TO PAYMENT OF ALL RECEIVERSHIP EXPENSES***

</div>

**A.      The Lockbox Agreement**

GECC primarily argued that it was justified in taking the Substitute Receiver's funds under the Lockbox Agreement, which the bankruptcy court agreed with. The Bankruptcy court erred, however, based on both a plain reading of the Lockbox Agreement and the basic purpose behind such agreements.

Preliminarily, the Lockbox Agreement does not permit GECC to utilize any of the Facilities' income to pay principal, interest or fees.  DE 1, ¶ 33, DE 5, Ex. 3. Rather, the Lockbox Agreement, like most lock boxes, was simply a *mechanism* for GE to ensure that all accounts receivable were properly collected. DE 1, ¶ 30.  Thus, the Lockbox Agreement merely provides that all accounts receivable collected by the lockbox are to be placed in a "Concentration Account" designated by GE.  (DE 1,   Complaint ¶ 31; DE 5, Ex. 3. Conversely, the Lockbox Agreement does not provide for the distribution of the funds collected in the Lockbox, much less to GECC. Therefore, the Lockbox Agreement merely enabled GECC to track the cash flow and not to pay itself more money at the expense of sick patients.

 In apparent recognition of this, GECC asserted that the Lockbox's only reasonable purpose was to allow it to use the money to fund the Line of Credit and pay itself fees and

<div align="center">21</div>

interest. As shown, GECC's assertion is not supported by the plain language of the Lockbox

Agreement. Moreover, GECC ignores that the purpose of a lockbox is a cash management

system to ensure that a company's receivables are processed quickly and accurately. As one

business columnist wrote: "[A lockbox's] primary advantage is the lockbox's direct impact on a

business's cash flow. Checks are received faster, bypassing the business's internal mail sorting

and delivery time. Once the checks are received in the special P.O. Box, they are processed faster

— often checks are delivered to the bank several times a day."

*http://www.sbnonline.com/2007/11/checks-and*-balances-use-lockbox-processing-to-better-

handle-check-flow/; *see also* National Check Fraud Center "Lockbox Banking Pro & Con,"

accessed at http://www.ckfraud.org/lockbox.html("Using lockbox banking is a cash flow

improvement technique in which you have your customers' payments delivered to a special post

office box instead of your business address").

Thus, under both the simple terms of the Lockbox Agreement and commercially

standardized practices, the Lockbox was simply a mechanism for keeping track of the money and

not a device to pay fees, interest and principal to GECC.


**B.     The CCO**

GECC also argued that it was justified in taking the Substitute Receiver's funds under the

CCO. This is incorrect, since the CCO does not allow GECC to pay itself. This is further

evidenced by the CCO's purpose during the tenure of the Substitute Receiver, as set forth below.

By way of background, prior to the Substitute Receiver's appointment, the Facilities were

in their death knells without any funds or any way to pay their debts.  Moreover, GECC was

owed over $20 million and had no ability to collect these funds if the nursing homes went "out of

business."  Thus, while the Trustee sought a white knight to buy the Facilities and pay some of

the debt, GECC appointed its own Initial Receiver and obligated itself, through the Initial

Receiver Order (DE  5, Ex. 4), and Shortfall Agreement, dated November 27, 2006 (DE 5, Ex.

5), to pay any shortfall of *its own Initial Receiver.*  Because GECC was then, in effect, still

lending money to the Facilities, it was permitted to operate its Line of Credit.

     **None of this is relevant to the Substitute Receiver,** *however, s*ince GECC was not

responsible for EF's shortfall. Thus, GECC's only permissible reason to lend money to the

Debtors (to pay for the shortfall) was inapplicable to EF's substitute receivership.

     Moreover, the CCO does not contain any provision that permitted GECC to take the

funds from the Lockbox after the Substitute Receiver was appointed.  In fact, under the CCO, the

Substitute Receiver's funds were to be utilized pursuant to regular budgets submitted through the

Modification Orders. Notably, GECC did not cite to any of these Modification Orders, because

none of the attached budgets provided for payments of interest, fees or principal to GECC.

