UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

EF CONSULTING LLC AND
OASIS HC LLC,

          Plaintiffs-Appellants,                          1: 11-CV-0325 (DNH)

          v.

GENERAL ELECTRIC CAPITAL
CORPORATION,

          Defendant - Appellee.
-------------------------------------------------------------x

## BRIEF OF APPELLEE
## <u>GENERAL ELECTRIC CAPITAL CORPORATION</u>

MORITT HOCK & HAMROFF LLP
400 Garden City Plaza
Garden City, NY  11530
(516) 873-2000
Marc L. Hamroff
William P. Laino
Theresa A. Driscoll

*Attorneys for Appellee General Electric
Capital Corporation*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

STANDARD OF REVIEW .................................................................................... 3

STATEMENT OF FACTS AND OF THE CASE ................................................. 4

    A.   THE GECC LOANS.................................................................................... 5

    B.   OPERATION OF THE REVOLVER ............................................................. 6

    C.   FORECLOSURE ACTION AND APPOINTMENT OF RECEIVER .................. 8

    D.   CHAPTER 11 FILINGS ............................................................................. 10

    E.   CASH COLLATERAL ORDER ................................................................... 10

    F.   THE PURCHASE AGREEMENT AND SALE ORDER ................................. 11

    G.   APPOINTMENT OF SUBSTITUTE RECEIVER ......................................... 13

    H.   EFFECT OF LOAN DOCUMENTS DURING SUBSTITUTE RECEIVERSHIP PERIOD ................... 13

    I.   PLAINTIFFS-APPELLANTS' BORROWING REQUESTS DURING SUBSTITUTE RECEIVER PERIOD................... 15

    J.   THE MEDICAID RETROACTIVE ADJUSTMENT ................................... 16

    K.   PLAINTIFF-APPELLANT EF'S MOTION IN STATE COURT FOR THE RETURN OF THE RATE ADJUSTMENT REFUND................... 17

    L.   THE CLOSING AND DISTRIBUTION ORDER ....................................... 18

    M.   THE COMPLAINT ................................................................................. 19

    N.   THE DISMISSAL ORDER......................................................................... 20

    O.   THE APPEAL ......................................................................................... 21

ARGUMENT ........................................................................................................ 21

POINT I

THE PLAINTIFFS-APPELLANTS' POSITION THAT GECC WAS NOT PERMITTED TO
USE COLLECTED ACCOUNTS TO PAY AMOUNTS DUE UNDER THE REVOLVER
MAKES NO SENSE.............................................................................................. 21

POINT II

THE BANKRUPTCY COURT PROPERLY INTERPRETED ITS OWN ORDERS, THE
STATE COURT ORDER WHICH INCORPORATED THE BANKRUPTCY COURT'S
ORDERS AND THE GOVERNING AGREEMENTS WHICH THE BANKRUPTCY COURT
HAD APPROVED.................................................................................................. 25

POINT III

NONE OF THE ARGUMENTS IN PLAINTIFFS-APPELLANTS'
BRIEF HAVE ANY MERIT ...................................................................................... 28

A.   THE SRO DOES NOT SUPPORT PLAINTIFFS-APPELLANTS' ARGUMENT ............................ 28

B.   PLAINTIFFS-APPELLANTS' RELIANCE UPON STATE LAW IS MISPLACED ........................... 32

C.   GECC COULD NOT CONVERT PROPERTY TO WHICH PLAINTIFFS-APPELLANTS
     HAD NO INTEREST ...................................................................................... 34

D.   PLAINTIFFS-APPELLANTS' RELIANCE ON *TIMBERS* IS MISPLACED ...................................... 34

E.   THE COMPLAINT FAILS TO STATE A CLAIM FOR FRAUD (COUNT I) .................................... 35

F.   THE COMPLAINT FAILS TO STATE CLAIMS FOR BREACH OF FIDUCIARY DUTY,
     NEGLIGENT MISREPRESENTATION, AND PUNITIVE DAMAGES (COUNTS II AND III) ........... 40

    1.  *The Fiduciary Duty Claim (Count III)*............................................................. 40

    2.  *Negligent Misrepresentation Claim (Count II)*............................................... 41

    3.  *Punitive Damages Claim (Count III)*.............................................................. 42

G.   THE COMPLAINT FAILS TO STATE A CLAIM FOR NEGLIGENCE (COUNT IV) ....................... 43

H.   THE COMPLAINT FAILS TO STATE A CLAIM FOR CONVERSION (COUNT V) ........................ 44

I.   PLAINTIFFS-APPELLANTS LACK STANDING TO ASSERT A CLAIM FOR TURNOVER UNDER 11 U.S.C. 542 (COUNT VII) AND CLAIMS FOR VIOLATION OF THE AUTOMATIC STAY (COUNTS I, II, III, IV, AND VII) ........................................................................................ 45

J.   THE CLAIM FOR DECLARATORY RELIEF WAS PROPERLY DISMISSED (COUNT VI) ............. 46

POINT IV

IN DISMISSING THE COMPLAINT, THE COURT BELOW DID NOT MAKE A FACTUAL DETERMINATION THAT PLAINTIFFS-APPELLANTS WERE GUILTY OF LACHES ..... 47

POINT V

THE DISMISSAL ORDER SHOULD BE AFFIRMED............................................................. 48

POINT VI

COSTS SHOULD BE IMPOSED UNDER 28 U.S.C. § 1927 AND F.R.C.P. 11 ....................... 49

CONCLUSION................................................................................................................. 50

# **TABLE OF AUTHORITIES**

## Cases

*Advanced Marine Technologies, Inc. v. Burnham Sec. Inc.*,
    16 F. Supp.2d 375, 384 (S.D.N.Y. 1998).................................................................. 43

*Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009) ........................................................... 2

*Aslanidis v. United States Lines, Inc. et al.*, 7 F.3d 1067, 1077 (2d. Cir. 1993)........................... 32

*Bank Leumi Trust Company of New York v. Block 3102 Corporation*,
    580 N.Y.S.2d 299, 301 (1st Dep't 1992)................................................................ 43

*Banque Arabe et Internationale D'Investissement v. Maryland National Bank*,
    57 F.3d 146, 153 (2d Cir. 1995 ........................................................................ 37

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 568 (2007) ....................................... 2, 49

*Colonial Auto Ctr. v. Tomlin (In re Tomlin)*, 105 F.3d 933, 941 (4th Cir. 1997)........................ 26

*Cramer v. Devon Group Inc.*, 774 F. Supp. 176, 184 (S.D.N.Y. 1991) ....................................... 40

*DDJ Capital Mont., LLC v. Rhone Group LLC*,
    19 Misc. 3d 1124A, * 12 (N.Y. Sup. Ct. 2008) ...................................................... 41

*Egan v. Marsh & McClennan Companies, Inc.*,
    2008 U.S. Dist. LEXIS 6647, *12 (S.D.N.Y. 2008)................................................ 3

*Enron Power Marketing, Inc. v. Nevada Power Co.*,
    2004 U.S. Dist. LEXIS 25999, *7 2004 WL 2290486, *1 (S.D.N.Y. 2004)............................ 3

*Eurycleia Partners, L.P. v. Seward & Kissel, LLP*,
    849 N.Y.S.2d 510, 512 (1st Dept. 2007) ............................................................ 41

*Global View Ltd. Venture Capital v. Great Central Basin Exploration, L.L.C.*,
    288 F. Supp 2d 473, 479 (S.D.N.Y. 2003)........................................................... 45

*Harbinger Capital Partners Master Fund I, Ltd. v.*
    *Wachovia Capital Markets, LLC*, 910 N.Y.S.2d 762 (Sup. Ct. N.Y. 2010)............................ 37

*Harvis Trien & Beck, P.C. v. Federal Home Loan Mortg. Corp.*
    *(In re Blackwood Assocs. L.P.)* 153 F.3d 61, 65-66 (2d Cir. 1998)................................ 26

*In re Cohoes Indus, Terminal, Inc.*, 931 F.2d 222, 230 (2d Cir. 1991) ................................... 49

*In re Commodore International Limited et al.*, 262 F.3d 96 (2d Cir. 2001) ................................ 46

*In re Defender Drug Stores, Inc.*, 145 B.R. 312 (B.A.P. 9th Cir. 1992) ...................................... 35

*In re Florida West Gateway, Inc.*, 147 B.R. 817, 819 (Bankr. S.D. Fla. 1992) ........................... 35

*In re Housecraft Industries USA, Inc.*, 310 F.3d 64 (2d Cir. 2002) .............................................. 46

*In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 988-89 (2d Cir. 1990) ........................................... 3

*In re Johns-Manville Corp.*, 340 B.R. 49, 59 (S.D.N.Y. 2006) .................................................... 26

*In re Mid-Island Hosp., Inc.*, 276 F.3d 123, 130 (2d Cir. 2002) .................................................. 40

*In re Quaker Distribs., Inc.* 189 B.R. 63, 67 (Bankr. E.D. Pa. 1995) ........................................... 46

*In re STN Enterprises*, 779 F.2d 901 (2d Cir. 1985) ..................................................................... 46

*Kaye v. Grossman*, 202 F.3d 611, 614 (2d Cir. 2000) ................................................................. 38

*Kimmel v. Schaefer,* 89 N.Y.2d 257, 263 (1996) ........................................................................ 41

*Korea First Bank of NY v. Noah Enters.*, 787 N.Y.S.2d 2, 4 (1st Dept. 2004) ........................... 41

*Kurtzman v. Bergstol*, 835 N.Y.S.2d 644, 646 (2d Dept. 2007) ................................................ 40

*Lopresti v. Terwilliger*, 126 F.3d 34, 41 (2d Cir. 1997) .............................................................. 44

*Manufacturers Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 318 (2d Cir. 1993) ......................... 40

*Matusovsky v. Merrill Lynch*, 186 F. Supp. 2d 397, 400 (S.D.N.Y. 2002) ................................... 3

*Merino v. New York City Transit Auth.*,  639 N.Y.S.2d 784, 787
   (1st Dep't 1996), *aff'd*, 89 N.Y.2d 824 (1996) ........................................................................ 43

*Morgenthan v. Erlbaum*, 59 N.Y.2d 143, 150 (1983) ................................................................ 47

*Moses v. Martin*, 360 F.Supp.2d 533, 541 (S.D.N.Y. 2004) ....................................................... 44

*Nails v. S&R Inc.*, 639 A.2d 660, 668 (Md. 1994) ..................................................................... 37

*Nathan W. Drage P.C. v. First Concord Sec. Ltd.*,
   707 N.Y.S.2d 782, 787 (N.Y. Sup. Ct. 2000) .......................................................................... 43

*Pan Am. Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 511 (S.D.N.Y. 1994) .............................. 40

*Regions Bank v. Wieder & Mastroianni*, 526 F.Supp.2d 411, 415 (S.D.N.Y. 2007) ............ 34, 45

*Rocanova v. Equitable Life Assurance Soc'y of the United States*,
   83 N.Y.2d 603, 613 (1994) ......................................................................................... 42

*Singleton v. Wulff*, 428 U.S. 106, 120 (1976) ............................................................. 32

*Smith v. Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002) ................... 2

*Truskoski v. ESPN, Inc.*, 60 F.3d 74, 77 (2d Cir. 1995).......................................... 4, 26

*United Savings Assn. of Texas v. Timbers*, 484 U.S. 365 (1988) ................................ 35

**Statutes**

11 U.S.C. § 1104................................................................................................... 10

11 U.S.C. § 542(a) ................................................................................................ 45

28 U.S.C. § 1927 .................................................................................................. 49

Fed. R. Bankr. P. 7009 ............................................................................................ 4

Fed. R. Bankr. P. 7012 ............................................................................................ 4

Fed. R. Civ. P. 12(b)(6)........................................................................................... 4

Fed. R. Civ. P. 9(b) ................................................................................................. 4

**Other Authorities**

5 COLLIER ON BANKRUPTCY ¶ 542.01 ...................................................................... 46

New York Public Health Law § 2810................................................................... 32, 33

New York Real Property Actions and Proceedings Law § 1325.................. 17, 32, 33

New York Public Health Law § 2810(2) .................................................................. 17

## PRELIMINARY STATEMENT

This is an appeal from a decision and order of the United States Bankruptcy Court for the Northern District of New York (Littlefield, J.), which dismissed the Complaint of Plaintiffs-Appellants Oasis HC LLC ("Oasis") and EF Consulting LLC ("EF") pursuant to Bankruptcy Rule 7012(b)(6) based on documentary evidence that unequivocally shows that no claims exist.  In their Complaint below, Plaintiffs-Appellants claim ownership of all accounts collected by Defendant-Appellee General Electric Capital Corporation ("GECC") during the Substitute Receivership Period (defined below).  Reduced to its essence, the Complaint below and this appeal are simply an attempt by a sophisticated purchaser to reduce *post-closing* the purchase price for assets it had agreed to buy by claiming rights to millions of dollars of collected accounts receivable that it never acquired or contracted to acquire.  The assets purchased by Oasis and the right of Plaintiff-Appellant Oasis or its Designee, EF, are set forth in the Purchase Agreement between Plaintiff-Appellant Oasis and the Trustee, which was approved by the Final Sale Order of the Bankruptcy Court.  The rights and obligations of the purchaser, the seller and the seller's senior secured lender are also set forth in a series of orders entered in the Bankruptcy Court and incorporated in an additional order entered by Justice Christian F. Hummel of the Supreme Court, Rensselaer County.  These rights included purchaser's affiliate EF's right (a) to use accounts receivable of the Debtor pre-closing *subject to* the terms of both Courts' Orders and Defendant-Appellee GECC revolving credit loan documents, and (b) to acquire whatever receivables were left with the Debtor at Closing.

