UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

In re:                                          Chapter 11

HIGHGATE LTC MANAGEMENT, LLC,                   Case No: 07-11068 (REL)

                              Debtor,

-----------------------------------------------------------x
EF CONSULTING LLC and OASIS HC LLC,             Adversary Pro. No. 10-90175  (REL)

                       Plaintiffs,

               v.

GENERAL ELECTRIC CAPITAL
CORPORATION,

                       Defendant,

-----------------------------------------------------------x

EF CONSULTING LLC and OASIS HC LLC,             Case No. 11-cv-00325 (DNH)

                       Appellants,

               v.

GENERAL ELECTRIC CAPITAL
CORPORATION,

                       Appellee,

-----------------------------------------------------------x


**REPLY BRIEF OF APPELLANTS EF CONSULTING LLC AND OASIS HC LLC**


                                        Backenroth Frankel & Krinsky LLP
                                        489 Fifth Avenue 28th Floor
                                        New York, NY 10017
                                        (212) 593-1100
                                        (212) 644-0544 (fax)
                                        Attorneys for Appellants

## Table of Contents

PRELIMINARY STATEMENT……………………………………………………………………    1

BACKGROUND……………………………………………………………………………...    6

POINT  I

      GECC'S OPPOSITION IS PREMISED ON A FALSEHOOD ……………….………    9

POINT II

      GECC ADMITS THAT IT TOOK THE $610,000 MEDICAID ADJUSTMENT AND
DID NOT APPLY IT TO THE REVOLVER …………………………………………….    11

POINT III

      GECC'S FUZZY MATH HIGHLIGHTS ITS IMPROPER ACTIONS……………    14

POINT IV

      GECC'S INTERPRETATION OF THE COURT ORDERS IS INCOMPATIBLE
WITH THE LAWS GOVERNING RECEIVERS UNDER THE RPAPL AND NEW
YORK'S PUBLIC HEALTH LAW……………………………………………………    17

POINT V

      GECC ADMITS THAT CERTAIN FACILITIES' EXPENSES HAD PRIORITY…..    18

POINT VI

      THE COURT BELOW IMPROPERLY DISMISSED THE COMPLAINT NOT
UPON THE MERITS BUT BASED UPON ITS DISPLEASURE WITH THE TIMING….    19

POINT VII

      GECC DISTORTS THE COURT ORDERS……………………………………………    21

POINT VIII

      THE COMPLAINT SHOULD NOT HAVE BEEN DISMISSED SINCE GECC

FAILED TO SHOW THAT ITS TAKINGS WERE ACCURATE ……………………….  22

POINT IX

GECC'S REQUEST FOR SANCTIONS IS FRIVOLOUS AND A TRANSPARENT
ATTEMPT TO CHILL APPELLANTS' RIGHT TO APPEAL ……………………….  23

CONCLUSION …………………………………………………………………………..  24

## TABLE OF AUTHORITIES

**CASES**

*New Lousiana Holdings, LLC et al v GE,  et al,* 11-cv-3773 (S.D.N.Y.) ..................... 3,4, 20

United Sav. v. Timbers of Inwood Forest, 484 U.S. 365 (1988) ................................... 16

In re United Merchants & Mfrs., Inc., 1979 Bankr. LEXIS 762, 13-14 (Bankr. S.D.N.Y. 1979) 16

*Vanston Bondholders Protective Committee v. Green,* 329 U.S. 156, 164 (1946)................. 16

*See Harvis Trien & Beck, P.C. v. Federal Home Loan Mortg. Corp. (In re Blackwood Assocs., L.P.),* 153 F.3d 61, 65-66 (2d Cir. 1998)............................................................... 20

<u>Oliveri v. Thompson</u>, 803 F.2d 1265, 1275 (2d Cir. 1986) .....................................23, 24

*Securities Indus. Ass'n v. Clarke*, 898 F.2d 318, 321 (2d Cir. 1990)............................   23

*Thypin Steel Co. et al. v. Certain Bills of Lading Issued for Cargo of 3017 Metric Tons,More or Less, of Hot Rolled Steel Plate Laden on Board the M/V Geroi Panfilovsky,* 1998 U.S. Dist. LEXIS 20212, 1998 WL 912100, at \*7 (S.D.N.Y. Dec. 30, 1998) ......................................... 23, 24

*Argo Marine Systems, Inc. v. Camar Corp.*, 755 F.2d 1006 (2d Cir. N.Y. 1985)................. 24

In re 72nd Street Realty Associates, 185 B.R. 460, 475 (Bankr. S.D.N.Y. 1995) ..............   24

**STATUTES**

NEW YORK REAL PROPERTY AND PROCEEDINGS LAW §1325 .................. 1, 6, 8, 17

NEW YORK PUBLIC HEALTH LAW§ 2810(2) ......................................... 1, 6, 9, 17

FED. R. CIV. PRO. 11.................................................................. 23, 24

28 U.S.C § 1927....................................................................................23, 24

Appellants EF Consulting, LLC (the "Substitute Receiver") and Oasis HC LLC ("Oasis," collectively, the "Appellants") submit this reply brief in further support of their appeal from the bankruptcy court's bench ruling, dated February 11, 2011, as memorialized by written order dated February 23, 2011, granting defendant General Electric Capital Corporation's ("GECC") motion to dismiss the Adversary Complaint and denying Appellants' cross-motion for summary judgment (the "Dismissal Order"). Unless stated otherwise, Appellants incorporate all definitions set forth in their initial brief in support of their appeal.

## PRELMINARY STATEMENT

Appellants asserted in their initial brief that GECC improperly paid itself millions of dollars in fees and interest from the income, funds and receivables of the Substitute Receiver, prior to the Substitute Receiver's payment of all receivership expenses (which were budgeted and agreed to by GECC), as required under both the Substitute Receiver Order and New York statutory law governing receivers under RPAPL 1325(2) and Public Health Law 2810(2)(c).