**C.**    **The Final Sale Order**

     The Final Sale Order provided, inter alia, that Oasis, the purchaser, took all assets free

and clear of all liens and encumbrances, and that there is no successor liability. Thus, the Final

Sale Order does not allow for the unrestrained payments of interest, fees or principal to GECC.

**POINT IV**

***EVEN UNDER THE BANKRUPTCY COURT'S***
***ERRONEOUS INTERPRETATION OF THE ORDERS,***
***GECC STILL DIVERTED THE SUBSTITUTE RECEIVER'S FUNDS***

     GECC does not dispute that: (a) it took approximately $610,000 for the Medicaid

reimbursement funds; and (b) *never applied it towards any interest or fee.*  Thus, even under the

bankruptcy court's erroneous interpretation of the various Orders, GECC still converted the Substitute Receiver's funds.

It is well-settled that conversion is the "'unauthorized dominion over personal property in interference with a plaintiff's legal title or superior right of possession.'" *Lopresti v. Terwilliger,* 126 F.3d 34, 41 (2d Cir. 1997) (internal citations omitted); *Vigilant Ins. Co. of America v. Housing Auth. City of El Paso, Texas,* 87 N.Y.2d 36, 44 (1995);  accord, *Moses v. Martin*, 360 F.Supp.2d 533, 541 (S.D.N.Y. 2004).

Here, Appellants established that: "(1) the property subject to conversion is 'a specific identifiable thing'; (2) [EF] had 'ownership, possession or control' over the property before its conversion; and (3) defendant [GECC]'exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of … [EF's] rights.'" *Moses,* supra, 360 F. Supp. 2d at 541.  Even more simply put: the money is a specifically identifiable fund; Appellants had a right to possess those funds; and GECC exercised unauthorized dominion over the money to the exclusion of Appellants' rights.

Thus, Appellants set forth a claim for, at the very least, conversion. Therefore, the bankruptcy court's dismissal of the entire Adversary Proceeding was inappropriate, and should be reversed.

## POINT V

## THE BANKRUPTCY COURT IMPROPERLY DISMISSED THE ADVERSARY PROCEEDING BY MAKING A FACTUAL DETERMINATION REGARDING THE TIMING OF THE COMPLAINT

The bankruptcy court primarily dismissed the Adversary Proceeding based on its displeasure with the timing or delay in filing of the Adversary Complaint ("The most troubling thing in all of this really is … the timing" ) (DE 24, Tr. p. 40 [9-11]), as opposed to its merits.

24

Even if Appellants' delay in filing could somehow shield GECC's wrongful acts, such a defense would be based on facts not properly before the bankruptcy court on a motion to dismiss.

Indeed, the bankruptcy court's reasoning most resembles a defense based on laches. To establish laches, however, a defendant must show four elements: "(1) conduct by an offending party giving rise to the situation complained of, (2) delay by the complainant in asserting his or her claim for relief despite the opportunity to do so, (3) lack of knowledge or notice on the part of  the offending party that the complainant would assert his or her claim for relief, and (4) injury or prejudice to the offending party in the event that relief is accorded the complainant." *Cohen v. Krantz*, 227 A.D.2d 581, 643 N.Y.S.2d 612, 614 (2d Dep't 1996).

Here, GECC has failed to satisfy these elements. First, GECC did not even move based on the grounds of laches. Second, GECC cannot demonstrate that it lacked knowledge or notice. Third, GECC cannot establish injury as a result.

To show prejudice, a party must have either changed its position in reliance on the adversary's delay, or because "the delay makes it difficult to garner evidence to vindicate his or her rights." *Robins Island Preservation Fund, Inc., v. Southhold Development Corp.*, 959 F.2d 409, 424 (2d. Cir. 1992). Here, GECC does not argue that it suffered evidentiary prejudice. Rather, it merely claims economic injury due to the alleged delay. However, laches requires a party to show not only financial inconvenience by the claims asserted, but that it detrimentally changed its position in reliance on the opposing party's delay. *Love v. Spector*, 215 A.D.2d 733, 627 N.Y.S.2d 87, 88 (2d Dep't 1995) (laches did not apply where defendants failed to demonstrate reliance and change of position resulting from delay); *Airco Alloys Div., Airco Inc. v. Niagara Mohawk Power Corp.*, 76 A.D.2d 68, 430 N.Y.S.2d 179, 187 (4th Dep't 1980) ("In

order to show that he has been prejudiced, a defendant must show reliance and change of position resulting from the delay.").