In their Complaint, Plaintiff-Appellant Oasis and Plaintiff-Appellant EF seek to avoid the clear mandate of the Purchase Agreement and Bankruptcy and State Court Orders to which they were subject by making reckless and conclusory allegations against GECC that

GECC defrauded Oasis and EF concerning the operation of a revolving credit facility which was expressly provided for by the very Purchase Agreement Plaintiff-Appellant Oasis signed and by those same Bankruptcy and State Court Orders.  A complaint, however, must contain allegations that render claims not just conceivable in the infinite realm of possibility, but plausible.  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 568 (2007).  A complaint containing naked conclusory allegations is insufficient.  *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009).  "[L]egal conclusions masquerading as factual conclusions" will not be accepted as true.  *Smith v. Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal,* 129 S. Ct. at 1949.  Where plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed."  *Twombly*, 550 U.S. at 570.

        In dismissing Plaintiffs-Appellants' complaint from the bench, the Bankruptcy Court interpreted and enforced its own orders -- orders which were the bedrock of the bankruptcy case -- and held that in utilizing the accounts collected and making credit available to Plaintiffs-Appellants based on clear and unambiguous terms of the Revolver (defined below), GECC had acted properly and in compliance with the Bankruptcy Court's orders.  Nevertheless, in an attempt to breathe life into their moribund complaint, Plaintiffs-Appellants below and before this Court have largely ignored those orders or relied upon tortured interpretations of Chief Judge Littlefield's orders and of Justice Hummel's Substitute Receivership Order, which incorporates Judge Littlefield's orders.  As Judge Littlefield determined below, Plaintiffs-Appellants' complaint should be summarily dismissed.  For the reasons set forth in the transcript of argument below and in this Brief, the Dismissal Order should be affirmed in its entirety.  Any

other result will have the effect of altering the Purchase Agreement entered into between Plaintiff-Appellant Oasis and the Trustee and overturning by collateral attack non-appealable final orders of the Bankruptcy Court which were necessary for the administration of the Bankruptcy Case (a case which remained pending for almost four years, two of which pre-dated the involvement of Plaintiffs-Appellants). Judge Littlefield had his fingers on the pulse of this highly dynamic chapter 11 case, which was subject to his regular oversight. His orders and his decision below were in no small part the result of his four years of intimacy with the issues and parties.

## **STANDARD OF REVIEW**

This appeal involves questions of law and applications of legal standards to indisputable and conceded facts. When reviewing a Bankruptcy Court decision, the District Court reviews matters of law *de novo*. *See In re Ionosphere Clubs, Inc*., 922 F.2d 984, 988-89 (2d Cir. 1990); *Enron Power Marketing, Inc. v. Nevada Power Co*., 2004 U.S. Dist. LEXIS 25999, *7 2004 WL 2290486, *1 (S.D.N.Y. 2004). This appeal involves the interpretation and legal effect of the Purchase Agreement (which was approved by order of the Bankruptcy Court) which Oasis signed. "The interpretation of an unambiguous contract is a question of law for the court, and the provisions of a contract addressing the rights of the parties will prevail over the allegations in a complaint." *Egan v. Marsh & McClennan Companies, Inc.*, 2008 U.S. Dist. LEXIS 6647, *12 (S.D.N.Y. 2008) ("At the motion to dismiss stage, where a plaintiff's 'factual allegations or legal conclusions are flatly contradicted by documentary evidence, they are not presumed to be true, or even accorded favorable inference'") (internal citations omitted). *See also Matusovsky v. Merrill Lynch*, 186 F. Supp. 2d 397, 400 (S.D.N.Y. 2002) (stating that "if a plaintiff's allegations are contradicted by . . . a document [in considering a Rule 12(b)(6)

motion], those allegations are insufficient to defeat [the motion]"). This appeal also involves whether Judge Littlefield had the right to issue the orders he did and whether the orders mean what Judge Littlefield held them to mean. These issues involve questions of law as to which *de novo* review is appropriate. Nevertheless, as for the necessity for and meaning of Judge Littlefield's orders, great deference should be given to the Bankruptcy Court in interpreting its own order. *See Truskoski v. ESPN, Inc.*, 60 F.3d 74, 77 (2d Cir. 1995) (*per curiam*).

## STATEMENT OF FACTS AND OF THE CASE

This appeal arises from an Order of the United States Bankruptcy Court for the Northern District of New York dismissing from the bench an Adversary Complaint filed by Plaintiff-Appellant Oasis and Plaintiff-Appellant EF pursuant to Fed. R. Civ. P. 12(b)(6) and Fed. R. Civ. P. 9(b), as made applicable by Fed. R. Bankr. P. 7012 and Fed. R. Bankr. P. 7009.

The Adversary Complaint below is based upon the Purchase Agreement and a number of court orders which incorporated various loan agreements and which collectively served as the foundation of the Bankruptcy Case, each of which is described below. The description of the operative agreements and court orders contained in GECC's Memorandum of Law in Support of its Motion to Dismiss and the Declaration of Richard Arrowsmith dated January 4, 2011 (Record, Tab 4.) in support thereof is hereby incorporated by reference. The documents contained in the record on this appeal are set forth in the Appellee's Counter-Designation of Items to be Included in the Record on Appeal Pursuant to Federal Rule of Bankruptcy Procedure 8006 filed with this Court on March 18, 2011 [ECF Docket No. 4] (the "Record").

A.    <u>**The GECC Loans**</u>

      Prior to the commencement of the Debtors' Chapter 11 cases and prior to a State Court receivership discussed below, Highgate Manor Group LLC and Highgate LTC Management LLC (collectively, "<u>Highgate</u>," "<u>Borrowers</u>" or the "<u>Debtors</u>") owned and operated four nursing home facilities in upstate New York (the "<u>Facilities</u>").  On May 26, 2005, GECC and Highgate entered into a Loan Agreement in the principal amount of Twenty Three Million Five Hundred Thousand Dollars ($23,500,000.00) (the "<u>Real Estate Loan</u>").  In consideration of and pursuant to the Real Estate Loan, Highgate executed a senior promissory note (the "<u>Promissory Note</u>") and promised to pay the sum of $23,500,000.00 to GECC.  As security for all obligations under the Real Estate Loan and the Promissory Note, Highgate Manor executed and delivered to GECC a Consolidated and Modified Mortgage, Assignment of Rents, Security Agreement and Financing Statement in the principal sum of $23,500,000.00 (the "<u>Mortgage</u>"). (Record, Tab 4, Ex. 4.)

      In addition to the Real Estate Loan, Promissory Note and Mortgage, on May 26, 2005 Highgate and GECC entered into that certain Loan and Security Agreement dated as of May 26, 2005 (the "<u>LSA</u>" or "<u>Revolver</u>") pursuant to which GECC provided to Highgate, as Borrowers, a revolving loan in a maximum amount of Four Million Dollars ($4,000,000). (Record, Tab 4, Ex. 2 ¶2.1(a).)  The LSA was secured by a first priority lien and security interest in, among other things, "all of Borrower's Accounts, and all of Borrower's money, … deposit accounts" and "all of Borrower's now owned or hereafter acquired deposit accounts into which Accounts or the proceeds of Accounts are deposited, including the Lockbox Account."  (Record, Tab 4, Ex. 2 at ¶¶3.1(a)(c).)   The Complaint and this appeal involve the operation of the Revolver during the period Plaintiff-Appellant EF acted as Substitute Receiver for the Facilities.

**B.**      **Operation of the Revolver**

Section 2.3 of the LSA spells out how Highgate's accounts receivable were to be collected and applied.  (Record, Tab 4, Ex. 2.)  Highgate was required to establish and maintain a lockbox with a specific bank (originally Manufacturers and Traders Trust Company and later Citizens Bank, Albany, New York) and to execute a Lockbox Agreement in the form annexed to the LSA.  (Record, Tab 4, Ex. 2 at §2.3.)  On October 24, 2005, the Borrowers, GECC and Citizens Bank entered into a Lockbox Account Agreement whose terms mirror the procedures set forth in Section 2.3 of the LSA.  (Record, Tab 4, Ex. 2.)  The Lock Box specifically refers to the LSA in that it requires that "all remittances made by account debtors in payment of accounts receivable of the [Borrowers] be made to a lockbox." (Record, Tab 4, Ex. 3.)

According to the LSA, two days before any proposed borrowing under the Revolver, Highgate was to give Lender notice of its intention to borrow, by submitting Borrowing Base Certificates ("BBC") specifying the amount to be borrowed and the date of borrowing.  (Record, Tab 4, Ex. 2 at ¶2.2(a).)  The Lender would then make advances based on 85% of Qualified Accounts and other "liquidity factors" it deemed appropriate in its sole discretion, up to the $4,000,000 loan maximum.  (Record, Tab 4, Ex. 2 at ¶2.1(d).) "Accounts" are not collected funds, but monies that are to be received.  "Account" is defined in the LSA as "any right to payment or a monetary obligation" and "any account receivable, any health-care insurance receivable … any payment intangible … and all other rights to payment of every kind and description…"  (Record, Tab 4, Ex. 2 at ¶1.1.)  Under ¶2.2(a) of the LSA, as interest or any other Obligation became due, Highgate, as Borrower, was specifically deemed to have made a request for Revolving advance and to have authorized Lender to disburse the proceeds of such revolving credit loan to payment of such interest or Obligation.

Under those agreements, Highgate was to ensure that all Accounts (not just Qualified Accounts) were paid directly by Highgate's Account Debtors into the Lockbox (essentially a P.O. Box to which Citizens Bank had exclusive access). (Record, Tab 4 Ex 2 at ¶2.3(a); Record, Tab 4, Ex. 3 at ¶4).   Citizens would then open all of the mail sent to the Lockbox and credit to the various Highgate accounts, designated as "Lockbox Accounts," all funds collected.  (Record, Tab 4, Ex. 3 at ¶4 (a)(b).)  However, Highgate would not have access to or receive those funds.  Rather, all funds credited to the designated Lockbox Accounts were then "immediately transferred into a depository account maintained by Lender at Deutsche Bank" (the "Concentration Account"). (Record, Tab 4, Ex. 2 at ¶2.3(c); Record, Tab 4, Ex. 3 at ¶(c)(d).)  Under ¶2.3(c) of the LSA, on a daily basis GECC "shall apply … all funds transferred into the Concentration Account pursuant to this Section 2.3 to reduce the outstanding indebtedness under the loan (in accordance with section 2.2(d)) and all future revolving credit loan advances and other extensions of credit…." (Record Tab 4, Ex. 2 at ¶2.2(d).)  Paragraph 2.2(a) of the LSA further provides that all collections from the Concentration Account are to be applied first to fees, costs and expenses, then to interest due and then to principal on the Revolver.  *See Id*.  (As discussed below, Plaintiff-Appellant EF was deemed by order of the Bankruptcy Court approving the Purchase Agreement to be a signatory to the Lockbox Agreement).

Contrary to Plaintiffs-Appellants' argument that the Lockbox Agreement was simply "a *mechanism* for GE to ensure that all accounts receivable were properly collected" and that it did "not permit GECC to utilize any of the Facilities' income to pay principal, interest or fees" (Plaintiffs-Appellants' Brief pp. 9, 21), the express language of the Lockbox Agreement and Revolver clearly and unambiguously demonstrate that the Lockbox (like most lockboxes

established for the benefit of a senior secured lender to protect the collateral securing a "revolver") was not just some bookkeeping convenience for the borrower and that GECC was indeed permitted to use the collections it received to reduce the debt due it.

The funds collected via the Lockbox were not the Borrowers' funds.  Those collections simply increased the amount of credit potentially available.  The precise amount of loans, however, was a function of Qualified Accounts <u>receivable</u> and other liquidity factors to be employed in GECC's sole discretion.

**C.**     <u>**Foreclosure Action and Appointment of Receiver**</u>

On October 17, 2006, following Highgate's defaults under the Real Estate Loan and Revolver, GECC commenced an action in the Supreme Court of the State of New York, Rensselaer County, to foreclose its real property fee and leasehold mortgages on the four nursing home facilities owned and operated by Highgate. (Record, Tab 4, Ex. 6 at p. 2.)  On November 29, 2006, the State Court (on the consent of the New York Department of Health) issued an Order Appointing Receiver (the "<u>Long Hill Order</u>") in which it appointed Long Hill Alliance Company ("<u>Long Hill</u>" or "<u>Receiver</u>") as Receiver of the four premises (the "<u>Mortgaged Premises</u>") with authority to operate the Facilities.  (Record, Tab 4, Ex. 4.)  Like the Substitute Receivership Order under which Plaintiff-Appellant EF later operated the Facilities as Substitute Receiver, the Long Hill Order provided that Long Hill was to pay receivership expenses out of collections, <u>but that nothing in the Long Hill Order would modify or abrogate the lockbox arrangement</u> whereby the Facilities' accounts receivable were collected for the benefit of GECC so that GECC could pay down old debt and continue to make new funds available to Long Hill to run the Facilities in a typical "revolver" fashion.  (Record, Tab 4, Ex. 4 at pp. 17-18.) ("Nothing herein is intended to amend, modify or abrogate the lockbox arrangement for the collection and

deposit of accounts receivable by the Receiver on behalf of the Facilities pursuant to the Revolving Credit Agreement between the Facilities and GECC.")  Under the Long Hill Order, Long Hill was not required to pay any expenses out of its own pocket, and in the event receivership expenses exceeded receivership income, GECC was required to make up any shortfall pursuant to a written Shortfall Agreement.   (Record, Tab 4, Ex. 4 at pp. 7, 9, 16.)  The Long Hill Order provided that any costs and expenses incurred by GECC, including payment under the Shortfall Agreement, were to be added to the lien of the mortgages held by GECC and were to be recovered "as provided in said Mortgages and the loan documents secured thereby or executed in connection therewith."  (Record, Tab 4, Ex. 4 at p. 22) (emphasis added).