GECC's opposition and purported justification for taking the fees prior to the Substitute Receiver, is primarily based on certain false assertions and distorted quotations. Most notably, that the Purchase Agreement between Oasis and the Bankruptcy Trustee somehow required the continuation of its pre-petition line of credit agreement, i.e., the Revolver (GE OppB. pp. 12 & 48). GECC's allegation is incorrect for the following reasons: First, this action involves pre-closing funds which should have been available to the Substitute Receiver to pay the Facilities'

expenses.[1] This action has nothing to do with what money belonged to the purchaser, or Oasis, post-closing.

Second, GECC deliberately misleads the Court in its citation to the Purchase Agreement, which (as will be shown herein) does not mandate, permit, or require that the Substitute Receiver operate the "Revolver."  Nor does the Purchase Agreement convey ownership of pre-closing receivables to GECC, especially since it was not even a party to the agreement.

Third, GECC's diversion of the Substitute Receiver's funds violates the Substitute Receiver Order.  As the Bankruptcy Court ordered in its Final Sale Order, if there is any disagreement between the Purchase Agreement and the Substitute Receiver Order, the Substitute Receiver Order controls (Record, Tab 4, Ex. 9,  p. 18, para 30).

Moreover, GECC now admits for the first time on appeal that it prior assertion under oath that it applied the $610,000 Medicaid adjustment to the Revolver (see, the Declaration of Richard Arrowsmith, executed January 4, 2011 ["ArrowDec"] at para 34)(Record, Tab 4) is false, as it was applied to other obligations (GE OppB. p. 18, Ft. 7) for which it was not collateral. In State Court, GECC had initially denied that it took the Medicaid adjustment. Moreover, GECC took the funds without informing the bankruptcy court, the creditors or the U.S. Trustee, and without any Court filing. These funds (and others) are all property of the Substitute Receiver.

GECC seeks to obfuscate its misconduct by misleading the Court as to the ownership of the $610,000 Medicaid adjustment, essentially positing that while it had no permission to take this money, Oasis shouldn't have any right to it either because the purchase of the Facilities did

---

[1]      GECC also incorrectly asserts that the Substitute Receiver could not use pre-closing receivables without complying with the Revolver (GE OppB. pp. 9, Ft. 1 & 17).

not include a right to **post-closing** Retroactive Adjustments under the Purchase Agreement.  This argument is simple misdirection because the Substitute Receiver was entitled by Court Order to <u>all</u> of the Debtors' pre-closing income without any limitations whatsoever (Record, Tab 4, Ex. 10, pp. 6-7, 9 & 16).  Here, the Substitute Receiver is seeking to recover what is undeniably a **pre-closing** asset—the $610,000 Medicaid adjustment that was received and converted by GECC well in advance of closing.  Pursuant to the Substitute Receiver Order and statutory law, the pre-closing income belonged to the Substitute Receiver and was to be used to pay for patient needs.

GECC's abrupt about face on this issue for the first time on appeal in and of itself warrants reversal of the Dismissal Order, as it supports the cause of action for, at least, conversion. The Court may take judicial notice of GECC's ever changing positions regarding its taking and application of the Substitute Receiver's funds (Cf., Record, Tab 4, ArrowDec. para 34; & GE OppB. p. 18, Ft. 7).

GECC's about face regarding the Medicaid adjustment is especially significant, since it failed to submit any itemization or explanation showing that the other funds that it took were for expenses and/or interest.  Thus, GECC failed to show that its alleged fees and interest were accurate or legitimate. Therefore, the bankruptcy court should not have dismissed the Adversary Complaint at the pleading stage where all allegations are accepted as true.

Moreover, the Court may take judicial notice that there is another lawsuit pending against GECC and related entities, which also names Richard Arrowsmith -- the same GECC executive that oversaw this loan, signed GE's declaration, and falsely swore that the Medicaid adjustment was applied to the Revolver --  for fraudulently overstating expenses and interest relating to financing provided to other skilled nursing facilities. *See e.g.,   New Lousiana Holdings, LLC et*

*al v GE, et al,* 11-cv-3773 (S.D.N.Y.). In that case GECC and Arrowsmith are being sued by 15 separate healthcare entities for rampant misconduct, including overcharging fees and interest and refusing to account for such alleged fees and interest, as they have done here.

As discussed below and in our initial moving papers, GECC's actions (i.e., paying themselves prior to the payment of all budgeted and agreed receivership expenses) were not permitted under: (i) the Substitute Receiver Order; and/or (ii) state law applying to the duties of a public health receiver (which mandates that the skilled nursing facilities' expenses are paid first).

GECC erroneously asserts that it owned all of the Facilities' account receivables[2] Therefore, according to GECC, to ensure that the Facilities did not go out of business (since they had no money), GECC would lend the Facilities 85% of their projected receivables ***even after the bankruptcy petitions were filed***. Further, according to GECC, it was permitted to keep any part of Debtors' accounts receivable as fees, interest or for other as yet undetermined reasons (since it was never included in any budget).

This explanation makes no sense. At the time of the bankruptcy filings, all pre-petition lending (and the interest accruing thereunder) ceased by operation of law. Thus, the "Revolver" which had millions of dollars outstanding (and no available credit) ***froze as is.*** There is no Court Order (or statute) which allowed GECC to continue the "revolver" which as of the date of the filings was a pre-petition debt. Thus, the first penny of receivables taken by GECC after the

---

[2]        GECC's entire basis for claiming that it "owned" the Facilities' account receivables is that the "Revolver" granted it a security interest in those receivables. Once the bankruptcy was filed, however, all of the accounts receivable was the property of the bankruptcy estate which GECC could not touch absent court permission. Thus, , GECC's revolver died upon the Facilities' bankruptcy. Whatever lending that GECC was allowed to do after the petitions were filed came only from the Shortfall Agreement (which even GECC agrees did not apply to the Substitute Receiver) and the Cash Collateral Order (which only permitted lending in accordance with the inapplicable Shortfall Agreement). Thus, none of the relevant documents granted GECC any ownership in the receivables. In any event, s "security interest" without any more (such as a separate automatic assignment) is a far-cry from the ownership interest GECC claims.

filings was improper as was its continued cycle of collecting interest and fees and only lending a portion of the Facilities' receivables.