    Moreover, since laches is an equitable defense it can not be asserted by an adversary, like GECC, that has acted improperly. *Aris-Isotoner Gloves, Inc. v. Berkshire Fashions, Inc.*, 792 F. Supp. 969, 973 (S.D.N.Y. 1992) (Defendant with unclean hands prohibited from asserting a defense of laches); *Bein v. Heath*, 47 U.S. 228, 247, 12 L. Ed. 416 (1848)  ("the equitable powers of this court can never be exerted in behalf of one who has acted fraudulently, or who by deceit or any unfair means has gained an advantage. To aid a party in such a case would make this court the abettor of iniquity").

    Thus, since GECC failed to raise any laches defense which is in any event inapplicable, the bankruptcy court erred in dismissing the Adversary Proceeding due to any timing issues.

## POINT VI

### *THE SUBSTITUTE REECEIVER DID NOT, AND COULD NOT, WAIVE ITS CLAIMS*

    GECC asserted before the bankruptcy court that the Substitute Receiver essentially waived its claims by signing a purported release contained on certain "borrowing certificates". GECC's assertion was incorrect for several reasons.  First, the Substitute Receiver never authorized nor signed a release. Rather, the form requesting the return of the Lockbox income was apparently signed by, at best, a mere bookkeeper at the Facilities who lacked authority. Second, the borrowing certificates omit the $610,218.18 in Medicaid reimbursement funds diverted by GECC. DE 5, Ex. 12. Third, the majority of the millions of dollars in principal, fees and interest kept by GECC were omitted from the numerous budgets and cash collateral orders that were submitted to the Bankruptcy Court.

Moreover, a Receiver (like EF) does *not* have the ability to waive claims. *See Mumford v. Crouch*, 8 A.D. 529, 538 (4th Dep't 1896) ("A receiver is clothed with no powers to waive the equitable rights of the judgment creditors, for the protection of whom he was appointed ..."). Thus, any "release" executed by the Substitute Receiver is a nullity.

Even if a Receiver had the ability to waive claims, any alleged "releases" herein were secured by fraud and therefore invalid.  *Meisel v. Grunberg*, 651 F. Supp. 2d 98, 122, Ft. 13 (S.D.N.Y. 2009) ("Defendant's arguments regarding the release plaintiff executed in connection with the Buy-Out Agreement … is similarly unavailing because a release procured by fraud may be voided 'even when it results from prolonged negotiations by represented parties'")*; Parnes v. Mast Property Investors, Inc*., 776 F. Supp. 792, 795 (S.D.N.Y. 1991).

## <u>CONCLUSION</u>

For the foregoing reasons, Appellants respectfully request that this Court (i) reverse the Dismissal Order; and (ii) grant such other and further relief as is just and proper.

<div style="margin-left:50%">

Backenroth Frankel & Krinsky LLP
*Attorney for Appellants* By:
<u>    /s/ Abraham Backenroth    </u>
Abraham Backenroth (516730)
489 Fifth Avenue, 28th Floor
 New York, New York 10017
(212) 593-1100

</div>

27

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

In re:                                          Chapter 11

HIGHGATE LTC MANAGEMENT, LLC,                   Case No: 07-11068 (REL)

                              Debtor,
------------------------------------------------------------x
EF CONSULTING LLC and OASIS HC LLC,             Adversary Pro. No. 10-90175     (REL)

                              Plaintiffs,

                    v.

GENERAL ELECTRIC CAPITAL
CORPORATION,

                              Defendant,
------------------------------------------------------------x

EF CONSULTING LLC and OASIS HC LLC,             Case No. 11-cv-00325 (DNH)

                              Appellant,

                    v.

GENERAL ELECTRIC CAPITAL
CORPORATION,

                              Appellee,
------------------------------------------------------------x


**BRIEF OF APPELLANTS EF CONSULTING LLC AND OASIS HC LLC**


Backenroth Frankel & Krinsky LLP
489 Fifth Avenue 28th Floor
New York, NY 10017
(212) 593-1100
(212) 644-0544 (fax)
Attorneys for Appellants