Thus, under the Long Hill Order, the Facilities' accounts receivable continued to be collected and applied pursuant to the Revolver, but, in the event the Facilities' operating expenses exceeded GECC's resupply of funds to Long Hill, GECC was obligated under the Short Fall Agreement to provide additional funds necessary to close the gap, which additions were added to the Revolver loan and repaid as accounts were collected via the Lockbox.[1]

---

[1] One significant difference between the Long Hill Order and the later Substitute Receivership Order ("SRO") that is the subject of this appeal was the fact, made explicit in the SRO, that there was no Shortfall or similar agreement that obligated GECC to make up any gap between Revolver availability and Facilities' expenses. (Record, Tab 4, Ex. 10 at p. 20.)  Pursuant to both the Purchase Agreement and the SRO, EF assumed all obligations of the Facilities as the Substitute Receiver for Long Hill.  Under the SRO, Plaintiff EF had the obligation to pay all Facility payables out of its own funds (Record, Tab 4, Ex. 10 at pp. 8-9, 11) and GECC had no obligation to fund those payables beyond its obligations under the Revolver.  Thus, when read together, the Purchase Agreement and SRO clearly intend that in the event the Substitute Receiver wished to get the benefit of the Estate's accounts receivable when collected, the Substitute Receiver had to comply with the Revolver.  Otherwise, the Substitute Receiver would have no access to the Estate's accounts receivable and any expenses of the Facilities would have to be paid out of the Substitute Receiver's own pocket or from some other source.

**D.**    **Chapter 11 Filings**

On April 16, 2007, (the "<u>Petition Date</u>"), the Debtors each filed voluntary petitions for relief under Chapter 11, Title 11, U.S.C. in the U.S. Bankruptcy Court for the Northern District of New York. ("<u>Bankruptcy Cases</u>").  On May 17, 2007, the Bankruptcy Court ordered that a Chapter 11 Trustee be appointed.  On May 21, 2007, Mark I. Fishman, Esq. ("<u>Trustee</u>") was appointed Chapter 11 Trustee pursuant to 11 U.S.C. § 1104 and, as of the date hereof, is still serving in such capacity.  In addition, the Bankruptcy Court entered an order on May 18, 2007 authorizing Long Hill, as Receiver, to continue to operate the Debtors' businesses and manage the Facilities under the Long Hill Order (the "<u>Continuation Order</u>"). (Record, Tab 4, Ex. 7.)

**E.**    **Cash Collateral Order**

On May 14, 2007, the Bankruptcy Court entered a Final Order Authorizing the Debtors to (A) Borrow Money Pursuant to Sections 105, 301, 326(c)(1); 364(c)(2), 364(c)(3) and 364(e) of the Bankruptcy Code; and (B) use Cash Collateral on a Consensual Basis and (C) Granting Adequate Protection and Related Relief Pursuant to Section 105, 361 and 363 of the Bankruptcy Code (the "<u>Cash Collateral Order</u>").  In the Cash Collateral Order, the Bankruptcy Court specifically found that:

> The access of the Receiver to sufficient working capital and liquidity through the incurrence of new indebtedness for borrowed money and other financial accommodations is vital to the health and welfare of the patients and Receivership of the Facilities, the preservation and maintenance of the going concern values of the Debtors and to a successful reorganization of the Debtors.

(Record, Tab 4, Ex. 6 at p. 6, ¶F.)  The Cash Collateral Order further provided that "the Receiver is hereby authorized to use Cash Collateral and <u>borrow money</u> in accordance with the terms of the Order, the <u>Loan Documents</u>, the Receivership Order and the Shortfall Agreement…" (*Id*. p.

7, ¶12) (emphasis added).   Pursuant to the Continuation Order, Long Hill was directed to "continue to keep in place all account and <u>lock-box arrangements</u> and deposit all funds <u>consistent with the credit facilities and loan documents</u> in existence between the Debtors and GECC." (Record, Tab 4, Ex. 7 at ¶6.) (emphasis added).   In recognition that Long Hill would continue to deposit accounts receivable in the Citizen's Bank lockbox and GECC would continue to use those collections to pay down the existing revolving loan, the Cash Collateral Order also provided that

> <u>no post-petition</u> obligation, <u>payment</u>, <u>transfer</u> or grant of security <u>under the Loan Documents</u>, the Shortfall Agreement, or this Order <u>shall be stayed</u>, restrained, voidable or recoverable under the Bankruptcy Code or under an applicable law…

(*Id.* p. 8) (emphasis added).   In addition to providing for postpetition financing of the Debtors' Estate, the Cash Collateral Order granted GECC a super-priority administrative claim against the Debtors with priority over all administrative expenses in the Bankruptcy Case.   (Record, Tab 4, Ex. 6 at ¶10.)

**F.**      **The Purchase Agreement and Sale Order**

On August 12, 2008, following an auction sale, the Trustee entered into a purchase and sale agreement (the "<u>Purchase Agreement</u>") for the sale of the Mortgaged Premises and the Facilities to Plaintiff-Appellant Oasis.   Pursuant to the Purchase Agreement, the Purchaser, Plaintiff-Appellant Oasis, or its Designee, Plaintiff-Appellant EF, was to apply in the State Court for appointment as Substitute Receiver to replace Long Hill.   (Record, Tab 4, Ex. 8 at p 3, Fifth Whereas Clause.)

Pursuant to the Purchase Agreement, Plaintiff-Appellant Oasis purchased, among other things, only those of the Debtor's ordinary accounts receivable which may exist "at Closing."   Until Closing, any accounts receivable remained the property of the Bankruptcy

Estate.  (Record, Tab 4, Ex. 8 at §1A(iv); §5.1(a).)  Thus, during the Substitute Receivership prior to Closing, all accounts receivable belonged to the Trustee subject to GECC's liens and super-priority claims under the Cash Collateral Order.[2]  The Purchase Agreement further provided that "to the extent Purchaser [or the Substitute Receiver] during the period prior to Closing, seeks to use <u>any accounts receivable</u>," it must do so by establishing or continuing "the revolving credit facility of [GECC] and that "<u>Purchaser shall comply with all aspects of the existing Revolving Credit Facility</u> with [GECC] including the establishment of lockbox accounts and executing such other documents as [GECC] may reasonably require."  (Record, Tab 4, Ex. 8 at ¶1C and ¶5.1 (c)) (emphasis added)."  *Id*. ¶1C.  It is this provision that Plaintiffs-Appellants ignore and seek to circumvent by their Complaint and this appeal.

By Order entered on August 28, 2008 (the "<u>Sale Order</u>"), the Bankruptcy Court approved the sale of the Debtors' specified assets to Plaintiff-Appellant Oasis in accordance with the Purchase Agreement.  The Sale Order provided that "upon the entry of the Order Appointing Substitute Receiver, the <u>Substitute Receiver shall be deemed to have replaced the Long Hill Alliance Company and/or the Debtors as signatory and responsible person on the Lockbox currently maintained by Citizen Bank</u> for the Debtor's operating account, without the need for any further order of this Court".  (Record, Tab 4, Ex. 9 at ¶12.) (emphasis added).  Thus, pursuant to both the Purchase Agreement and the Sale Order any access by the Plaintiffs-Appellants to the accounts receivable collected prior to Closing had to comply with the LSA and the Lockbox Agreement governing the Revolving Credit Facility between the Debtors and GECC.

---

[2] In addition to pre-Closing accounts receivable, there were other Estate assets that were withheld from sale.  Thus, Plaintiffs-Appellants' assertions at pages 12 and 23 of their Brief that Oasis purchased the Debtors' assets and "took all assets free and clear of all liens and encumbrances" is flatly incorrect.

**G.**      **Appointment of Substitute Receiver**

As required by the Sale Order, the Purchaser's Designee, Plaintiff-Appellant EF, applied in the Supreme Court, Rensselaer County, for an order appointing it as Substitute Receiver. On November 3, 2008, the State Court entered the Substitute Receivership Order (the "SRO") appointing Plaintiff-Appellant EF as Substitute Receiver to replace Long Hill as Receiver "for the benefit of [GECC] and consistent with bankruptcy court orders." (Record, Tab 4, Ex. 10 at pp. 6-7) (emphasis added). Thereafter, Plaintiff-Appellant EF operated the Facilities as Substitute Receiver between November 3, 2008 and August 30, 2010, the Closing Date of the purchase of the real property and the Facilities by Plaintiff-Appellant Oasis (the "Substitute Receivership Period").[3] Decretal paragraph 21 of the SRO specifically states that

> the Substitute Receiver shall forthwith deposit all monies received by it at the time it receives same in a special account in its own name in RBC Citizens Bank, N.A. or such other bank as GECC shall require …" (emphasis added).

The paragraph goes on to state that "[n]othing herein is intended to annul, modify or abrogate the lockbox arrangement for the collection and deposits of accounts receivable by the Substitute Receiver on behalf of the Facilities pursuant to the Revolving Credit Agreement between the Facilities and GECC…"  (Record, Tab 4, Ex. 10 at ¶21.)

**H.**      **Effect of Loan Documents During Substitute Receivership Period**

As stated, based on the terms of the Purchase Agreement, Sale Order and the SRO, both the LSA and the Lockbox Agreement, to which the Substitute Receiver was deemed a signatory, were in full force and effect during the Substitute Receivership Period.  Also as noted,

---

[3] The approximate 22-month delay between the Sale Order approving the sale and the Closing Date was the result of the time-consuming process whereby the New York State Department of Health ("DOH") investigated Plaintiff Plaintiff-Appellant Oasis' eligibility to operate the four nursing homes.  The DOH did not issue Plaintiff-Appellant Oasis a Certificate of Need ("CON") until August, 2010.

the Lockbox Agreement required all of the accounts receivable to be deposited into the Lockbox and disbursed to GECC.  The LSA, which was also continued in effect under the Sale Order and SRO permitted GECC to use all accounts collected for payment of the fees, interest and principal due under the Revolver.  The Purchase Agreement and Final Sale Order permitted Plaintiff-Appellant Oasis or its Designee to apply for new loans under the Revolver.  The Revolver, in turn, provided for advances by GECC in accounts reflecting up to 85% of Qualified accounts receivable based on BBCs submitted by Plaintiff-Appellant EF.  The LSA was necessary to enable Plaintiffs-Appellants to operate the Facilities while Plaintiff-Appellant Oasis awaited issuance of the CON by the DOH.  If the LSA were not in effect during the Substitute Receivership Period, GECC simply would have frozen the line of credit thereunder.  In such event, Plaintiff-Appellant Oasis, as Substitute Receiver, would have had to find another source of borrowings from another lender or dip into its own pocket given that the Plaintiffs-Appellants were liable for 100% of all expenses.

In dismissing the Complaint from the bench, Judge Littlefield clearly understood this point.  At oral argument, speaking to Plaintiffs-Appellants' counsel, Judge Littlefield observed that:

> you're an experienced Chapter 11 attorney -- this case, from day one, was DOA, other than GE.  GE was the driver through the years that we were here.  If, at any point, GE became so uncomfortable they just withdrew the cash collateral, they turned off the steam, this case would have been dismissed [and] the patients [dispersed], all that.  This is all -- GE is in control of this entire case.  Does it make any sense to you that GE, who is controlling all the money -- all the money in this case is coming from GE -- that GE is going to enter into an agreement in the middle of the case that so changes the rules of the game that they are not going to be able to do anything, get anything, operate under the orders -- at least, I think, as I understand them -- and put themselves in that box, when they could just walk away from the whole deal.  They could just shut it down and lick their wounds

and go.  Why would they subject themselves to this torturous path that you're indicating when they could have just walked away?  It makes no sense.  It makes no sense, whatsoever.

(Record, Tab 17 at p. 10, lines 4-21.)

## I.   Plaintiffs-Appellants' Borrowing Requests During Substitute Receiver Period

It is clear beyond peradventure that Plaintiffs-Appellants also understood that in order to survive during the Substitute Receivership Period, they either had to cover the expenses themselves or borrow from another lender.[4]  During the approximate 22 months Plaintiff-Appellant EF operated as Substitute Receiver, it submitted to GECC, almost every other business day, 301 BBC's pursuant to which it sought new loans in the aggregate amount of $72,195,736.40 under the Revolver with GECC.  At the same time as Plaintiff-Appellant EF was submitting BBCs, Citizens Bank was collecting the Facilities' accounts receivable and transmitting them daily to GECC's Concentration Account and GECC was applying the proceeds in the Concentration Account to repayment of the principal, interest and fees due it under the Revolver.  Each BBC, contains an acknowledgment by Plaintiff-Appellant EF that the current loan balance is properly due and that by accepting the requested advance, "Borrower agrees to waive and release Lender from all claims, demands, causes of action (whether known or unknown) based in whole or in part on acts or omissions of Lender as relating to the Loan

---

[4] Since GECC had super-priority claims and liens on all assets, no lender other than GECC could be expected to fund the Substitute Receivership if the new lender wanted to rely on the Debtors' assets to secure such a loan.