Further, at the time of the Substitute Receiver Order, GECC had no reason to retain any of the Facilities' accounts receivable because there was no Shortfall Agreement and thus no reason for GECC to be lending or collecting any of the bankruptcy estate's money. In fact, GECC admits that the budgets submitted to and approved by the Court, pursuant to the Cash Collateral Order, did not make any mention of the millions of dollars that it took (GE OppB. p. 33, Ft. 15). GECC claims that this was because the budget was based on the 85% of receivables that GECC allowed the Debtor to borrow after the first wave of fees, interest, principal reduction and unidentified funds were taken. In other words, GECC collected the Debtors' accounts receivable and then, unlike any other "post-petition" lender (who would lend new money), GECC was allowed to skim 15% of all funds outside of the view of the Bankruptcy Court. As shown, the law does not allow GECC's taking of the Debtors' revenue.

The simple fact remains that upon the bankruptcy filings all accounts receivable belonged to the Debtors and by extension, the Receiver, and not to GECC. The Revolver, like all pre-petition lending instruments, terminated by its own terms upon the bankruptcy filings. GECC improperly took the initial accounts receivable, which belonged to the Debtors and Receiver, and then "lent" the Facilities a portion of their own money back after deducting unspecified interest and fees that it wanted. GECC seeks to obfuscate this by referring to pre-bankruptcy documents and agreements, to which the Receiver was not a party and which terminated upon the bankruptcy filings, and which have no relevance to the Substitute Receiver, who was bound by the Substitute Receiver Order which did not mandate or provide for any borrowing from GECC.

## BACKGROUND

To understand the sequence of events leading up to this Adversary Complaint, it is critical to comprehend the overall background under which the Substitute Receiver was operating.  When the Facilities were forced into bankruptcy, they had descended into a state of operational and financial chaos.  The Receiver or Initial Receiver was appointed by the state court pursuant to New York's Public Health Law and the RPAPL, so as to protect the needs of the patients and ensure they had adequate care. DE 5, Ex. 10.

The real reason that GECC actively participated in, and encouraged, the appointment of the Initial Receiver and Substitute Receiver was to preserve its collateral, by saving the Facilities owned by the Debtors. If GECC would not have cooperated, the Debtors would have collapsed; the patients would have been sent elsewhere; the nursing Facilities would have disbanded; and GECC's over $20 million investment would be secured by nothing but an empty shell and would be rendered virtually worthless.

GECC's argument that it would not have participated in the sale of the Debtors to Oasis if not for its ability to take millions of dollars in fees is untrue.  By "cooperating" GECC was able to recoup over $20 million that it had lent the Debtors, a return far better than many debtors attempting to collect funds from a bankrupt creditor.

The Initial Receiver was hand selected by GECC and effectively functioned as an arm of GECC.[3]  The Court allowed this to take place because of GECC's interests and since it was required, via the Shortfall Agreement, to make up for any operational deficit during this period.

---

[3]      GECC specifically requested this entity be put in place in its Order to Show Cause to appoint a receiver.  In fact, the Initial Receiver's website specifically notes that it was contracted by the mortgage holder/lender (i.e. GECC) in reference to its management of the Debtors (http://www.longhillcompany.com/engagements.htmcites)

The Initial Receiver operated the Facilities during this period in a manner that maximized GECC profit, including continuing, *at the Initial Receiver's option*, the Revolver and Lockbox arrangement which was to GECC's benefit, but not to that of the skilled nursing Facilities. The continuation of the Lockbox made sense, because (i) the Initial Receiver was a GECC appointee and (ii) GECC was mandated to fund the Debtors through the Shortfall Agreement.  DE5, Ex. 5. GECC did not live up to its obligations, however, because the Initial Receiver apparently was left with unpaid accounts receivable.

Once a potential buyer appeared on the horizon, however, the arrangement was terminated by the Court, and GECC's handpicked receiver was replaced. The Substitute Receiver took over in its stead.  Evidencing this arrangement, the Shortfall Agreement terminated and the Substitute Receiver became liable for any shortfall in the operating budget (DE 1, ¶ 14, DE 5, Exhibit 9.).  As a result of the relationship between GECC and the Initial Receiver, GECC would take 100% of the receivables belonging to the Facilities, and purportedly "loan" the Initial Receiver back 85% of the cash receipts, and charge interest for the privilege.

The Substitute Receiver then took over and continued running the Facilities. Once the Substitute Receiver was in place, however, GECC no longer had any need or permission to take any of the accounts receivable. All accounts receivable was deposited in the Lockbox, which are common accounting mechanisms and *nothing in the Lockbox Agreement says that the Revolver would continue or that GECC was entitled to use the Debtors' accounts receivable*.[4] Plaintiffs

---

[4]       This point cannot be stressed enough. The Substitute Receiver Order *only mentions the Lockbox Agreement* and the Lockbox Agreement does not say anything about (i) the Revolver; (ii) GECC's ownership of receivables; and (iii) GECC's ability to lend money or keep any money.  GECC argues that the Revolver and Lockbox Agreement go hand in hand. This is false. Nothing in the Lockbox Agreement requires the continuation of the Revolver and the Substitute Receiver was only empowered to maintain the Lockbox Agreement.

remained unaware that GECC was misusing the lockbox and keeping funds for itself until the GECC diverted the $610,000 Medicaid adjustment.

On or about April 2010, months prior to the closing of the sale of the Facilities (which did not occur until August 30, 2010), Medicaid sent a check to the Lockbox (in the same manner Medicaid sends all checks).  DE 1, ¶ 54.  This check was unexpected and came in as a result of the governmental periodic adjustments of such facilities, in which they periodically review their payments to skilled nursing facilities based on a host of complex factors, and systematically adjust, upwards or downwards, the amount it should have paid out. Here, the payment was in favor of the Facilities in excess of $610,000.