15

Agreement."  Plaintiff-Appellant EF submitted BBCs and made these same acknowledgements, not once, but 301 times, over the almost 22 months of the Substitute Receivership.[5]

**J.      The Medicaid Retroactive Adjustment**

During the course of the Substitute Receivership, Plaintiff-Appellant EF as Substitute Receiver received a check from the DOH for a retroactive Medicaid reimbursement in the amount of $610,021.18 (the "Rate Adjustment Refund").  The Rate Adjustment Refund was issued as a result of the DOH's recalculation of the Facilities' Medicaid per diem reimbursement rate for the period commencing January 1, 2009.  The Rate Adjustment Refund was sent by the DOH directly to Plaintiff-Appellant EF as Substitute Receiver.  (Record, Tab 1 ¶¶54-59; Plaintiffs-Appellants' Brief at p. 11.) Contrary to its position that it owned all receivable collections, Plaintiff-Appellant EF sent the DOH check to the Lockbox.[6] *Id.*

Plaintiffs-Appellants argue that in addition to failing to remit all of the other Lockbox collections, GECC "converted" this Rate Adjustment Refund.  However, neither Plaintiff-Appellant EF nor Plaintiff-Appellant Oasis had a right to the Rate Adjustment Refund. Section 1.B(vii) of the Purchase Agreement specifically excludes from the assets being sold by

---

[5]  At page 27 of their Brief, Plaintiffs'-Appellants attempt to dismiss the releases and acknowledgments contained in their 301 BBCs by arguing that a receiver "does not have the ability to waive claims" (citing a case concerning an attempt by a receiver to waive the claims of a third party).  Unlike the case cited by the Plaintiffs-Appellants, the 301 BBCs executed by the Substitute Receiver did not involve a release of a *third party's* claim.  They were repeated releases of the *Substitute Receiver's* claims and acknowledgments by *it* of the propriety of GECC's actions.

[6]  Appellants admit that EF received the Rate Adjustment Refund and deposited it into the Lockbox.  At page 11 of their Brief, Appellants state that "the Medicaid check was deposited into the Lockbox.  On or about May 6, 2010, after the check cleared, EF's comptroller requested GECC to 'pay' $1,127,028.78 which should have been available due to the deposit for the $610,218.18 rate adjustment".  (Plaintiffs-Appellants' Brief, p. 11.)

the Trustee and purchased by Plaintiff-Appellant Oasis (and thus available to Plaintiff-Appellant

EF as Plaintiff-Appellant Oasis's "<u>Receivership Designee</u>"):

> All rights to refunds, settlements, retainages, holdbacks, and/or
> <u>retroactive adjustments</u>, to the extent applicable to periods ending
> on or before the Closing, <u>arising in connection with Sellers'</u>
> <u>Medicare and Medicaid provider numbers</u> [for periods prior to
> Closing] ..." (emphasis added).

As stated above, the Purchase Agreement was approved by the Bankruptcy Court's Sale Order.

Plaintiffs-Appellants only had the right to use pre-closing <u>receivables</u> pursuant to the Revolver

(from which all retroactive rate adjustments were specifically <u>excluded</u>).  Thus, GECC could not

have converted property in which Plaintiffs-Appellants never had any rights.

**K.    Plaintiff-Appellant EF's Motion in State Court for**
     **the Return of the Rate Adjustment Refund**

Notwithstanding the clear absence of any right by Plaintiffs-Appellants to any

Retroactive Rate Adjustment Refund, on or about June 2, 2010, Plaintiff-Appellant EF filed a

motion in the State Court foreclosure action seeking the entry of an Order pursuant to Section

1325 of *New York Real Property Actions and Proceedings Law* and Section 2810(2) of the *New*

*York Public Health Law* directing GECC to apply the $610,021.18 Rate Adjustment Refund to

pay down the outstanding balance on the Revolver.  (Record, Tab 1, at ¶59; *see also* Plaintiffs-

Appellants Brief p. 11.)  By Decision and Order entered on August 18, 2010, Justice Hummel

denied the motion on the basis that Chief Judge Littlefield entered the Sale Order and retained

jurisdiction thereunder to "interpret, implement and enforce the terms and provisions" thereof

and to "adjudicate, if necessary, any and all disputes concerning or relating in any way to th[e]

[Sale]."  (Record, Tab 4, Ex. 9 at ¶17.)  The State Court decision is significant for two reasons.

First, Plaintiffs-Appellants moved in State Court to have the Rate Adjustment Refund applied by

GECC to pay down the Revolver so that the amount of credit available to Plaintiffs-Appellants

would thereby be increased (as set forth in footnote 7 below, this refund was initially applied to the Revolver by GECC but then reversed).[7]  This motion directly contradicts their position in the Bankruptcy Court and on this appeal as it shows that Plaintiffs-Appellants knew full well how collections were to be handled and how the Facilities' operations were to be funded.  Second, Justice Hummel recognized that Plaintiff-Appellant EF's rights to the Rate Adjustment Refund under the SRO were all subject to Judge Littlefield's orders and, in so doing, the State Court properly deferred to Judge Littlefield to interpret his own orders and adjudicate what the State Court correctly viewed to be a dispute concerning the Sale.  Plaintiffs-Appellants never appealed Justice Hummel's order deferring to Judge Littlefield.

**L.      The Closing And Distribution Order**

On August 11, 2010, the Bankruptcy Court entered an Order Pursuant to Sections 105 and 363 of the Bankruptcy Code Authorizing the Distribution of Proceeds of the Sale of Certain Assets and Approving Related Agreement (the "Distribution Order").  (Record, Tab 18.) All interested parties, including Plaintiff-Appellant EF and Plaintiff-Appellant Oasis were given

---

[7] As expressly set forth in the Purchase Agreement, no retroactive Medicaid rate adjustment applicable to any pre-Closing period was purchased by Oasis and was ever to become its property.  This retroactive adjustment, which was a specifically "Excluded Asset," was not an invoiced "account receivable" but a refund of payments previously made by the Facilities. Nevertheless, in an apparent effort to get "credit" for the $610,218.18 rate adjustment, EF sent the check that it received in May, 2010, to the Lockbox.  As a matter of course it was initially sent by Citizen's Bank to GECC's Concentration Account and applied to payments due under the Revolver as indicated in paragraph 34 of the Arrowsmith Declaration.  In order to provide full disclosure to the Court, GECC advises that after GECC realized that this amount was not a receivable to which EF was to have any access under the Purchase Agreement, GECC reversed the application to the Revolver and retained the funds for payment of the other secured obligations due it in excess of $30,000,000.  In sum, neither of the Plaintiffs-Appellants ever had an interest in that refund.  Further, as between the Trustee and GECC, the Trustee effectively consented to the release of the refund to GECC by not objecting or otherwise taking a position in EF's State Court motion claiming ownership to or credit for the refund, and by consenting to the entry of the Distribution Order and the releases set forth therein (presumably given that the refund was subject to GECC's super-priority first lien).

18

notice of the proposed entry of the Distribution Order and an opportunity to respond thereto. Neither of the Plaintiffs-Appellants opposed the entry of the Distribution Order, which provided, among other things, for the distribution of all Proceeds of Sale to be made to GECC as holder of a first priority lien on all Proceeds except for the approximate $3,000,000 in proceeds that GECC voluntarily carved out of its lien to facilitate a consensual closing and pay other constituents such as the DOH and creditors, all as set forth in the Distribution Order.  Plaintiff-Appellant Oasis made no claim to any credit allegedly due to it for "conversion" of any of the Debtors' receivables collected and applied by GECC, nor did Plaintiff-Appellant Oasis or Plaintiff-Appellant EF raise this issue to Judge Littlefield pre-closing.  By not objecting, Plaintiffs-Appellants consented to the distribution of Proceeds of Sale to GECC pursuant to the Distribution Order without adjustment for any claim of "conversion" of any receivable allegedly due Plaintiffs-Appellants.  On August 30, 2010, Plaintiff-Appellant Oasis closed on the Sale for the purchase price it had agreed to pay.  (Record, Tab 1 at ¶12.)

**M.**     **The Complaint**

Approximately four months after the Closing, the Distribution Order and distribution of all funds pursuant thereto, Plaintiff-Appellant EF and Plaintiff-Appellant Oasis filed an adversary complaint in the Bankruptcy Case against GECC asserting for the first time claims for fraud, breach of fiduciary duty, negligent misrepresentation, conversion, negligence, turnover and declaratory relief, in which they sought in excess of $2.9 million in compensatory and $10 million in punitive damages.  Notably, Plaintiff-Appellant EF and Plaintiff-Appellant Oasis transformed what was a single claim in the State Court for application of the Rate Adjustment Refund to the credit availability under the Revolver (relief which is diametrically opposed to the relief that Plaintiffs-Appellants now seek here) to a multi-count complaint for

recovery of all receivables collected sounding in baseless and implausible theories of recovery. Interestingly, despite the allegations of their Complaint certified under Federal Rule of Civil Procedure 11 as supportable in fact and law, Plaintiffs-Appellants were forced to admit both on the record at oral argument on GECC's motion to dismiss and in their opening brief in this appeal that they had included "excess claims" in their Complaint and that their only real claim is whether the Bankruptcy Court's orders were valid and followed.   Despite the strident tone of their 111 paragraph complaint, in which they seek $10 million in punitive damages because GECC allegedly defrauded them concerning the operation of the Revolver, Plaintiffs-Appellants backed off their reckless claims of fraud and misrepresentation at oral argument.   When asked by Judge Littlefield what the basis was for Plaintiffs-Appellants' fraud and misrepresentation claims,  Plaintiffs-Appellants' attorney admitted that "I cannot tell you that detail now".  (Record, Tab 17 at p. 15, lines 13-25 and p. 16, lines 1-10.)  Plaintiffs-Appellants' counsel noted that the sole issue in this action is whether, in collecting the Debtors' accounts and in operating the Revolver, GECC complied with the Bankruptcy Court's orders.  (Record, Tab 17 at p. 15, lines 1-10.) ("Your Honor, the gravamen of our complaints -- and <u>maybe I will amend it</u>, because there's a lot of, <u>perhaps, excess</u> causes of action.  But, the gravamen of our complaint is exactly what I said in our opposition papers.  There's a legal issue, and the legal issue is very simple, is whether or not the receipts that come in must first be applied to pay the expenses before GE can take anything.  That's a legal issue.") (emphasis added).

**N.**     **The Dismissal Order**

By motion dated January 6, 2011, GECC moved pursuant to Federal Rules 12(b)(6) and 9(b) (as made applicable to the Bankruptcy Case by Bankruptcy Rules 7012(b) and 7009) Bankruptcy Rule 7012(b)(6) for an order dismissing the Complaint.  On February 11,

2011, the Bankruptcy Court held a hearing on the Motion to Dismiss and after lengthy arguments by both sides the Bankruptcy Court granted GECC's motion to dismiss.  By order entered on February 23, 2011 (the "Dismissal Order"), the Bankruptcy Court dismissed the Complaint. (Record, Tab 19.)

**O.**     **The Appeal**

On February 25, 2011, Plaintiffs-Appellants filed a Notice of Appeal of the Dismissal Order in the Bankruptcy Cases, which is now before this Court.  (Record, Tab 20.)

**ARGUMENT**

**POINT I**

**THE PLAINTIFFS-APPELLANTS' POSITION THAT
GECC WAS NOT PERMITTED TO USE COLLECTED
ACCOUNTS TO PAY AMOUNTS DUE UNDER THE
REVOLVER MAKES NO SENSE**

According to Plaintiffs-Appellants, 100% of all accounts which were collected via the Lockbox should have been immediately remitted to the Substitute Receiver so that it could pay the expenses of the Facilities.  (Plaintiffs-Appellants Brief pp. 9, 15-20.)[8]  However, even had the Bankruptcy Court never issued orders explicitly authorizing the handling of the Lockbox collections precisely as GECC handled them, the very nature of accounts receivable financing demonstrates that Plaintiffs-Appellants' position cannot possibly be correct.

---

[8]  According to Plaintiff-Appellants, before any payment was permitted to be made to GECC, "all" expenses of the Facilities had to be paid (*See* Appellant Brief pp. 9, 15-20).  Since, as Plaintiffs-Appellants assert, the Facilities' operations during the Substitute Receivership period were "$9,000,000", "$10,000,000" or "over $10,000,000" in the red (depending on what page of their Brief one reads), under such circumstances GECC could never make any payment to the Revolver out of collections.

As set forth in the Declaration of Richard Arrowsmith submitted in support of GECC's motion to dismiss the Complaint below (Record, Tab 4 at ¶¶4-10.), accounts receivable financing, specifically the Revolver in this case, is based on <u>receivables</u>, *i.e.* <u>projected</u> income, not on actual collections.  Clearly there is a gap, which can be from 30 to 60 to 90 days or more, between the date an invoice is mailed to a customer and the receipt of payment for the billed amount.  Indeed, in some cases the invoice never gets paid and is written off as uncollectible.