This $610,000 belonged to the Substitute Receiver.  It was automatically deposited in the Lockbox.  GECC then wrongfully took the $610,000 and refused to return it to the Substitute Receiver.  Even under GECC's improper scheme (where it claimed that it "owned" the Facilities' money and gave it only an 85% allowance), this money was not accounts receivable and did not belong to GECC.  Nevertheless, GECC kept this money without any warning or authority.  Not only did GECC not "loan" back the funds, GECC now admits that it *did not credit the Revolver loan balance at all*.  Instead, GECC allegedly applied the $610,000 plus Medicaid adjustment to some other pre-petition debt for which it was not collateral (GE OppB. p. 18, Ft. 7).

Plaintiffs then discovered that GE would take 100% of the receivables belonging to the Facilities and "loan" them back 85%, and charge unspecified interest and fees. This was improper, since the Substitute Receiver was not bound by the Revolver to which it was not a party. Moreover, it violated the laws governing receivers pursuant to both the RPAPL and New

York's Public Health Law, which required that the needs of the Facilities and their patients (for which there was a shortfall every single month of the Substitute Receiver period) be given priority over the payment of any debt service.  At that point, the Substitute Receiver moved the State Court for the $610,000 Medicaid adjustment to be returned to the Facilities to pay for basic patient needs. The State Court proceeding ultimately culminated in the Adversary Complaint.[5]

## POINT I

## GECC'S OPPOSITION IS PREMISED ON A FALSEHOOD

GECC's opposition is primarily based on the assertion that the Purchase Agreement between Oasis and the Bankruptcy Trustee (and Debtors), entered and approved pursuant to the bankruptcy court's Final Sale Order, required the continuation of GECC's pre-petition line of credit agreement or the "Revolver" (GE OppB. at pp. 12 & 17).  This argument is false for the following reasons.

First, GECC confuses apples with oranges.  This action involves pre-closing funds which should have been available to the Substitute Receiver under the SRO and applicable law, to pay the Facilities' expenses (Record, Tab 4, Ex. 10, pp. 6-7, 9 & 16). This action has nothing to do with what money belonged to the purchaser, Oasis, post-closing.  Thus, GECC's reliance on the Purchase Agreement is inapposite for this reason alone.

Second, GECC misleads the Court by distorting a quotation to the Purchase Agreement, which indisputably does not mandate, permit, or require that the Substitute Receiver operate the

---

[5]        GECC attempts to portray the denial of the state court motion as evidence that the state court understood it was the bankruptcy court's job to interpret its own orders. This is not supported by any evidence and the state court's decision is silent in this regard.  It is undisputed that the bankruptcy court had jurisdiction over the estate and its funds and, therefore, the state court denial may have simply been an understanding that the bankruptcy court should retain jurisdiction over matters that relate to the bankruptcy estate.

"Revolver."  The Purchase Agreement certainly does not convey ownership of pre-closing receivables to GECC (who was not even a party to the agreement). This is the GE "quote" from its appellate brief (GE OppB. p. 12):

> "The Purchase Agreement further provided that "to the extent Purchaser [or the Substitute Receiver] during the period prior to Closing, seeks to use any accounts receivable," it must do so by establishing or continuing "the revolving credit facility of [GECC] …" (Record, Tab 4, Ex. 8 at ¶1C and ¶5.1 (c)) (emphasis added)." *Id.* ¶1C.

This is the actual quote from the Purchase Agreement:

> "To the extent Purchaser, as Receiver or the Receivership Designee during the period prior to Closing, seeks to use any accounts receivable and establish and/or continue the revolving credit facility of General Electric Capital Corporation ("GE"), then: (A) Purchaser shall use accounts receivable collected for services rendered or provided both prior to and after the issuance to Purchaser of the Requisite Approvals to pay, without credit to the Purchase Price, all accrued operating expenses, including trade accounts payable, professional fees and expenses (including trustee fees) of Trustee, and Committee and U.S. Trustee fees which are incurred between Final Sale Order and Closing (in accordance with Annex IC hereto), accrued vacation, sick and personal time and similar items, cash receipt assessment and similar taxes, employee wages or salary, and required contributions under employee benefit plans or programs, including accrued but unbilled expenses arising from the operation of the Facilities after the Order Appointing Receiver through the Closing Date; and (B) Purchaser shall be in compliance with the Order Appointing Substitute Receiver and pay expenses of the estate consistent with the approved budgets and cash collateral orders entered by the Bankruptcy Court…."

Record, Tab 4, Ex. 8 at ¶1C

> "All accounts receivables collected during the Temporary Receivership Period shall be held by the Substitute Receiver as defined in the Order Appointing Substitute Receiver and applied to the payment of all expenses of the facilities including those incurred during the pendency of the prior receivers1p of Long Hill Alliance Company consistent with cash collateral orders in the Bankruptcy Case, approved budgets and the terms of the Order Appointing Substitute Receiver. Purchaser shall comply with all aspects of the existing Revolving Credit Facility with GE including the establishment of lock box accounts and executing such

other documents a GE may reasonably require."

Record, Tab 4, Ex. 8 at ¶5.1 (c)

Thus, as shown above, GECC misquotes the Purchase Agreement in the following manner:  First, the Purchase Agreement contemplates the possibility but does not require the borrowing of money from GECC.  Second, the use of receivables is completely separate from the possible use of the Revolver, since nothing therein mandates or connects the use of receivables to the Revolver.  Third, the express purpose of this paragraph is that any use of funds (a) belonging to the Facilities cannot operate as a credit to the purchase price at closing; and (b) ***including the use of the Revolver must comply with the Substitute Receiver Order.***

Fourth, to the extent GECC can find any authority for its diversion of funds in the Purchase Agreement, it is still a violation of the Substitute Receiver Order. Moreover, as the Bankruptcy Court ordered in its Final Sale Order, if there is any disagreement between the Purchase Agreement and the Substitute Receiver Order, the Substitute Receiver Order controls (Tab 4,  Ex. 9, p. 18,  para 30).