It is also beyond dispute that during the course of the Substitute Receivership, the Substitute Receiver continued to borrow under the Revolver and that during the course of the Substitute Receivership, the Substitute Receiver submitted 301 BBCs totaling over $72,000,000 to GECC.[9]   (Record, Tab 4 at ¶19.)  It is also undisputed that these BBC's contained <u>projections</u> of receivables that the Facilities believed would be collected in the future and that based on those <u>projections</u>, during the Substitute Receivership GECC loaned to the Facilities for use by the Substitute Receiver funds amounting to up to 85% of such <u>projected</u> collections.   It is also undisputed that when a customer finally paid a Facility's invoice, the payment was transmitted by the customer to the Lockbox at Citizen's Bank in Albany, New York, from which it was then transferred by Citizens to GECC's "Concentration Account."  (Plaintiffs-Appellants' Brief at p. 9).

After having transferred to the Facilities for use by the Substitute Receiver millions of dollars based on the projected collections set forth in the BBC's, GECC then waited

---

[9] In their Brief, Plaintiffs-Appellants take two inconsistent positions concerning the 301 BBCs EF submitted.  On the one hand, at page 10 of their Brief, they say that "GECC required the Substitute Receiver to formally request funds as if it were somehow a pre-petition borrower, like the Debtors, and the Line of Credit was still in force and effect," thereby implying that the Substitute Receiver knowingly complied with the request, albeit reluctantly.  On the other hand, Plaintiffs-Appellants lamely claim at page 26 of their Brief that the Substitute Receiver never authorized the BBCs which contained the acknowledgment and release because the forms were "apparently signed by, at best, a mere bookkeeper at the Facilities who lacked authority."

for the accounts <u>receivable</u> to be <u>received</u>, *i.e.* actually be collected.  It is at this point that Plaintiffs-Appellants' view on the one hand and GECC's (and the Bankruptcy Court's) view on the other of what should happen irreconcilably diverge.

    Plaintiffs-Appellants contend that the Lockbox (and presumably GECC's Concentration Account) was nothing more than a "mechanism" to keep track of what was collected and that GECC should have immediately remitted to the Substitute Receiver all of the funds collected by GECC via the Lockbox.  (Plaintiffs-Appellants Brief pp. 9, 15-20.)  Simply stating Plaintiffs-Appellants' contention demonstrates its absurdity.[10]  Had GECC been required to do as the Substitute Receiver contends it was required to do, GECC would have advanced its own money to the Substitute Receiver for nothing in return, and the Substitute Receiver would

---

[10] Judge Littlefield recognized the absurdity in Plaintiffs' arguments below that the Lockbox was merely a "mechanism" for the collection of accounts receivable.  (Record, Tab 17 at pp. 50-51.) ("to adopt Mr. Backenroth's interpretation of … the lockbox agreement, it would make absolutely no sense … The parties simply should have put all the money into an account that the receiver had ability to access and eliminate everything else … ").  *See also* Discussion at Point I *supra*.

have received up to <u>twice</u> the value of its actual accounts receivable.[11]  Obviously, the

fundamental flaw in Plaintiffs-Appellants' position on this appeal is that by insisting that the

Substitute Receiver had a right to demand return of all collections and by arguing that the BBCs

which the Substitute Receiver submitted were merely "requests" for return of the funds collected

in the Lockbox, Plaintiffs-Appellants simply ignore and fail to account for the funds initially

advanced by GECC before one dollar had actually been collected.

        Further, the absurdity of the Substitute Receiver's contention is not ameliorated in

the event the Substitute Receiver were to argue that instead of 100% of Lockbox collections,

GECC needed only to remit the excess of what it collected via the Lockbox over what it had

initially transferred to the Substitute Receiver based on its projection of what accounts were

collectible in the future.  Even if GECC were required to remit only the excess of its collections,

GECC would have borne without any compensation whatsoever the credit risk of possible

uncollectibility – a risk that otherwise was solely that of the Substitute Receiver who was

personally and unequivocally responsible to pay all the Facilities' expenses.  Moreover, in

---

[11] For example, assume that at the beginning of a given month the Facilities had mailed invoices amounting to $1,000,000 to their account debtors.  For ease of computation, assume that all of these accounts were deemed to be "good" or "Qualified" accounts under the LSA.  Assume further that based on $1,000,000 in Qualified accounts, GECC transferred to the Substitute Receiver 85%, or $850,000.00, on the first day of the month (the "<u>Initial Transfer</u>").  Next, assume that over the next 30-60 days all of these invoices, <u>i.e.</u> $1,000,000, are collected via the Lockbox.  If GECC were required to pay over 100% of all its collections to the Substitute Receiver as it contends (the "<u>Subsequent Transfer</u>"), GECC would have received nothing for its Initial Transfer to the Substitute Receiver and the Substitute Receiver would have received $1,850,000 (the Initial Transfer plus the Subsequent Transfer) in payment for the products and services for which it had only billed $1,000,000 in the first place!  Even if less than all of the accounts receivable ultimately got paid (assume only 75% = $750,000 was collected), under the Substitute Receiver's scenario, GECC still gets nothing in return for the Initial Transfer and the Substitute Receiver still receives almost twice the value of its original invoices.  Thus, if, as the Substitute Receiver contends, GECC was legally required (at the risk otherwise of being labeled a fraudster, criminal and thief), to remit 100% of  Lockbox collections, the result would simply be absurd.

addition to bearing the Substitute Receiver's credit risk, GECC would have also lost the time-value of the money it had originally advanced to the Substitute Receiver while GECC waited for the actual collections to come in.  This time-value of money, normally compensated for by the imposition of interest, could not, according to the Substitute Receiver, be paid to GECC out of any Lockbox collections until all Facility expenses were paid (which never happened) (*See* Plaintiffs-Appellants Brief pp. 3, 5.)  In short, according to the Substitute Receiver, GECC was obligated to continually honor the Facilities' request for funds without any hope of compensation for the risks it undertook.  Thus, even under an alternative scenario pursuant to which GECC would at least get back its advance, according to the Substitute Receiver GECC agreed to lend for free!  No rationally operated commercial enterprise, and there is no allegation that a successful, enduring company like GECC is anything but rational, would ever agree to such a charade.

Thus, even without reviewing the operative agreements and Court orders, it is obvious, and the Court should understand, that the scenario advanced by the Substitute Receiver below and on this appeal requiring GECC to remit either 100% of Lockbox collections or even just to send the excess to the Substitute Receiver is irrational and patently untenable.

## POINT II

**THE BANKRUPTCY COURT PROPERLY INTERPRETED ITS OWN ORDERS, THE STATE COURT ORDER WHICH INCORPORATED THE BANKRUPTCY COURT'S ORDERS AND THE GOVERNING AGREEMENTS WHICH <u>THE BANKRUPTCY COURT HAD APPROVED</u>**

The crux of Plaintiffs-Appellants' argument is that Judge Littlefield misinterpreted the SRO, which not only incorporated his own orders but, according to Plaintiffs-Appellants, also somehow trumped his own orders.  The record below leading up to and including the

Dismissal Order reflects Judge Littlefield's very intimate understanding of both the "tenor and the tone" of all the orders he entered in the Bankruptcy Case. [12]

        A judge's interpretation of the judge's own order is accorded great deference and "will not be disturbed 'absent a clear abuse of discretion.'"  *See Truskoski v. ESPN, Inc*., 60 F.3d 74, 77 (2d Cir. 1995) (*per curiam*) (internal citations omitted).  *See also In re Johns-Manville Corp*., 340 B.R. 49, 59 (S.D.N.Y. 2006); *Colonial Auto Ctr. v. Tomlin (In re Tomlin)*, 105 F.3d 933, 941 (4th Cir. 1997) ("the bankruptcy court's interpretation of its own order … 'warrants customary appellate deference.  The bankruptcy court was 'in the best position to interpret its own orders.'") (internal citations omitted).  *Cf. Harvis Trien & Beck, P.C. v. Federal Home Loan Mortg. Corp. (In re Blackwood Assocs. L.P.)* 153 F.3d 61, 65-66 (2d Cir. 1998) (distinguishing a stipulation drafted by the parties from an order of the court with only the former not being accorded any special deference).

        Indeed, not only should Judge Littlefield's interpretation of his own orders be accorded great deference, (a fact not lost on Justice Hummel who, despite having issued the SRO, deferred to Judge Littlefield), but the fact that some of those orders were entered on notice to Plaintiffs-Appellants and are final, non-appealable orders strongly militates against permitting Plaintiffs-Appellants to now use their Complaint as a belated collateral attack on the effectiveness of those orders.  Judge Littlefield noted below that:

> We're looking at Court orders.  We're looking at Federal
> Court orders.   Final Federal Court orders.   If somebody

---

[12] "To me, it would make absolutely no sense to have Mr. -- to adopt Mr. Backenroth's interpretation of even the lockbox agreement, it would make absolutely no sense to go through the machination, the expense, the trouble, the time, all of that. If his position is correct, then the parties simply should have put all the money into an account that the receiver had ability to access and eliminate everything else, and then report back to GE whatever was left, and then GE would get back. That was not the tenor.  That was not the tone.  That was not the intent of this Court's orders."  (Record, Tab 17 at pp. 50-51.)

> disagreed with my order, or I find the supremacy clause indicates anything in a Federal Court order, trumps state law. If you disagreed with it, why didn't somebody appeal it?

(Record, Tab 17 at p. 8, lines 1-6.)

Final, non-appealable orders of the Bankruptcy Court and the State Court authorized the continuation of the LSA pursuant to which GECC was permitted to pay the fees, interest and principal out of lockbox collections and make available to the Substitute Receiver new borrowings up to a maximum of $4,000,000. The Cash Collateral Order authorized the Receiver (and the Substitute Receiver) to "use Cash Collateral and borrow money in accordance with the terms of this Order, the Loan Documents, the Receivership Order and the Shortfall Agreement, which shall be used for all purposes permitted under the Budget, including, without limitation, the ongoing working capital needs of the Debtors' estates and for the payment of interest, fees and expenses in accordance with this Order and the Loan Documents." (Record, Tab 4, Ex. 6 at ¶2) (emphasis added). The Purchase Agreement, which was negotiated by Plaintiff-Appellant Oasis and to which it is a party, was approved on notice to Plaintiff-Appellant Oasis by the Sale Order. After those orders were applied to Plaintiffs-Appellants for almost two years, at no time did either Plaintiff-Appellant Oasis or Plaintiff-Appellant EF seek to annul, vacate, revoke or appeal any of those orders, nor did they object to the Distribution Order, which was also entered on notice to them. The present Complaint is simply a collateral attack on the final orders of the Bankruptcy Court which the Court below did not, and which this Court should not, permit.

## POINT III

## NONE OF THE ARGUMENTS IN PLAINTIFFS-APPELLANTS' BRIEF HAVE ANY MERIT

In the face of overwhelming documentary evidence contradicting their claim to the Lockbox collections, Plaintiffs-Appellants set forth a laundry list of pseudo-claims in their Complaint. First, Plaintiffs-Appellants claim that the SRO itself authorized and mandated EF's access to 100% of collections. Next, Plaintiffs-Appellants claim that to the extent the Orders of the Bankruptcy or State Courts do not authorize payment of all expenses before payment of any portion of the Revolver, those orders would violate both federal and state law. Finally, Plaintiffs-Appellants argue that they were duped by the fraudulent or negligent misrepresentations of GECC which owed them a fiduciary duty. Each of these contentions is addressed below. As is shown below, none of these contentions has any merit whatsoever.

### A.    The SRO Does Not Support Plaintiffs-Appellants' Argument

According to Plaintiffs-Appellants, the "essence" of their claims is that GECC diverted funds due the Substitute Receiver in violation of the SRO and applicable New York law. (Plaintiffs-Appellants' Brief p. 3.) In support of their argument, Plaintiffs-Appellants rely heavily on four paragraphs of the SRO which provided that,

> (1)   "The Substitute Receiver shall have full control over…all accounts…"
>
> (2)   "The Substitute Receiver shall be entitled to utilize all accounts receivable cash existing at the Facility as of the date of commencement of its appointment…"
>
> (3)   "The Substitute Receiver shall collect incoming payments from all sources and apply them to the costs incurred in the performance of its functions and obligations hereunder…," and
>
> (4)   "The Substitute Receiver be, and hereby is, authorized and directed:  [to pay all property and liability insurance, taxes,

> utilities, other charges and to comply with all municipal requirements] and (e)  to pay to [GECC] monthly); out of funds remaining in the custody of the Substitute Receiver, all interest accrued on the Revolving Credit Note…"

(Plaintiffs-Appellants' Brief p. 5 and 6.)   There are several answers to Plaintiffs-Appellants' arguments.

First, to the extent the SRO contradicts (which it did not) the Purchase Agreement and the orders of Judge Littlefield, the SRO would be ineffective.  (Record, Tab 4, Ex. 10 at p. 6-7.) (expressly requiring that the authority in the SRO be "consistent with bankruptcy court orders").  Except as to the DOH's jurisdiction to issue a CON, the State Court could simply not issue an order which inconsistently affected the Bankruptcy Estate's assets, over which the Bankruptcy Court had exclusive jurisdiction.  Indeed, the SRO itself contains explicit provisions which indicate that it incorporates the Bankruptcy Court Orders and that "[n]othing herein is intended to amend, modify or abrogate the lock box arrangement for the collection and deposit of accounts receivable by the Substitute Receiver … pursuant to the [LSA] between the Facilities and GECC".  (Record, Tab 4, Ex. 10 at pp. 21-22.)  In their papers below and on this appeal, Plaintiffs-Appellants simply ignore these provisions as if they had never existed or can be made to disappear.  However, Justice Hummel, who entered the SRO, recognized the primacy of these provisions when he deferred to Judge Littlefield the determination of Plaintiffs-Appellants' rights to the Rate Adjustment Refund collected in the Lockbox by GECC.