## POINT II

### GECC ADMITS THAT IT TOOK THE $610,000 MEDICAID ADJUSTMENT AND DID NOT APPLY IT TO THE REVOLVER

GECC now admits for the first time that its prior assertion, under oath, that GECC applied the $610,000 Medicaid adjustment to the Revolver is false (Cf., GE OppB. p. 18, Ft. 7; & Record, Tab 4, ArrowDec. at para 34). Instead, GECC found an extra $610,000 in the Lockbox and simply took the funds for itself, and allegedly applied them to a different pre-petition debt for which it was not collateral. Based on this new admission alone, the Dismissal Order must be

reversed, as Appellants have alleged a cause of action against GECC for, at the very least, conversion of the Medicaid adjustment.

Moreover, the Substitute Receiver Order explicitly provided that all incoming funds, monies, income, receivables, etc., including the Medicaid adjustment were to go to the Substitute Receiver. "The Substitute Receiver shall collect incoming payments from all sources *and apply them to the costs incurred in the performance of its functions and obligations hereunder*". (Record, Tab 4, Ex. 10, p. 16) (emphasis added). The SRO further gives the Substitute Receiver the authority to utilize ***all*** of the Facilities' accounts receivable to meet its obligations:

> "That the Substitute Receiver *shall be entitled to utilize all accounts receivable* cash existing at the Facility as of the date of the commencement of its appointment as receiver to meet Substitute Receiver's obligations hereunder except that funds held in escrow by Long Hill for professional fees shall not be deemed to be cash existing at the Facility but shall be turned over by Long Hill to be held in escrow by counsel to the Trustee" (Record, Tab 4, Ex. 1, Complaint ¶ 26, Ex. 10, p. 9) (emphasis added).

GECC seized the Medicaid adjustment without informing the Court, the U.S. Trustee, or the Creditors Committee of this $610,000 plus windfall. Furthermore, it failed to credit the Revolver or acknowledge its receipt of these funds until the Substitute Receiver threatened to seek court intervention. GECC's misconduct is compounded by its admission (which it attempts to bury in a footnote: GE OppB. p. 18, Ft. 7) that the Medicaid adjustment was not accounts receivable but simply a bankruptcy asset that was subject to Court supervision. Thus, even under GECC's incorrect explanation of how the Revolver worked (based on its erroneous claim that it owned the Facilities' accounts receivable), the Medicaid adjustment still belonged to the bankruptcy estate and not GECC, since it was not accounts receivable. Therefore, GECC's

taking of the bankruptcy estates' asset without the permission of the Court, the U.S. Trustee, the Creditors Committee and the Substitute Receiver is, at the very least, conversion.

GE's *post facto* excuse that the Trustee dropped the ball and failed to object to GECC's diversion in this complex bankruptcy action does not in any way immunize or retroactively lessen the conversion that took place.  In fact, to date, there has been no Court Order allowing GECC to retain these funds. The best evidence of GECC's improper diversion is encapsulated by its own words:

> "In order to provide full disclosure to the Court, GECC advises that after GECC realized that this amount was not a receivable to which EF (the Substitute Receiver) was to have any access under the Purchase Agreement, GECC reversed the application to the Revolver and retained the funds for payment of the other secured obligations due it" (GE OppB. p.18, Ft. 7)

Thus, GECC declared itself to be the judge, jury, and owner of $610,000 in funds without consulting or even informing the bankruptcy court of the very existence of this money. Without mentioning this money in any budget, and without making other creditors aware of the existence of these funds, GECC took $610,000 of the Substitute Receiver's funds.  Instead, GECC determined that the bankruptcy estate would be best served if it kept this money for itself to pay off some unidentified portion of its ***pre-petition debt*** rather than allowing the Court to make the proper determination, which might be less favorable to GECC but perhaps more fair to the hundreds of patients and staff in the Facilities.

GECC's contention that the Substitute Receiver was not entitled to the Medicaid funds under the Purchase Agreement is also incorrect.  The Purchase Agreement excluded retroactive adjustments **after or subsequent** to the closing, i.e., they were not sold to Oasis.  All retroactive

adjustments that came in pre-closing, or during the bankruptcy proceedings and prior to the liquidation of the bankruptcy estate were, as GECC admits in the very same paragraph, ordinary assets of the bankruptcy estate.  GECC ignores that the adjustment *predated* the closing and was therefore a pre-closing asset and should have been used by the Substitute Receiver prior to closing to reduce the Facilities' deficit by over $610,000.  It is indisputable that according to the SRO *all assets of the Facilities belonged to the Substitute Receiver* (including rate adjustments) for use to pay its expenses.

Thus, under the SRO, the New York laws governing receivers under both Public Health Law and the RPAPL, and the Purchase Agreement, the $610,000 Medicaid adjustment should have been used to pay for the needs of the patients and Substitute Receiver, as opposed to GECC.  Moreover, GECC's improper diversion of the Medicaid adjustment from the Lockbox is further evidence of its improper conduct and supports a claim sounding in, at the very least, conversion which requires reversal of the Dismissal Order.

## POINT III

## GECC'S FUZZY MATH HIGHLIGHTS ITS IMPROPER ACTIONS

GECC's argument is essentially that it was permitted to keep the Facilities' receivables because it was authorized to lend money to the Facilities post-petition.  Therefore (using GECC's own example), because GECC gave the Facilities a loan based on 85% of their prospective receivables, GECC was authorized to keep 100% of the Facilities' receivables.  GECC argues that why else would it participate in the bankruptcy process or "lend" money, if it was not allowed to take something off the top?  GECC attempts to avoid the fact that no Order,

court-approved budget or statute (whether state-receiver law or the Bankruptcy Code) permitted GECC to keep the millions of dollars that it took.

First, GECC participated in the bankruptcy to attempt to maximize the return on its collateral. The best way to do that was to keep the Debtors going so that they could sell the Facilities. GECC would not have collected even a fraction of its outstanding loan, had the Debtors simply dissolved and lost their operating license.