Second, the SRO provisions that Plaintiffs-Appellants rely on do not help their case.  Provision one above, that the Substitute Receiver shall have "full control over…all accounts" simply means that the Substitute Receiver, as opposed to the Debtors and the Trustee, will handle invoicing and collections.  This paragraph of the SRO says nothing that would

29

prevent the Substitute Receiver from using that "control" of the accounts for asset-based financing under the Revolver.

The second provision above, that at the inception of the Substitute Receivership the Substitute Receiver shall have access to all "cash existing at the Facility," likewise is meant to ensure that the Substitute Receiver, and not the Debtors or Trustee, gets the benefit of cash on hand. However, the "cash existing at the Facility at the date of the commencement of [the Substitute Receiver's] appointment" has absolutely nothing to do with future receivables collected by GECC during the course of the Substitute Receivership. In fact, that is the very cash GECC <u>already</u> had advanced to the Facilities.

The third provision above, that the Substitute Receiver shall collect incoming payments and "apply them to the costs incurred and… its obligations hereunder," does not prohibit the operation of the Revolver. Again, the provision that the Substitute Receiver "shall collect" was meant to prevent the Debtors or the Trustee from collecting them since it was the Substitute Receiver which was operating the Facilities and which was ultimately responsible for their expenses. Indeed, since these receivables were not sold to or purchased by the Substitute Receiver and since they could not be collected by the Debtors or Trustee, this provision of the SRO underscores the fact that these receivables were to be collected by GECC to apply to the Substitute Receiver's "costs" and "obligations" under the Revolver. Otherwise, the additional language of the SRO that the Substitute Receiver was to ensure that all collections went to the Citizen's Lockbox and that nothing in the SRO was to modify that arrangement would simply make no sense. (Record, Tab 4, Ex. 10 at pp. 21-22.)

Paragraph four, on which Plaintiffs-Appellants rely most heavily, also is of no help to them. This is a standard provision in a foreclosure receivership order which requires that

before a foreclosing mortgagee is paid interest, certain expenses applicable to preservation of the mortgaged property be paid (this is because not only the mortgagee but also the owner of the premises and other lienor-creditors of the owner have an interest in the premises).  This portion of the SRO order relates to payments of interest to a lender who is no longer lending.  It has nothing to do with a lender, like GECC in this case, who had loaned substantial amounts post-petition to Long Hill under the Cash Collateral Order and was committed to continue to lend to Long Hill's replacement, the Substitute Receiver.   Certainly, had the Substitute Receiver obtained a term loan from, say, Citibank, which provided for payments of principal and interest each month, the Substitute Receiver would not seriously suggest that under the SRO it was not required to pay Citibank anything until it had paid, say, its liability insurance carrier, and then only after such "property expenses" had been paid, it need pay Citibank only the accrued interest on its post-petition loan.   GECC, as a post-petition lender, like any other post-petition lender, was entitled to get paid per its loan documents and that is why the SRO makes clear, notwithstanding paragraph four above, that the loan documents continue in full force and effect.[13]  (Record, Tab 4, Ex. 10 at pp. 13, 21-22.)

---

[13] It is important to note that contrary to Plaintiffs-Appellants' argument that the fourth paragraph of the SRO cited by them requires that "all" expenses of the receivership be paid before any payments to GECC, that provision on its face only requires that a limited category of expenses relevant to preservation of the mortgaged premises be paid.  Indeed, in their Brief, Plaintiffs-Appellants highlighted a portion of the fourth paragraph that requires compliance with all municipal requirements in an attempt to bootstrap that provision into a requirement that all patient care and all other Facility expenses (such as employee salaries, benefits, office supplies, landscaping, custodian services, etc) be paid first.  However, patient care and normal operating expenses are not the subject of "municipal ordinances"  They are mandated by federal and state statutes and regulated by the New York State DOH.  Clearly, compliance with "municipal" ordinances such as zoning and building code requirements -- things that relate to real property preservation -- do not get Plaintiffs-Appellants to where they want or need to go.

**B.**    <u>Plaintiffs-Appellants' Reliance Upon State Law Is Misplaced</u>

Closely allied to Plaintiffs-Appellants' argument concerning the SRO is their argument that under Section 1325 of *New York Real Property Actions and Proceedings Law* ("<u>RPAPL</u>"), and *New York Public Health Law* §2810 ("<u>PHL</u>") all expenses must be paid before a receiver is authorized to pay anything to a secured lender.   Section 1325 of the New York RPAPL provides that before payment of accrued interest "on the mortgage," due provision must have been made for the payment of taxes, administration expenses, fees and charges and such reserve as the court may direct.   On its face, it is limited to the pre-foreclosure debt.   Similarly, PHL §2810 provides that the receiver "shall collect incoming payments from all sources and apply them to the costs incurred in the performance of his functions as receiver."[14]   Had GECC simply been a plaintiff mortgagee in a foreclosure action where all of GECC's lending had been completed before the receivership and had the payments at issue been made "on the mortgage," *RPAPL* §1325 would have some applicability.   What Plaintiffs-Appellants fail and refuse to recognize, however, is that GECC was more than a former, pre-foreclosure, pre-receivership lender.   GECC was both a prepetition and a <u>postpetition</u> lender which was permitted under Federal Bankruptcy Law by the Bankruptcy Court's Cash Collateral Order to continue to lend

---

[14] Not only is Appellants' reliance upon PHL §2810 misplaced but it was never raised below and, on that basis alone, should be disregarded by this Court.  *Singleton v. Wulff*, 428 U.S. 106, 120 (1976) ("It is a general rule, of course, that a federal appellate court does not consider an issue not passed upon below."); *see also Aslanidis v. United States Lines, Inc. et al.*, 7 F.3d 1067, 1077 (2d. Cir. 1993) ("a party opposing summary disposition of a case must raise all arguments against such remedy in the trial court and may not raise them for the first time on appeal").

and to continue to be paid.[15]  Plaintiff-Appellant EF, as Substitute Receiver, chose to continue borrowing money from GECC under the Revolver during the SRO.  The SRO -- which was entered by the State Court in furtherance of and pursuant to the Sale Order -- expressly provides for the payment of fees and accrued interest to GECC "pursuant to the Revolving Credit Agreement."  (Record, Tab 4, Ex. 10 at p. 22.)  In that regard, the repayment of a lender from which a receiver has borrowed is in fact an "administration expense" and a "cost incurred in the performance of [the Receiver's] functions," which both *RPAPL* §1325 and *PHL* §2810 expressly require to be paid out of receivership assets.[16]  Moreover, the Cash Collateral Order itself authorized the payment of interest to GECC.

---

[15] At pages 12 and 23 of their Brief, Plaintiffs-Appellants attempt to chastise GECC  for not referring in their motion below to the monthly budgets submitted by EF to the Bankruptcy Court, "none [of which] provided for payments of interest, fees or principal to GECC."  Plaintiffs-Appellants are correct that GECC did not refer below to the monthly budgets and that none of the monthly budgets referred to payments of the Revolver.  GECC did not refer to them because they are wholly irrelevant to the issues at bar.  The monthly budgets set forth operating expenses to be paid by EF each month.  As described in the Arrowsmith Declaration and herein, EF was never obligated to, nor did it ever directly pay, any part of the Revolver to GECC.  All payments to the Revolver came out of Lockbox collections which were received and applied <u>before</u> any remaining funds were transmitted by GECC out of the Lockbox collections pursuant to the Facilities' BBCs.  Thus, in setting forth the expenses of operations to be paid by EF, the budgets necessarily excluded payments to the Revolver that had already been made.

[16] None of the cases relied upon by Appellants arises in the context of a receivership in which the <u>receiver borrowed monies from the mortgagee</u> to operate the mortgagor's businesses.  It is against this backdrop which the Appellants' state law arguments must be evaluated.  The SRO expressly provides that "the Substitute Receiver shall not incur any obligation or make borrowings secured by the Facility or any part of the Facility or the Facility's assets . . . <u>except as may be permitted by the Final Sale Order or Cash Collateral Orders in the Bankruptcy Court</u>." (Record, Tab 4, Ex. 10 at p. 13) (emphasis added).  The State Court in entering the SRO was acting in furtherance of the Purchase Agreement and Sale Order and authorized the continuation of the LSA.

## C.     GECC Could Not Convert Property to Which Plaintiffs-Appellants Had No Interest

As stated above, GECC came into possession of all accounts receivable collected during the Substitute Receivership Period lawfully and then disposed of the accounts receivable collections in accordance with the LSA which was approved at the outset of the Bankruptcy Court as the source of financing.  (Record, Tab 4, Ex. 2 at §2.3; Record, Tab 4, Ex. 6 at ¶2.)  As further stated above, under the Purchase Agreement, Plaintiffs-Appellants had absolutely no interest in the Rate Adjustment Refund.  Having received these assets lawfully, GECC could not "convert" assets of which Plaintiffs-Appellants never had a right to possession in the first place. *See Regions Bank v. Wieder & Mastroianni*, 526 F.Supp.2d 411, 415 (S.D.N.Y. 2007) ("courts have declined to impose liability [for conversion] where the defendant came into possession lawfully and then disposed of the property in a manner that was not wrongful.").

What makes Plaintiffs-Appellants' claim of conversion even more incredible is the fact that Plaintiff-Appellant EF, upon receipt of the Rate Adjustment Refund, itself deposited such check into the Lockbox.  (Record, Tab 1 at ¶¶54, 59.)  This undisputed fact highlights two very important points.  First, it illustrates that GECC also came into possession of the Rate Adjustment Refund lawfully.   Second, Plaintiff-Appellant EF -- by arguing that the Rate Adjustment Refund should have increased the availability under the Line of Credit -- acknowledged the continued vitality of the Revolver and GECC's right to apply collections to the Revolver.

## D.     Plaintiffs-Appellants' Reliance on *Timbers* is Misplaced

At page 20 of their brief, Plaintiffs-Appellants argue that the Bankruptcy Court Orders as entered and interpreted by Judge Littlefield were either invalid or could not mean what they say because they violated the Supreme Court's holding in *United Savings Assn. of Texas v.*

*Timbers*, 484 U.S. 365 (1988).  Like provision four in the SRO and the *RPAPL* and *PHL*, *Timbers* is not applicable to this case.  *Timbers* involved the right of a <u>prepetition</u> secured creditor to postpetition interest.  The United States Supreme Court's decision in *Timbers* addressed the circumstances under which adequate protection should be paid to a secured creditor for lost opportunity costs.  484 U.S. 365, 369.  *Timbers* did not involve the rights of a postpetition lender, such as GECC which agreed to continue lending money postpetition in accordance with a financing order of the Bankruptcy Court.

     *Timbers* does not prohibit the payment of interest to a lender who provides postpetition financing to a debtor or trustee or their representative as was the case here.  In order to secure such postpetition financing by GECC, the Trustee, the unsecured creditors committee and GECC engaged in lengthy and detailed negotiations of the Cash Collateral Order.  One of the results of those negotiations was GECC's continuation of the Revolver in accordance with the terms thereof and authorized the payment of interest accruing thereon.  Indeed, GECC likely would not have agreed to continue financing the Debtors or its Receiver absent a continuation of the Revolver.  *Timbers* simply has no application to such set of facts.[17]

## E.    <u>The Complaint Fails to State a Claim for Fraud (Count I)</u>

     In addition to attacking or ignoring the substance of the Bankruptcy Court's Orders, Plaintiffs-Appellants attempted to achieve their goal of obtaining a rebate on the

---

[17] Indeed, the purpose of Section 364 of the Bankruptcy Code is to induce creditors to extend credit after commencement of a Chapter 11 case.  *See In re Florida West Gateway, Inc.*, 147 B.R. 817, 819 (Bankr. S.D. Fla. 1992) ("Congress designed §364 to provide 'incentives to the creditor to extend post-petition credit.'") (internal citations committed).  In addition to the lien and priority incentives contained in Section 364 of the Bankruptcy Code, courts generally recognize and routinely approve incentives that are not expressly set forth in the statute.  *See In re Defender Drug Stores, Inc.*, 145 B.R. 312 (B.A.P. 9th Cir. 1992) (upholding bankruptcy court's approval of an enhancement fee to postpetition lender).  Payment of interest to a postpetition lender is a well recognized and oft authorized incentive to a postpetition lender.

purchase price by attacking GECC below with claims of fraud and misrepresentation, which, frankly, defy analysis.  Plaintiffs-Appellants' fraud claim is simply disingenuous.  In Count I of the Complaint, Plaintiffs-Appellants allege that "[i]n order to retain control of [Debtors]'s account receivables, [GECC] misrepresented to [P]laintiffs its procedures for operation of the lockbox in order to induce them to continue to deposit the money in the lockbox and retain [the Debtors'] previous bank accounts.  [GECC]'s misrepresentations included telling [P]laintiffs that: (i) the Line of Credit was still in force and effect; (ii) it would continue to provide [P]laintiffs with the money that was collected in the lockbox; and (iii) that it would not retain any of the funds deposited in the lockbox."  (Record, Tab 1 at ¶ 65.)[18]

---

[18] Plaintiff's allegations of "fraud" [which they abandoned at oral argument below and hardly refer to on this appeal] demonstrate the desperate confusion with which they recklessly launched this assault on GECC.  GECC, of course, denies that it defrauded Plaintiffs in any way. Although Plaintiffs included no specifics as to who at GECC said what to whom at Plaintiff-Appellant Oasis or EF and when, it is clear that had someone at GECC told someone at Plaintiff-Appellant Oasis or EF that "The Line of Credit [is] still in force and effect," that statement would be true and, therefore, not fraudulent.  It has always been, and continues to be, GECC's position that the Line of Credit, i.e. the Revolver, was in effect during the Substitute Receivership Period. Indeed, to be fraudulent, it would have been necessary that the Revolver not have been in effect and that Plaintiffs would have had to have relied to their detriment that is was in effect. However, it is Plaintiffs' position in this lawsuit and on this appeal that the Revolver was not, or should not have been permitted to be, in effect.  Moreover, a representation that the "Line of Credit is still in effect" is directly at odds with another "misrepresentation" alleged by Plaintiffs that, despite GECC's representation that the Revolver was still in effect, GECC would not retain any money received via the Lockbox.  What rational person would make both statements and what rational person would believe both statements?  Plaintiffs' "fraud" claim makes no sense and is obviously a fabrication.