Second, GECC participated in the bankruptcy to suck out money in fees, principal and interest.  According to GECC, it only lent at most 85% of the Facilities' receivables back to the Substitute Receiver. After GECC unilaterally took its claimed interest and fees, the Facilities' deficit increased at an exponentially higher rate each month (growing to over $9 million at closing).  Thus, GECC's Revolver was a deadly parasite slowly sucking the bankruptcy estate dry, to the detriment of the Substitute Receiver and patients.

Third, GECC's argument is premised on yet another false assertion, i.e., that the accounts receivable belonged to it and not the Substitute Receiver (which like many of its obfuscations it hides in a footnote). GECC undercuts this argument by later admitting that the bankruptcy estate owns the pre-closing receivables (GE OppB. p. 11: "Until closing any accounts receivable remained the property of the Bankruptcy Estate".) Thus, the pre-closing funds belonged to the bankruptcy estate and the SRO required that the Substitute Receiver use those funds to maintain the Facilities and pay their expenses (Record, Tab 4, Ex. 10, pp. 6-7, 9 & 16).. According to GECC, its circular, parasitic scheme had to continue because on "day one" of the Substitute Receiver's appointment GECC had to lend it money based on prospective receivables.

Moreover, upon the filing of the bankruptcies all accounts receivable belonged to the Debtors, and by extension, the Initial Receiver and Substitute Receiver, and not to GECC. At the time the petitions' were filed, the "Revolver" was frozen, no interest could accrue or be collected and no principal could be paid down. GECC admits that it took this initial post-petition accounts receivable, which belonged to the Debtor and Initial Receiver, and then "lent" the Facilities a portion of their _own_ money back after deducting whatever interest and fees it wanted. This initial "collection" was used to improperly pay down pre-petition debt and collect interest.

In any event, this has no relevance to the Substitute Receiver, who was bound by the Substitute Receiver Order, which did not mandate or provide for any borrowing from GECC.[6] Furthermore, the Substitute Receiver was responsible for its own shortfall. In fact, what really happened is GECC just continued its *pre-petition* line of credit, as *no new money was lent to the Substitute Receiver.*[7]

---

[6] GECC uses the Shortfall Agreement which it had with its own hand-picked Initial Receiver, as an excuse for restarting the "Revolver." This argument fails for two reasons: First, the fact that GECC was obligated to cover the shortfall of the Initial Receiver (its own appointee) did not mean it was able to breathe life into the Revolver and begin taking profits from the Facilities. The Shortfall Agreement was simply a requirement that GECC ensure the survival of the Facilities and its patients while its own receiver operated the Facilities. Second, since the Substitute Receiver had no Shortfall Agreement and was responsible for the Facilities' shortfall, there was no longer any reason to continue keeping the Facilities' receivables and taking money off the top.

[7] Because the Revolver simply continued a pre-petition debt, GECC was precluded from its post-petition collection of interest on pre-petition debt. United Sav. v. Timbers of Inwood Forest, 484 U.S. 365 (1988);  see also, *In re United Merchants & Mfrs., Inc.*, 1979 Bankr. LEXIS 762, 13-14 (Bankr. S.D.N.Y. 1979) (citing *Bruning v. United States*, 376 U.S. 358, 362 (1964)("In a bankruptcy or a Chapter XI case, it is fundamental that a claimant against the debtor's estate may not claim interest accruing after the filing of the petition.)" ; *Vanston Bondholders Protective Committee v. Green,* 329 U.S. 156, 164 (1946).

## POINT IV

## GECC'S INTERPRETATION OF THE COURT ORDERS IS INCOMPATIBLE WITH THE LAWS GOVERNING RECIEVERS UNDER THE RPAPL AND NEW YORK'S PUBLIC HEALTH LAW

GECC's interpretation of the various court orders is not only wrong, but is also incompatible with the New York Public Health Law and the RPAPL, which require patient needs and property maintenance be given priority over payments to a lender.

GECC essentially argues that the Substitute Receiver did not "own" the Facilities' accounts receivable; had no money to carry out its legally mandated responsibilities; and could only spend what GECC gave the Substitute Receiver from the accounts receivable. GECC claims that it decided to ensure the facilities' success, and give the Substitute Receiver 85% of the facilities' accounts receivable.[8] GECC does not offer any legal authority to support this incorrect notion. Moreover, the Public Health Law and RPAPL do not provide any kind of exception for a super priority lender as GE suggests.

In apparent recognition of the strength of Appellants' position, GE claims that the argument that RPAPL 1325 and Public Health Law 2810 require that all expenses must be paid prior to payments to a secured lender, was not raised below (GE OppB. p. 32 Ft. 14).  GECC's claim is plainly contradicted by the record, as Appellants raised this argument at virtually every level of the adversary proceeding from plaintiffs' Adversary Complaint (Record, Tab 4, Ex. 1, Compl. ¶ 7) to their brief in opposition to the motion to dismiss and in support of their motion

---

[8]     According to GECC, on "day one" of the Substitute Receiver, GECC had the power to keep all of the accounts receivable and to refuse to "lend" the Substitute Receiver any of the Facilities' receivables effectively shutting them down. This could not have been the Court's intent in appointing the Substitute Receiver, who is mandated to protect patient health.

for summary judgment (Record, Tab 3, Ex. 12, pp. 10, 16-19 ); and it was discussed extensively at oral argument (Record, Tab 3, Ex. 28, Tr. pp.4[16], 21[5] & 24[3]).

As argued to the bankruptcy court, the Public Health Law and the RPAPL do not allow for GECC to take interest and principal payments prior to the payment of expenses of the Substitute Receiver, the Facilities, and the patients. As further pointed out during oral argument before the bankruptcy court, GECC was even further protected since the Substitute Receiver's expenses were limited by budgets which were reviewed, approved and agreed to by GECC (Record, Tab 3, Ex. 28, Tr. pp. 27[3-25]-28[1-3]). Thus, the Dismissal Order should be reversed on this ground as well.