The elements of a Fraud claim under New York law[19] are as follows: (i) representation of a material fact; (ii) the falsity of such representation; (iii) intent to defraud plaintiff; (iv) reliance; and (v) damages. *See Harbinger Capital Partners Master Fund I, Ltd. v. Wachovia Capital Markets, LLC*, 910 N.Y.S.2d 762 (Sup. Ct. N.Y. 2010); *Banque Arabe et Internationale D'Investissement v. Maryland National Bank,* 57 F.3d 146, 153 (2d Cir. 1995). Completely devoid from the Complaint is a single statement of *what* fraudulent act or acts GECC committed and *when*, *where* or *how* such alleged fraudulent statements or omissions were made. Further, at oral argument, the Bankruptcy Court probed Plaintiffs-Appellants' counsel for specific facts to support the claim of fraud and unsurprisingly elicited no such facts. The relevant portion of the hearing transcript reads as follows:

> COURT: When you say GE misrepresented --
> BACKENROTH: That was their legal position.
> COURT: But, by who? How did that get -- who enunciated this legal position --
> BACKENROTH: I --
> COURT: -- what person?   What -- how did it get transmitted?
> BACKENROTH: Your Honor, I cannot tell you.  That's -- I can get those details to you, but I cannot tell you that detail now.
> COURT: Well, shouldn't that have been in the complaint? There's so many allegations without face or name.  It's just these generalizations that just allege this and that but there's absolutely no specifics to any of this.

---

[19]   The Lockbox Agreement is governed by New York law.  (Record, Tab 4, Ex. 3 at §15(e).) The LSA is expressly governed by Maryland law "[e]xcept to the extent the UCC provides for the application of the law of the borrower's state of organization…"  (Record, Tab 4, Ex. 2 at ¶9.20.)  The elements of fraud are the same under New York and Maryland jurisprudence. *See Nails v. S&R Inc.*, 639 A.2d 660, 668 (Md. 1994) (elements for fraud under Maryland law are (1) defendant made a false representation to plaintiff, (2) that its falsity was either known to the defendant or was made with reckless indifference as to its truth, (3) that the representation was made for purposes of defrauding plaintiff, (4) plaintiff relied on the representation and had the right to rely on it and (5) plaintiff suffered compensable injury resulting from the misrepresentation.).

> BACKENROTH:   Your Honor, the gravamen of our complaints -- <u>and maybe I will amend it</u>, because there's a lot of, perhaps, <u>excess causes of action</u>.  But, the gravamen of our complaint is exactly what I said in our opposition papers.   There's a legal issue, and the legal issue is very simple, is whether or not the receipts that come in must first be applied to pay the expenses before GE can take anything.  That's a legal issue.

(Record, Tab 17 at p. 15, lines 13-25, p. 16, lines 1-10.) (emphasis added).

In addition, to an admitted failure of any specificity, the Complaint lacks any particularized allegation that GECC possessed the requisite fraudulent intent.   *See Kaye v. Grossman*, 202 F.3d 611, 614 (2d Cir. 2000) (explaining that a fraud plaintiff must plead that the defendant both "knew of the falsity" of the misrepresentation and "possessed an intent to defraud").  Thus, as a point of law, no claim for fraud has been stated.

At page 35 of their Complaint and again at page 10 of their Appellants' Brief, Plaintiffs-Appellants claim that GECC falsely represented that it was "passing each dollar collected through the lockbox to the Substitute Receiver."  After GECC moved to dismiss for, among other things, the failure to plead any specifics concerning their fraud allegation, Plaintiffs-Appellants had the opportunity to cure these defects by either amending the Complaint or submitting an affidavit setting forth who said what to whom and, in particular, who at GECC said that it would pass every dollar collected to Plaintiff-Appellant EF.  Plaintiffs-Appellants, however, did neither.  The Declaration of Nacham Sherman dated February 6, 2011 submitted in opposition to GECC's motion to dismiss is strangely (but not surprisingly) silent as to any specifics concerning any purported representations by GECC.  (Record, Tabs 10 and 11.)  In the absence of further specification, *Federal Rule of Civil Procedure* 9(b) permits dismissal under the common sense notion that such allegation is unsupportable and made of whole cloth.

But Judge Littlefield's decision was not based simply on a lack of specificity. More to the point, it is clear that no fraud could have occurred based upon the existence of the LSA, Lockbox and terms of the Revolver because prior to the Substitute Receivership Order and Plaintiff-Appellant EF's assumption of duties as Substitute Receiver, Plaintiff-Appellant EF's principal, Plaintiff-Appellant Oasis, negotiated, agreed to and executed the Purchase Agreement. The Purchase Agreement clearly states that "Purchaser shall comply with all aspects of the existing [LSA] with GE including the establishment of the lockbox accounts." (Record, Tab 4, Ex. 8 at §501(e)) (emphasis added). In addition, the Sale Order states that Plaintiff-Appellant Oasis and Plaintiff-Appellant EF were deemed signatories to the Lockbox Account. (Record, Tab 4, Ex. 9 at ¶12.) Finally, the SRO, which incorporated the Bankruptcy Court Orders, specifically provided that nothing in the SRO was meant to amend or modify the Lockbox Agreement. (Record, Tab 4, Ex. 10 at p. 21.)

Thus, both the Bankruptcy Court and State Court Orders drove home in exquisite detail the fact that all borrowings would be governed by the LSA, Lockbox Agreement and Revolver, a fact confirmed time and time again by Plaintiff-Appellant EF when it borrowed 301 times in amounts less than 100% of collections.[20]  To later claim in this action, as they attempt to do in their Complaint, that Plaintiffs-Appellants were defrauded would mean that Plaintiffs-Appellants -- sophisticated businessmen represented by sophisticated lawyers -- intentionally closed their eyes to the plain meaning of governing documents and orders to which they were specifically alerted and the operation of which they now claim they did not understand. That

---

[20] Without stating when they discovered the facts, at page 3 of their Brief Plaintiffs-Appellants lamely claim that at some point they "discovered that GECC was paying itself from the Substitute Receiver's funds and receivables that were placed in the Lockbox…" Plaintiffs-Appellants offer no explanation as to why this "discovery" was not made when the Purchase Agreement was first executed or when EF submitted the first or even the 10th of its 301 BBCs.

they persist in their claims demonstrates their utter lack of good faith in bringing the action below and prosecuting this appeal.

**F.    The Complaint Fails to State Claims for Breach of Fiduciary Duty, Negligent Misrepresentation, and Punitive Damages (Counts II and III)**

1.    The Fiduciary Duty Claim (Count III)

In their Appellate Brief, Plaintiffs-Appellants do not devote one word to the existence of an alleged fiduciary duty between Plaintiffs-Appellants and GECC.  Nevertheless, as they allege such a duty in their Complaint, this argument is briefly treated here for the sake of completeness.   Under New York law, "[i]n order to establish a breach of fiduciary duty, a plaintiff must prove the existence of a fiduciary relationship, misconduct by the defendant, and damages that were directly caused by the defendant's misconduct."  *Kurtzman v. Bergstol*, 835 N.Y.S.2d 644, 646 (2d Dept. 2007); *see also Cramer v. Devon Group Inc.*, 774 F. Supp. 176, 184 (S.D.N.Y. 1991) (two primary elements of breach of fiduciary duty claim are (1) existence of a fiduciary relationship between the parties and (2) a breach of the duty flowing from the relationship).

"When parties deal at arms length in a commercial transaction, no relation of confidence or trust sufficient to find the existence of a fiduciary relationship will arise absent extraordinary circumstances." *In re Mid-Island Hosp., Inc.*, 276 F.3d 123, 130 (2d Cir. 2002) (*quoting Pan Am. Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 511 (S.D.N.Y. 1994)).  The law in New York is well settled that the "usual relationship of bank and customer is that of debtor and creditor," rather than that of fiduciaries.  *Manufacturers Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 318 (2d Cir. 1993) (internal citations omitted) ("[T]he mere fact that a corporation has borrowed money from the same bank for several years is insufficient to transform the relationship into one in which the bank is a fiduciary").  The Complaint fails to state any facts to

alter these rules and to support the existence of a fiduciary relationship between GECC and Plaintiffs-Appellants.

2. <u>Negligent Misrepresentation Claim (Count II)</u>

Because the Complaint fails to state facts to support a fiduciary relationship and without such additional facts, none exists between a borrower and lender, the claims of negligent misrepresentation must also fail. Unlike a claim for actual fraud, which requires proof of intentional wrongdoing, *i.e.* scienter (which was not alleged), a claim for negligent misrepresentation requires proof of a special relationship of trust before any innocent misrepresentations or failure to speak can be actionable.[21] *See Kimmel v. Schaefer,* 89 N.Y.2d 257, 263 (1996) ("in a commercial context, a duty to speak with care exists when 'the relationship of the parties, arising out of contract or otherwise, [is] such that in morals and good conscience the one has the right to rely on the other for the information.'"). *See also DDJ Capital Mont., LLC v. Rhone Group LLC*, 19 Misc. 3d 1124A, * 12 (N.Y. Sup. Ct. 2008) (A failure, as here, to plead facts that could establish a fiduciary relationship with the defendant is "generally fatal to the claim [of negligent misrepresentation]"). Absent proper allegations of such a special relationship, Plaintiffs-Appellants' claim must be dismissed. *See Eurycleia Partners, L.P. v. Seward & Kissel, LLP*, 849 N.Y.S.2d 510, 512 (1st Dept. 2007); *Korea First Bank of NY v. Noah Enters.*, 787 N.Y.S.2d 2, 4 (1st Dept. 2004). Again, at argument, Plaintiffs-Appellants' counsel abandoned any attempt to bolster his "fiduciary duty" claim with facts. None being alleged in the Complaint or in response to Judge Littlefield's specific inquiries, no such duty can exist and Plaintiffs-Appellants' negligent misrepresentation claim must fail.

---

[21] In addition to the absence of a fiduciary duty that would have compelled GECC to speak, the misrepresentation claim, negligent or otherwise, must fail for the same reasons as the fraud claim must fail, *viz*, there is no specificity as what was said, when and by and to whom and any "misrepresentation" that was alleged even conclusorily, makes absolutely no sense.

3.      Punitive Damages Claim (Count III)

The Complaint contains unsupported, conclusory allegations as a basis for punitive damages.  Specifically, the Complaint states that "GE[CC]'s misuse and manipulation of this system and abuse of the trust reposed in it by the court, was willful, wanton, quasi-criminal and shocking to the conscience… In order to discourage others from misusing the public trust in the same manner and in order to protect assets entrusted to the Courts by virtue of either bankruptcy or the appointment of a receiver, the Court should impose punitive damages in the amount of $10 million…"  (Record, Tab 1 at ¶84.)  (emphasis added).  First, punitive damages is not a cause of action but a remedy.  In order to have a claim for punitive damages, plaintiff must have a legally cognizable claim, which Plaintiffs-Appellants do not.  Moreover, like their fraud, breach of fiduciary duty and negligent misrepresentation claims, Plaintiffs-Appellants' claim for punitive damages is based on GECC's purported "quasi-criminal" breach of trust.  As no such "breach of trust reposed in it by the court" could exist in the absence of a relationship of trust, the lynchpin of Plaintiffs-Appellants' punitive damage claim has come loose and fallen by the wayside.[22]

Further, punitive damages are appropriate principally in cases where repetitious conduct by the alleged wrongdoer threatens the public at large.  *See Rocanova v. Equitable Life Assurance Soc'y of the United States*, 83 N.Y.2d 603, 613 (1994) ("a private party seeking to recover punitive damages must not only demonstrate egregious tortious conduct by which he or she was aggrieved, but also that such conduct was part of a pattern of similar conduct directed at the public generally.").  Here there are absolutely no allegations by Plaintiffs-Appellants  that

---

[22] Certainly good faith compliance with the orders of this Court and the State Court (a fact confirmed by the Bankruptcy Court itself) can hardly rise to the "quasi-criminal" level of wrongful conduct required.

GECC is in the habit or business of violating Bankruptcy Court orders for postpetition financing and that such conduct has affected or could affect anyone other than Plaintiffs-Appellants. Indeed, the only parties complaining about GECC's use of the Debtors' accounts receivable are Plaintiffs-Appellants.  Neither the Debtors nor the Trustee, former Receiver, nor any creditor ever complained that what GECC did was unauthorized or wrong.