## POINT V

### GECC ADMITS THAT CERTAIN FACILITIES' EXPENSES HAD PRIORITY

GECC admits that, at the very least, certain expenses related to property maintenance were required to be paid prior to it taking any funds (GE OppB. p. 31, Ft 13; Record, Tab 3, Ex. 27, p. 9), which was repeatedly confirmed by the bankruptcy court (Record, Tab 3, Ex. 28, Tr. pp. 16, 19-20 & 27). But this did not happen. Instead GECC took *all* of the money and left the patients and Facilities without their account receivable which is a violation of the SRO. In fact, GECC took all the money first which is prohibited by law.

GECC's actions contradict its position that it "owned" all accounts receivable of the Facilities. For example, if GECC owned all the money, then how could the receiver pay the limited category of expenses that GECC admits should have been paid first? Or put differently, if 100% of the money coming in was "required" to be deposited in the Lockbox and applied towards the Revolver as GECC claims, then how could anything be paid prior to GECC? The

court orders did not require all incoming money to be deposited in the Lockbox to be "owned" by GECC and then only to be partially lent back to the Facilities. Instead, the court orders required a priority of payments that placed the needs of the Facilities and that of the patients prior to GECC.

GECC's position is even more untenable, since there was no Shortfall Agreement with the Substitute Receiver. Thus, GECC is essentially claiming that it owned all the funds coming into the Facilities and could, at its discretion, choose to lend the money back to the Facilities. This means that GECC could also choose *not* to lend the money back to the Facilities, but simply to let them rot and leave the hundreds of patients to fend for themselves. Thus, GECC essentially argues that the bankruptcy court allowed it complete, unchecked discretion (since it also apparently did not have to include its use of the receivables in the Court-mandated budgets) to completely control the cash flow of the Facilities without any regard to patients' needs. This position is improper and obviously not what the Bankruptcy Court provided for.

## POINT VI

### THE COURT BELOW IMPROPERLY DISMISSED THE COMPLAINT NOT UPON THE MERITS BUT BASED UPON ITS DISPLEASURE WITH THE TIMING

From even a cursory review of the transcript of the oral argument, the bankruptcy court did not dismiss plaintiffs' case because, as GECC asserts, it agreed with or even condoned GECC's behavior or found that GECC's actions were consistent with its Orders. In fact, the bankruptcy court explicitly acknowledged that it was not focused on the estate's funds after the appointment of the Substitute Receiver (but on issues regarding the Department of Health and patient safety unrelated to GECC) (Record, Tab 3, Ex. 28, Tr. pp. 49[18-25]-50[1-6]).

Rather, the bankruptcy court improperly concluded that plaintiffs waited too long before commencing the action ("The most troubling thing in all of this really is…the timing")(Record, Tab 3, Ex. 28, Tr. p. 40[9-11]).  In fact, nowhere in the transcript is there a single example of the bankruptcy court quoting even one section of an Order which it claimed to be inconsistent with plaintiffs' position. The bankruptcy court did not interpret its Orders at all.[9] Instead, it stressed over and over that it felt it unfair that this case had not been brought to the Court's attention sooner. That was the basis for the dismissal which is improper and the Dismissal Order should therefore be reversed.

Likewise, the bankruptcy court did not even discuss the plaintiffs' claim for conversion, including for the Medicaid adjustment. Rather, because of its displeasure with the timing of the action, the bankruptcy court chose to dismiss the case in one fell swoop.

Moreover, GECC's about face regarding the Medicaid adjustment is especially significant, since it failed to submit any itemization or explanation concerning that the funds that it allegedly took for expenses and/or interest. Thus, GECC failed to show that its alleged fees and interest were accurate or legitimate. Therefore, the bankruptcy court should not have dismissed the Adversary Complaint at the pleading stage when all allegations are accepted as true. The Court may also take judicial notice that there is another lawsuit pending against GECC and Arrowsmith -- the same GECC executive that oversaw this loan, signed GE's affidavit, and falsely swore that the Medicaid adjustment was applied to the Revolver -- for fraudulently overstating expenses and interest relating to financing provided to other skilled nursing facilities. *See e.g.  New Lousiana Holdings, LLC et al v GE,  et al,* 11-cv-3773 (S.D.N.Y.).

---

[9]    Although, even if the bankruptcy court had been interpreting its own orders, these were form orders drafted by the parties and not the judge. A review of a Court Order is likewise reviewed *de novo*, particularly when, as here, the Orders were drafted by the parties and not the court. *See Harvis Trien & Beck, P.C. v. Federal Home Loan Mortg. Corp. (In re Blackwood Assocs., L.P.),* 153 F.3d 61, 65-66 (2d Cir. 1998).

## POINT VII

## GECC DISTORTS THE COURT ORDERS

Aside from misquoting the Purchase Agreement (see, Point I), GECC has also distorted other documents before the bankruptcy court, including the SRO and the Cash Collateral Order or CCO.

For example, GECC asserts that the "SRO…expressly provides for the payment of fees and accrued interest to GECC 'pursuant to the Revolving Credit Agreement' (the Revolver)" (GE OppB. p. 33). As repeatedly shown, however, the SRO prohibits the payment of any money, including "fees", to GECC aside from interest under the Revolver, and only from "funds remaining" in the Substitute's Receiver's "custody" and after it first discharges its duty to pay all of the Facilities' operating costs and expenses (Record, Tab 4, Ex. 10, p. 25).

Moreover, nothing in the CCO permitted GECC to take the funds from the Lockbox after the Substitute Receiver was appointed, as GECC claims. In fact, under the CCO, the Substitute Receiver's funds were to be utilized pursuant to regular budgets submitted through stipulations and "so-ordered" by the Bankruptcy Court that modified the CCO and approved the Substitute Receiver's budget (the "Modification Orders").  Notably, GECC did not cite to any of these Modification Orders, because the budgets attached to each of the Modification Orders do not provide for any payments of interest, fees or principal to GECC, which it now admits herein (GE OppB. p. 33, Ft. 15).