G.      **The Complaint Fails to State a Claim for Negligence (Count IV)**

Again, although not discussed in their Appellate Brief, Plaintiffs-Appellants purported to assert a claim below for simple negligence.  However, the Complaint fails to state a claim for negligence inasmuch as it is devoid of any allegation that a legally cognizable duty of care was owed to Plaintiffs-Appellants, let alone that any such duty was breached and that damages were substantially caused by the breach.  *See Merino v. New York City Transit Auth.*, 639 N.Y.S.2d 784, 787 (1st Dep't 1996), *aff'd*, 89 N.Y.2d 824 (1996); *Nathan W. Drage P.C. v. First Concord Sec. Ltd*., 707 N.Y.S.2d 782, 787 (N.Y. Sup. Ct. 2000).  The relationship between the Estate and Plaintiff-Appellant Oasis and between GECC and Plaintiff-Appellant EF concerning the use of accounts receivable was contractual.  The absence of a breach of contract cannot be remedied by a claim of negligent conduct.  There is no allegation in the Complaint that GECC breached any cognizable duty.  There is no duty of care owed by a lender with respect to the lender's administration of a borrower's loan. *See Bank Leumi Trust Company of New York v. Block 3102 Corporation,* 580 N.Y.S.2d 299, 301 (1st Dep't 1992) (holding that there is no "duty of care owed . . . with respect to the negligent administration of an underlying loan"). Plaintiffs-Appellants' failure and inability to plead a cognizable duty, alone, constitutes sufficient ground to dismiss the negligence claim.  *See Advanced Marine Technologies, Inc. v. Burnham Sec. Inc.*, 16 F. Supp.2d 375, 384 (S.D.N.Y. 1998).

Aside from the failure to articulate the existence of a duty, Plaintiffs-Appellants have failed to articulate what GECC did to breach that duty.  If Plaintiffs-Appellants were to contend that GECC breached a duty by failing to interpret the Bankruptcy Court orders and the SRO properly, Plaintiffs-Appellants would first have to show that GECC's interpretation was incorrect, something they have utterly filed to do, as confirmed by Judge Littlefield and Justice Hummel.  It would seem axiomatic that a litigant cannot negligently interpret and thereby evade a duty to comply with a court order that the court which entered the order in the first instance has held the litigant did not violate.

**H.     The Complaint Fails to State a Claim for Conversion (Count V)**

In this Appeal Plaintiffs-Appellants do continue to argue that GECC converted their funds.  In New York, conversion is the exercise of "unauthorized dominion over personal property [of another] in interference with a plaintiff's legal title or superior right of possession." *Lopresti v. Terwilliger*, 126 F.3d 34, 41 (2d Cir. 1997) (citation omitted) (emphasis added).  To plead a cause of action for conversion, the plaintiff must show that "(1) the property subject to conversion is 'a specific identifiable thing'; (2) plaintiff had 'ownership, possession, or control' over the property before its conversion, and (3) defendant 'exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights.'"  *Moses v. Martin*, 360 F.Supp.2d 533, 541 (S.D.N.Y. 2004) (internal citations omitted).

The Purchase Agreement clearly provides that Plaintiff-Appellant Oasis only purchased accounts receivable existing at Closing.  (Record, Tab 4, Ex. 8 at §1A(iv).)[23]  Under the express terms of the SRO, all receivables were required to be deposited into the Lockbox and further, the Substitute Receiver's rights to use cash collateral were at all relevant times expressly made subject to GECC's rights under the LSA and Lockbox Agreement during the pre-closing period.  Any conversion claim fails for the simple reason that the Trustee of the Debtors as owners, and GECC as senior secured lender with a superpriority lien and claim on all accounts receivable, had rights of possession superior to that of Plaintiff-Appellant Oasis (whose right only existed once Closing occurred) and EF (whose rights were subject to the LSA as was the Debtor's and Long Hill's).  Thus GECC cannot convert its own property.

## I.     Plaintiffs-Appellants Lack Standing to Assert a Claim for Turnover Under 11 U.S.C. 542 (Count VII) and Claims for Violation of the <u>Automatic Stay (Counts I, II, III, IV, and VII)</u>

Section 542(a) of the Bankruptcy Code provides in relevant part as follows:  "an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title . . . <u>shall deliver to the trustee,</u> and account for such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.  11 U.S.C. § 542(a) (emphasis added).  Section 542 by its express terms contemplates the return of property of the estate to the estate (or the trustee on behalf of the estate).

---

[23] GECC is not a party to the Purchase Agreement and no claim could be brought against it for "breach" of the Purchase Agreement.  Furthermore, Plaintiffs fail to allege acts that are unlawful or wrongful as distinguished from acts which may, at best, amount to a simple violation of contract.  *See, e.g.*, *Global View Ltd. Venture Capital v. Great Central Basin Exploration, L.L.C.*, 288 F. Supp 2d 473, 479 (S.D.N.Y. 2003) (discussing the "well-settled principle that, 'to sustain a conversion claim, a plaintiff must allege acts that are unlawful or wrongful as distinguished from acts that are a mere violation of contractual rights.'") (internal citations omitted);  *see also Mastroianni*, 526 F. Supp 2d 411, 415.

Plaintiffs-Appellants lacked standing to assert a claim for turnover under Section 542 as they are neither the Debtors nor the Trustee. Nor has standing been conferred upon them by a prior order of the Bankruptcy Court. *See In re STN Enterprises*, 779 F.2d 901 (2d Cir. 1985); *In re Housecraft Industries USA, Inc*., 310 F.3d 64 (2d Cir. 2002); *In re Commodore International Limited et al*., 262 F.3d 96 (2d Cir. 2001). Further, Plaintiffs-Appellants' claim for turnover fails as the Adversary Complaint demands turnover of purported property of the estate to Plaintiffs-Appellants, as opposed to the Debtors' estate or the Trustee. *See* 5 COLLIER ON BANKRUPTCY ¶ 542.01 ("The turnover of property of the estate under section 542 must be made to the trustee."). *See also In re Quaker Distribs., Inc.* 189 B.R. 63, 67 (Bankr. E.D. Pa. 1995) (demand for turnover under 542 is appropriately made only by the debtor, as opposed to a demand for turnover by a non-debtor). As noted, neither the Debtors nor the Trustee has sought turnover of the accounts receivable collected by GECC. If a court were to grant Plaintiffs-Appellants the relief they request, all collections would be turned over to Plaintiff-Appellant Oasis thereby rewriting the Purchase Agreement as approved by the Sale Order and giving to Plaintiff-Appellant Oasis assets the Trustee never agreed to sell.

**J.     The Claim for Declaratory Relief was Properly Dismissed (Count VI)**

All of the operative Loan Documents and Court orders point unerringly to the fact that it was GECC, and GECC alone, which was entitled to receive all the accounts receivable collected via the Lockbox Agreement and to re-loan funds under the formula provided for in the LSA. Plaintiffs-Appellants' insufficient claims for fraud, negligent misrepresentation, negligence, breach of fiduciary duty, conversion and turnover do not gain any sufficiency by Plaintiffs-Appellants' rebottling those claims in the form of a claim for declaratory judgment. Further, declaratory relief would add nothing to Plaintiffs-Appellants' claims. All of the funds

that went through the Lockbox prior to Closing have been disbursed. This is not like a case where an escrow fund is being held by an escrowee who needs direction from a court as to whom to pay the escrow funds. *See Morgenthan v. Erlbaum*, 59 N.Y.2d 143, 150 (1983) (purpose of declaratory relief is to determine parties' rights before "wrong" occurs).

**POINT IV**

**IN DISMISSING THE COMPLAINT, THE COURT BELOW
DID NOT MAKE A FACTUAL DETERMINATION THAT
<u>PLAINTIFFS-APPELLANTS  WERE GUILTY OF LACHES</u>**

In a last ditch effort to sustain their Complaint, Plaintiffs-Appellants argue that the "primary" reason Judge Littlefield dismissed the Complaint was that he was troubled by the timing, *i.e.*, their delay in bringing their action.   This, Plaintiffs-Appellants argue, was tantamount to a finding that Plaintiffs-Appellants were guilty of "laches." (*See* Plaintiffs-Appellants' Brief pp. 24-25).  Judge Littlefield made no such determination.

Plaintiffs-Appellants acknowledge they are sophisticated parties.  Plaintiffs-Appellants negotiated and executed the Purchase Agreement which provided that any borrowings by Purchaser or its Designee from GECC shall comply with the LSA.  Plaintiffs-Appellants submitted 301 borrowing requests and obtained in excess of $72 million in advances from GECC in the approximate 22 month Substitute Receivership Period.  Further, not only did Plaintiffs-Appellants proceed to Closing but they consented to the entry of the Distribution Order by the Bankruptcy Court -- which order (again, a final, non-appealable order of the Bankruptcy Court) directed the payment of the proceeds of sale to GECC as the holder of a first priority lien on all proceeds of sale.

GECC never pleaded or raised the defense of laches in its motion to dismiss.  The Dismissal Order was entered pursuant to Federal Rules 12(b)(6) based upon the Bankruptcy

Court's determination based on ample documentation that the Complaint failed to state a single claim against GECC.  Plaintiffs-Appellants' delay in bringing this action did not form the basis, let alone the primary basis, of the Bankruptcy Court's decision.  Rather, it underscored the knowledge of the Plaintiffs-Appellants in this matter.  In fact, the term "laches" does not appear once in the Transcript of Oral Argument below.  Judge Littlefield did not determine that Plaintiffs-Appellants' claims below were without merit because they unreasonably delayed in asserting them to the detriment of GECC (a "laches" determination).  Rather, Judge Littlefield made a common sense observation that in view of the fact that Plaintiffs-Appellants transmitted 301 BBCs to GECC and had appeared before Judge Littlefield more than a dozen times during the approximate 22 month Substitute Receivership Period and never once raised their concerns regarding the operation of the Lockbox or GECC's collection of accounts, Plaintiffs-Appellants themselves did not have a good faith belief in their own tortured misinterpretation of his Orders.

### POINT V

### <u>THE DISMISSAL ORDER SHOULD BE AFFIRMED</u>

The dismissal of the Complaint was based on documentary evidence:  The Bankruptcy and State Court orders and the Purchase Agreement.  Indeed, the very Purchase Agreement to which Plaintiffs-Appellants were party expressly and unambiguously provided that "to the extent Purchaser, [or the Substitute Receiver] during the period prior to Closing, seeks to use any accounts receivable," it must do so by establishing or continuing "the revolving credit facility of [GECC]."  (Record, Tab 4, Ex. 8 at ¶1C.)  Further, the Sale Order specifically deemed the Purchaser [and the Substitute Receiver] to be a signatory to the existing Lockbox Agreement which governed the collection and disbursement of the facilities' receivables.  (Record, Tab 4, Ex. 9 at ¶12.)  At all relevant times preceding and during Plaintiff-Appellant EF's tenure as

Substitute Receiver, GECC acted in accordance with the terms of the LSA, Lockbox Agreement, SRO, Final Sale Order and Cash Collateral Order.

The Bankruptcy Court properly dismissed the Complaint.  In so doing, the Bankruptcy Court interpreted its own orders and determined that none of the claims set forth in the Complaint were capable of being nudged across the line from fanciful to plausible.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Accordingly, the Dismissal Order should be affirmed in its entirety.

## POINT VI

## <u>COSTS SHOULD BE IMPOSED UNDER 28 U.S.C. § 1927 AND F.R.C.P. 11</u>

Several months after receipt of its portion of the Closing proceeds in which GECC received millions of dollars <u>less</u> than its loan balance, GECC was served with this Complaint.  After attempting without success to obtain Plaintiffs-Appellants' consent to withdraw their Complaint and after providing the requisite copy of the proposed motion and affording Plaintiffs-Appellants a 21-day safe harbor, GECC made a motion below pursuant to Federal Rules of Civil Procedure 11 for sanctions against Plaintiffs-Appellants.  Clearly, no such reasonable inquiry was made in this case nor could Plaintiffs-Appellants' reckless allegations be legally sustained in fact or law.

In addition to GECC's motion under Rule 11 below, this Court has the power to order sanctions under Rule 11 and for vexatious conduct under 28 U.S.C. § 1927.  A court may impose costs and fees pursuant to Section 1927 if it finds that "[a]n attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay."  *In re Cohoes Indus, Terminal, Inc.*, 931 F.2d 222, 230 (2d Cir. 1991).  Certainly, the additional costs to GECC in drafting and filing this Brief were

unnecessarily increased by Plaintiffs-Appellants' failure, after dismissal of their Complaint from the bench, to cease their meritless campaign against GECC.  Such conduct is "unreasonable" and "vexatious" and should not be countenanced by the Court.

## CONCLUSION

For all of the foregoing reasons, the Bankruptcy Court's Decision and Order dismissing the Complaint in this action should be affirmed in all respects and costs and sanctions should be imposed against Plaintiffs-Appellants.

Dated: Garden City, New York
　　　　June 20,  2011

MORITT HOCK & HAMROFF LLP


By:　　s/ Marc L. Hamroff　　　　　　　　
　　　　Marc L. Hamroff
　　　　William P. Laino
　　　　Theresa A. Driscoll

400 Garden City Plaza
Garden City, New York  11530
(516) 873-2000

*Attorneys for Appellee General Electric Capital Corporation*