Additionally, the CCO was intended to apply only to the Initial Receiver because there was a Shortfall Agreement which explicitly mandated that GECC pay the Initial Receiver's shortfall.  Because the Substitute Receiver Order made Appellants responsible for all shortfalls, the portion of the CCO giving GECC the limited authority to lend money was inapplicable to the

Substitute Receiver. This is evidenced by the section of the Cash Collateral Order cited by GECC which explicitly notes: "the Receiver is hereby authorized to use Cash Collateral and borrow money in accordance with the terms of the…. *Shortfall Agreement*…" (Record, Tab 4, Ex. 6 at p. 11¶F., [emphasis added]). Once the Substitute Receiver took over, *the Shortfall Agreement was terminated*. Thus, there was no authority and no logical reason for the Cash Collateral Agreement to apply to the Substitute Receiver.

Similarly, the Final Sale Order provided, *inter alia*, that Oasis obtained virtually all assets, which were free and clear of all liens[10] and encumbrances and there be no successor liability. Once again, no part of the Final Sale Order allows for the unrestrained payments of interest, fees, or principal to GECC .

## POINT VIII

### THE COMPLAINT SHOULD NOT HAVE BEEN DISMISSED SINCE GECC FAILED TO SHOW THAT ITS TAKINGS WERE ACCURATE

GECC essentially argues that the money that it took from the Substitute Receiver was permitted for post-petition lending. Even if this were true (which it is not), the Adversary Complaint should not have been dismissed because GECC failed to show that the funds that it took were accurate. This is further evidenced by GECC's improper diversion of the $610,000 Medicaid adjustment. Further, as plaintiffs allege in the Adversary Complaint, much of the money taken was for unidentified "fees" or even to pay down principal.

In fact, GECC admits that it took every single dollar of receivables as a pay down of principal, which it would then make available (at a 15% markdown) for additional lending. There

---

[10]    There were certain minor excluded assets. Moreover, GECC had a lien on the receivables, which was extinguished by plaintiffs' purchase and the receivables were to be delivered free and clear of any lien. Thus GECC had no right to the Facilities' receivables.

is not a single order permitting GECC to collect principal on pre- or post-petition debt.

Moreover, GECC does not support its contention that it could take fees or pay down principal

even on post-petition debt because the law is clear that such payments are not allowed absent a

specific provision for them in a Court approved budget (which GECC admits it did not do).

## POINT IX

### GECC'S REQUEST FOR SANCTIONS IS FRIVOLOUS AND A TRANSPARENT ATTEMPT TO CHILL APPELLANTS' RIGHT TO APPEAL

Without making a separate motion before this Court, GECC requests sanctions pursuant

to Rule 11 and 28 U.S.C. 1927.

Preliminarily, to impose sanctions under Rule 11, it must be "'patently clear that a claim

has absolutely no chance of success ' (citation omitted)." Oliveri v. Thompson, 803 F.2d 1265,

1275 (2d Cir. 1986). Moreover, the Court must "resolve all doubts in favor of the signer".

Oliveri, supra, at p. 1275.

The fact that the Court (erroneously) dismissed the adversary proceeding does not

automatically subject plaintiff to sanctions. *See Securities Indus. Ass'n v. Clarke*, 898 F.2d 318,

321 (2d Cir. 1990) ("A distinction must be drawn between a position which is merely losing, and

one which is both losing and sanctionable"); *see also Thypin Steel Co. et al. v. Certain Bills of

Lading Issued for Cargo of 3017 Metric Tons, More or Less, of Hot Rolled Steel Plate Laden on

Board the M/V Geroi Panfilovsky,* 1998 U.S. Dist. LEXIS 20212, 1998 WL 912100, at *7 (S.D.N.Y.

Dec. 30, 1998) (granting in part defendant's motion to dismiss but holding that plaintiff's

allegations were "not so baseless or so without merit as to warrant the imposition of sanctions,

which is a harsh punishment reserved for the raising of claims that are totally frivolous and

without merit"); *see also Argo Marine Systems, Inc. v. Camar Corp.*, 755 F.2d 1006 (2d Cir. N.Y. 1985) (declining to sanction appellant for frivolous appeal even after upholding district courts sanctions for frivolous conduct in the district court).

Similarly, the "[i]mposition of sanctions under this section [28 U.S.C. 1927] requires a clear showing of bad faith", and "actions" that "are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay". Oliveri, supra, 803 F.2d at 1273. Moreover, "the purpose of the statute was 'to deter unnecessary delays in litigation.' (citation omitted)." Id., "Thus, the statute 'looks to unreasonable and vexatious multiplications to avoid dilatory tactics' (citation omitted)." In re 72nd Street Realty Associates, 185 B.R. 460, 475 (Bankr. S.D.N.Y. 1995).

Here, GECC's request for sanctions is nothing but a brazen attempt to chill plaintiffs' right to appeal and avoid GECC's obligation to answer for its improper conduct. Moreover, GECC's request for sanctions is frivolous, especially due to its about face reveal for the first time on appeal that it took the $610,000 Medicaid adjustment and did not apply it to the Revolver, but to some other alleged pre-petition debt (GE OppB. p. 18, Ft. 7). GECC's request under Section 1927 is also frivolous, since plaintiffs' have not delayed anything. In fact, to the extent that any party should be sanctioned it should be GECC, since its' about face reveal confirms that its prior assertion, under oath, that the Medicaid adjustment was applied to the Revolver was false (Record, Tab 4, ArrowDec. para 34).

## CONCLUSION

For the foregoing reasons, Appellants respectfully request that this Court (i) reverse the Dismissal Order; and (ii) grant such other and further relief as is just and proper.

Dated: New York, New York
July 11, 2011

Backenroth Frankel & Krinsky LLP
*Attorney for Appellants*

By: /s/ Abraham Backenroth
Abraham Backenroth (516730)
489 Fifth Avenue, 28th Floor
New York, New York 10017
(212) 593-1100