UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

EF CONSULTING LLC and OASIS HC LLC,

                Appellants,

  -v-                                          1:11-CV-325

GENERAL ELECTRIC CAPITAL CORPORATION,

                Appellee.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                                    OF COUNSEL:

BACKENROTH FRANKEL & KRINSKY LLP      MARK A. FRANKEL, ESQ.
Attorneys for Appellants
489 Fifth Avenue
New York, NY 10017

MORITT HOCK & HAMROFF LLP              MARC L. HAMROFF, ESQ.
Attorneys for Appellee                           WILLIAM P. LAINO, ESQ.
400 Garden City Plaza                          THERESA A. DIRSCOLL, ESQ.
Garden City, NY 11530

DAVID N. HURD
United States District Judge

## MEMORANDUM-DECISION and ORDER

## I. INTRODUCTION

      Appellants EF Consulting LLC ("EF" or "Substitute Receiver") and Oasis HC LLC ("Oasis") (collectively "appellants") appeal the order[1] of Hon. Robert E. Littlefield, Jr., United States Bankruptcy Judge, granting appellee General Electric Capital Corporation's ("GECC")

---

[1] The oral decision of the Bankruptcy Court of February 22, 2011, was memorialized with a written order filed on February 23, 2011.

motion to dismiss appellants' adversary complaint. GECC filed a brief in opposition, and appellants replied. The appeal was taken on submission.[2]

## II. BACKGROUND

Debtors Highgate LTC Management, LLC, and Highgate Manor Group, LLC ("debtors" or "Highgate") were owners and operators of nursing homes at various locations in upstate New York. On May 26, 2005, debtors secured financing for the operations of its nursing home facilities from GECC in the form of a revolving line of credit ("Line of Credit"). GECC also refinanced the real properties with a loan to debtors of up to $23.5 million. As collateral for these loans, debtors granted GECC security interests in the real properties as well as the rents, income, accounts receivables, general intangibles, equipment, inventory, fixtures, and proceeds from the properties' operations. To that end, debtors and GECC executed various loan documents setting forth the manner in which Line of Credit funds, accounts receivable, and payments on the loans would be handled. Loan and Security Agreement, Dkt. No. 2-7 ("LSA"); Lockbox Account Agreement, Dkt. No. 2-8 ("Lockbox Agreement"). Non-party Citizens Bank also executed the Lockbox Agreement.

The maximum amount available under the Line of Credit was $4 million. LSA § 2.1(a). However, the amount GECC would loan under the Line of Credit was limited to eighty-five percent of certain specified accounts receivable, such as those due from Medicare,

---

[2] It is noted that there are over 3,000 pages of documents in the Record on Appeal. Neither party properly identified these documents on the docket, making it extremely time-consuming to review. Moreover, many of the documents were duplicates or triplicates, further confusing the record. Finally, neither party used appropriate citations to the Record on Appeal. For example, appellant cited to the docket entries in the adversary proceeding, which does not identify where in the Record on Appeal the documents can be found. Appellee's citations are no more helpful, identifying documents by name while having filed them only as generic exhibits. In the interest of judicial economy this appeal is being decided on the merits. However, both parties are put on notice that any future submissions without proper identification of the Record on Appeal may well be rejected, resulting in dismissal of the appeal.

Medicaid, and private insurance (collectively "qualified accounts"), to which liquidity factors had been applied ("borrowing base"). Id. § 2.1(d). Two business days before it wished to borrow from the Line of Credit, Highgate would give GECC notice of its intent to borrow specifying the amount and date of the proposed borrowing. Id. § 2.2(a). GECC would then make an advance against the Line of Credit, up to the maximum amount of $4 million also taking into consideration the borrowing base, which was deposited in a bank account as directed by Highgate. Id. § 2.2(b)

Additionally, if Highgate failed to pay on the due date any amounts that became due as to the Line of Credit loan, such amounts were deemed a request for a loan against the Line of Credit, as of the day after the due date. Id. § 2.2(a). GECC would disburse to itself such funds to apply directly against the amounts due. Id. § 2.2(b).

All collections of accounts were to be paid directly to a Lockbox Account. Id. § 2.3(a). Every business day Citizens Bank would open the mail from the lockbox, endorse checks, accept electronic transfers to the lockbox, deposit the foregoing funds into the Lockbox Account, and then transfer the funds to a deposit account at Deutsche Bank ("Concentration Account"). Id. Daily, GECC would apply funds in the Concentration Account to the indebtedness first to fees, costs and expenses; then to interest; then to outstanding principal, all of which were due and owing pursuant to the loan documents. Id. §§ 2.2(d), 2.3(c). After GECC applied the Concentration Account funds as set forth toward the indebtedness, if there was a credit balance that balance was available to debtors so long as there was no default. Id. § 2.3(e).

In sum, the Line of Credit available for borrowing was measured as eighty-five percent (85%) of the receivables due from qualified accounts up to the $4 million maximum.

Highgate took advances against the Line of Credit as operating funds. All of Highgates' receivables were paid into a lockbox, from which GECC received payment on the Line of Credit loan. In this manner, as a revolving line of credit, the outstanding principal balance fluctuated, increasing by amounts loaned or advanced, and decreasing by repayments. Remedies for default included reduction in the credit limit for the Line of Credit, use of the collateral and/or funds in the Concentration Account, and initiation of proceedings against the collateral. Id. § 8.3(a)(iii)(D).

In April 2006 debtors defaulted on their obligations regarding the GECC loans. Consequently, in October 2006 GECC initiated a foreclosure action in Supreme Court of the State of New York, Rensselaer County ("Foreclosure Court"). On November 29, 2006, the Foreclosure Court, upon application by GECC, appointed non-party The Long Hill Alliance Company ("Long Hill") as receiver "to operate the Mortgaged Premises and to collect the rents, issues, income, fees and profits." Order Appointing Receiver at 3, Dkt. No. 2-9.[3] The receivership was to remain in effect until a foreclosure sale was completed. Id. at 6. Long Hill was to be paid its service fees as well as expenses out of receivables, which were paid first before any other operating expenses. Id. at 8. Further, the Foreclosure Court ordered Long Hill and GECC to enter into a Shortfall Agreement, under which GECC would, in essence, underwrite any shortfall between revenues and operational expenses. Id. at 7. Any shortfall related to the Long Hill's fees and expenses would be satisfied according to the Shortfall Agreement. Id. at 9. All liabilities incurred prior to the receivership remained with debtors; Long Hill did not assume any such liabilities. Id. The Order Appointing Receiver did

---

[3] The Order Appointing Receiver also set forth the New York State Department of Health involvement, required since the nursing home operations were licensed by it and required by it to maintain certain standards. This involvement is not relevant to determination of the issues on appeal.

- 4 -

not change the Lockbox Agreement, and accounts receivable continued to be deposited into the Lockbox Account for ultimate payment of amounts due to GECC under the Line of Credit. Id. at 18. GECC's costs and expenses relating to the receivership, including any shortfalls which it paid pursuant to the Shortfall Agreement, were added to the mortgages and created a lien on the collateral, and hence were recoverable from the debtors and as against any property securing debtors' loans. Id. at 22.

The Shortfall Agreement provided a framework for how Long Hill was to conduct the receivership. Shortfall Agreement, Dkt. No. 2-10. Under this agreement, when Long Hill's expenses were greater than the facilities' income, GECC agreed to pay the difference. Id. at 3. That is, GECC would make up any working capital deficit. Id. However, any such funds provided by GECC would constitute loans, added to the principal of the Line of Credit loan.

On April 16, 2007, debtors voluntarily filed for bankruptcy protection under Chapter 11. According to appellants, debtors owed GECC $3,492,795[4] on the Line of Credit debt as of the bankruptcy filing. Sherman Decl. ¶ 12, Dkt. No. 3-2.

On May 14, 2007, the Bankruptcy Court entered a Final Order authorizing the debtors to borrow money and use cash collateral.[5] Cash Collateral Order, Dkt. No. 2-11. In essence, the Cash Collateral Order permitted Long Hill to continue, as it had been, to operate the facilities using the GECC Line of Credit, and pursuant to the terms of the loan documents. Id. at 8. Moreover, as further security for GECC's agreement to continue the

---

[4] Dollar amounts are rounded down to the next whole dollar. The exact dollar-and-cents amounts are not relevant to this appeal.

[5] An interim order granting such relief was entered on April 25, 2007.

loan, the Bankruptcy Court granted GECC a lien pursuant to 11 U.S.C. §§ 361, 363(e), senior to all other liens except those delineated.  Id. at 9.

On May 18, 2007, the Bankruptcy Court entered an Order permitting Long Hill to continue as receiver pursuant to the Foreclosure Court's Order Appointing Receiver, that is, excusing non-compliance with 11 U.S.C. §§ 543(a)-(b).  Section 543 Order at 2, Dkt. No. 2-12.  The May 18, 2007, Order further required Long Hill to continue the lockbox arrangements pursuant to the terms of the loan documents.  Id. at 3.  Upon an order by the Bankruptcy Court, a Trustee to manage the bankruptcy estate was appointed.

On August 12, 2008, the Trustee entered into an agreement with Oasis, which was the highest bidder at a foreclosure sale auction, for the sale of most of debtors' property. Purchase Agreement, Dkt. No. 2-13.  The agreement, subject to approval of the Bankruptcy Court, provided that Oasis apply to the Foreclosure Court for an order appointing EF as receiver, replacing Long Hill.  Id. at 3-4.  The sale included real estate, buildings, and equipment comprising the nursing homes, as well as "ordinary course accounts receivable." Id. at 4 ¶ 1(A)(i)-(iv).  The purchase specifically excluded retroactive adjustments related to Medicare and Medicaid.  Id. at 7 ¶ (B)(vii).  Additionally, if, during the substitute receivership, EF wished to use accounts receivable and the GECC Line of Credit, then Oasis and EF would assume liability for all of the expenses of the nursing homes.  Id. at 8 ¶ C.  The agreement states:

> To the extent Purchaser, as Receiver or the Receivership Designee during the period prior to Closing, seeks to use any accounts receivable and establish and/or continue the revolving credit facility of [GECC] , then:  (A) Purchaser shall use accounts receivable collected for services rendered or provided both prior to and after the issuance to Purchaser of the Requisite Approvals to pay, without credit to the Purchase Price, all accrued operating expenses, including trade accounts payable, professional fees and expenses (including trustee

>fees) of Trustee, and Committee and U.S. Trustee fees which are incurred between Final Sale Order and Closing (in accordance with Annex 1C hereto), accrued vacation, sick and personal time and similar items, cash receipt assessment and similar taxes, employee wages or salary, and required contributions under employee benefit plans or programs, including accrued but unbilled expenses arising from the operation of the Facilities after the Order Appointing Receiver through the Closing Date; and (B) Purchaser shall be in compliance with the Order Appointing Substitute Receiver and pay expenses of the estate consistent with the approved budgets and cash collateral orders entered by the Bankruptcy Court.  At the Closing, Purchaser shall pay or otherwise resolve, at its sole expense, all section 365 cure obligations with respect to the Assumed Contracts and all retroactive premium adjustments with respect to workers' compensation and other insurance policies to the extent attributable to time periods subsequent to the Petition Date.  It is expressly understood that Purchaser is not assuming any obligations related to the First Niagara Risk Management Agreement.

Id. As of the date of the closing, all accounts receivable would become the property of Oasis.  Id. at 13-14 ¶ 5.1(a).  Further, EF was required to hold accounts receivable actually received during the receivership (including when Long Hill served as receiver) and apply them to expenses incurred by the nursing homes during the receivership.  Id. at 14 ¶ 5.1(c). EF was also required to "comply with all aspects of the existing Revolving Credit Facility with GE including the establishment of lock box accounts and executing such other documents a[s] GE my reasonably require."  Id.

On August 28, 2008, the Bankruptcy Court issued a Final Sale Order ("Sale Order") authorizing the sale to Oasis, in accordance with the Purchase Agreement.  Sale Order at 1, 4-5, Dkt. No. 2-14.  As set forth in the Purchase Agreement, the Sale Order provided that GECC request an order from the Foreclosure Court appointing Oasis or its designee as Substitute Receiver, as soon as the Department of Health approved the Substitute Receiver. Id. at 7-8, 13.  The Substitute Receiver would assume the obligation to operate the nursing homes, "meet all funding obligations necessary to continue the operation" through the date of

the closing, prepare necessary tax returns, and assume responsibility for the lockbox. Id. at 13. Generally, Oasis was to take the properties free of encumbrances; however, the transfer would not be "free and clear of any obligations incurred by the Substitute Receiver." Id. at 5-6. That is, the Sale Order provided that Oasis would be liable for the Substitute Receiver's obligations, including any operational deficiencies. Id. at 18. Overall, the Sale Order "authorized and approved [the Purchase Agreement] in its entirety." Id. at 16.

On November 3, 2008, the Foreclosure Court entered an order appointing EF as Substitute Receiver. Order Appointing Substitute Receiver, Dkt. No. 2-15 ("Substitute Receiver Order"). Pursuant to the Substitute Receiver Order, EF and Oasis would be responsible for "all obligations incurred by Long Hill at or for the Facility, including trade accounts payable . . . ." Id. at 8. Appellants also would fund operations of the nursing homes, "including prior debts and obligations coming due and/or remaining unpaid" as well as obligations incurred during the substitute receivership. Id. at 9. Unlike the Order Appointing Receiver as to Long Hill, the Substitute Receiver Order expressly excluded any type of shortfall agreement. Id. In other words, EF and Oasis were responsible for any shortfall should expenses exceed revenue. Id. at 9-10. In addition, EF was authorized and directed to collect incoming payments and deposit them in the Lockbox Account at Citizen's Bank. Id. at 21. The arrangement for collection of receivables and payment to GECC set forth in the Lockbox Agreement remained unchanged. Id. at 21-22. Monthly, EF was to pay accrued interest owed to GECC on the Line of Credit loan. Id. at 25. EF and Oasis were also obligated to pay the fees and expenses of the Trustee and his professionals, the creditors' committee's professionals, and the United States Trustee fee. Id. at 29. If the foregoing fees were paid, then the Substitute Receiver could be paid its fee. Id.

On April 7, 2010, Medicaid paid $610,218 to the lockbox as a retroactive rate adjustment payment. Sherman Decl. ¶ 15, Dkt. No. 3-2. This rate adjustment payment was made in the normal course of Medicaid payment procedures. Id. According to appellants, GECC removed $610,218 from the lockbox on approximately April 7, 2010. Id. ¶¶ 15-17. Also according to appellants, from the time the Foreclosure Court first appointed Long Hill as receiver, through the date of the closing of the sale to Oasis, GECC took more than $760,313.79 in interest. Id. ¶ 13. Further, appellants contend that during the receiverships GECC collected from the receivers' funds $804,358 in fees. Id. ¶ 14. Finally, appellants assert that at the time of the closing of the sale, the Line of Credit debt was $2,707,234, a reduction of $785,561, which GECC allegedly took from EF's income. Id. ¶ 12.

On June 3, 2010, EF moved the Foreclosure Court for an order requiring GECC to pay it $1,127,028, the amount EF claims should have been available to it due to deposit of the Medicaid retroactive rate adjustment payment of $610,218. The Foreclosure Court denied the motion without prejudice to seek such relief in the bankruptcy proceeding.

The sale closed on August 30, 2010.

Appellants then filed the Adversary Proceeding, on December 7, 2010, alleging fraud, negligent misrepresentation, breach of fiduciary duties, negligence, conversion, declaratory judgment, and turnover under the Bankruptcy Code, all based upon GECC allegedly misappropriating lockbox funds (accounts receivable) and the Medicaid retroactive adjustment to pay down debt and interest owed on the Line of credit. As noted, the Bankruptcy Court granted GECC's motion to dismiss, and this appeal followed.

### III. **STANDARD OF REVIEW**

In reviewing a bankruptcy court's decision, a district court applies the clearly erroneous standard to conclusions of fact and *de novo* review to conclusions of law.  In re Manville Forest Prods. Corp., 209 F.3d 125, 128 (2d Cir. 2000); In re Petition of Bd. of Directors of Hopewell Int'l Ins. Ltd., 275 B.R. 699, 703 (Bankr. S.D.N.Y. 2002); Fed. R. Bankr. P. 8013.

The parties agree that the appeal requires review of the Bankruptcy Court's conclusions of law, rather than conclusions of fact.  Therefore, *de novo* review will be undertaken.

### IV. **DISCUSSION**

Appellants contend that the Bankruptcy Court erred in dismissing its adversary complaint.  The bases for this contention are that (1) GECC was not entitled to retain any lockbox funds; (2) GECC was not entitled to collect fees, interest, or principal on its loans prior to the receivership expenses being paid; and (3) GECC was not permitted to collect interest and fees from monies collected by EF because such interest and fees were not included on the cash collateral budgets GECC submitted to the Bankruptcy Court.

The lockbox arrangement was initiated when GECC first extended a revolving credit loan to Highgate to finance operation of the nursing homes.  The agreements among GECC and Highgate (the loan documents, LSA, and Lockbox Agreement) provided that all accounts receivable would be paid into a lockbox, monies from which GECC would use to pay fees, costs and expenses, interest, and outstanding principal.  See LSA §§ 2.2(d), 2.3(c).  Those monies from the lockbox (that is, accounts receivable) were available to debtors only after GECC paid amounts due for fees, costs and expenses, interest, and outstanding principal

due, and only if there was a credit balance after such payments and there was no default. See id. § 2.3(e).

Meanwhile, Highgate obtained operating funds by drawing on the Line of Credit. The balance available from the line of credit decreased as Highgate obtained funds. Receivables sent to the lockbox made their way to GECC's Concentration Account via the Lockbox Account. GECC then withdrew funds from the Concentration Account to make the payments as set forth above. The Line of Credit balance available for Highgate to borrow then increased as GECC paid down the outstanding principal.

Highgate defaulted on the loan. Pursuant to the LSA, any balance left in the Concentration Account after payment of fees, costs and expenses, interest, and outstanding principal due was no longer available to debtors. See id. § 2.3(e).

After debtors' default and GECC's initiation of a foreclosure action, the Foreclosure Court appointed Long Hill as receiver to operate debtors' nursing homes. The lockbox arrangement remained unchanged. Order Appointing Receiver at 9, 18. Thus, Long Hill stood in the place of debtors, obtaining operating funds by borrowing against the Line of Credit available balance.[6] Long Hill's service fees as a receiver were to be paid from the "rents, profits, income, Medicaid reimbursements and other sums received by" Long Hill. Id. at 8. Further, when expenses (including receivership fees) exceeded receivables, GECC would make up any shortfall, and add that amount to the amount owed on the Line of Credit. Id. at 9.

---

[6] As set forth above, the available balance was limited by the borrowing base, up to $4 million.

When debtors filed for bankruptcy protection, the Bankruptcy Court permitted Long Hill to continue borrowing against the Line of Credit for operating funds. Cash Collateral Order at 8. The Bankruptcy Court further permitted Long Hill to continue as receiver, and required Long Hill to continue complying with the lockbox arrangement. Section 543 Order at 2-3. Thus, the status quo was preserved as to the lockbox arrangement.

When Oasis won as low bidder at the bankruptcy foreclosure auction, it executed a Purchase Agreement with the Trustee. Pursuant to the terms of the purchase, if EF used accounts receivable and the Line of Credit for operating expenses, then Oasis and EF assumed liability for such operating expenses. Purchase Agreement at 8 ¶ C. EF was also required to comply with the lockbox arrangement. Id. at 14 ¶ 5.1(c).

In other words, EF was substituted for Long Hill in terms of standing in the place of debtors using the Line of Credit and complying with the lockbox arrangement. Thus, accounts receivable were deposited in the Lockbox Account for transfer to GECC's Concentration Account. GECC then used those funds to pay fees and costs, expenses, interest, and outstanding principal due. Additionally, because a default had occurred, any balance remaining after GECC made such payments was not available to EF, and in no way was EF entitled to any such remaining balance.

Appellants complain that GECC wrongfully took monies from the Lockbox Account for its fees, interest, and principal on the loans. However, the loan documents and subsequent court orders sustaining the applicability of the loan agreements unambiguously establish that GECC properly used those monies for fees, interest, and to reduce the principal on the loans.

Appellants argue that the Substitute Receiver Order did not permit GECC to maintain or collect debtors' funds and was entitled only to interest, only after all operating expenses were paid. This argument fails to take account of the Substitute Receiver Order provisions leaving the lockbox arrangement in place and permitting EF to draw on the Line of Credit. It also fails to account for the many orders of the Bankruptcy Court leaving in place all provisions of the original loan agreements, including the lockbox arrangement and the Line of Credit. These orders are clear: if EF continued to use the Line of Credit, it was bound by the provisions of the loan documents, meant to serve as protections for GECC as a creditor. In fact, without the protections set forth in the loan documents and those afforded by the Bankruptcy Court, it would make no business sense to continue to extend credit to fund operations of nursing homes already in default, foreclosure, and bankruptcy.

Appellants also argue that the New York Real Property Actions and Proceedings Law as well as the Public Health Law pertaining to nursing homes prohibit the manner in which GECC made payments prior to all expenses of the facilities being paid.

According to appellants, a receiver cannot pay interest to a secured creditor until operating expenses are paid. N.Y. Real Prop. Acts. L. §1325(2). The real property statute cited permits a court to direct payment of "accrued interest on the mortgage" after taxes, administration expenses, fees and charges have been paid. Id. However, here GECC applied the accounts receivable funds not to "accrued interest on the mortgage" but to interest accrued on the Line of Credit, against which EF borrowed. Moreover, the Substitute Receiver Order and multiple orders of the Bankruptcy Court provided that EF could continue to borrow against the Line of Credit (after the bankruptcy) and GECC could use accounts receivable, as it had with the debtors, to pay accrued interest and principal on the loan.

Appellants cite no authority for the proposition that these post-petition orders violate New York state law.

Appellants also argue that the receiver must apply funds to maintaining the health facility, rather than to pay other obligations.  The Purchase Agreement, Sale Order, and Substitute Receiver Order specifically provide for compliance with Public Health Laws pertaining to operation of nursing homes.  Again, appellants argue violation of state law without any authority establishing such a violation.

Appellants repeat that according to state law a receiver must pay expenses first.  This principle is not contrary to the manner in which the receivership was to operate, when reviewing the entire arrangement.  Although somewhat repetitive, reviewing how the receivership operated in the context of the bankruptcy is necessary here to illustrate how the entire arrangement does, in fact, provide for expenses to be paid first.  The arrangement was as follows.  GECC agreed to continue to make the Line of Credit available after debtors defaulted and then entered bankruptcy.  It retained as collateral all accounts receivable and, as further protection of the collateral, required that the accounts receivable be deposited pursuant to the Lockbox Agreement.  In other words, GECC, rather than the receiver, maintained control over the accounts receivable.  GECC used those funds to pay down the principal amount due on the Line of Credit, making available to EF funds it could borrow to pay operating expenses.  EF was not required to borrow operating funds from GECC; it could have financed the nursing home operations on its own.  However, if EF did borrow against the line of Credit, it did so subject to all provisions of the loan documents, including the lockbox arrangement.

EF was to pay the operating expenses of the nursing homes as well as its receivership fees. The agreements and orders provided that any shortfall between revenues and expenses must be absorbed by EF and Oasis, clearly contemplating that expenses would be paid first and without use of the lockbox funds. See Sale Order at 18. Moreover, although subject to GECC's secured lien, the accounts receivable (i.e., lockbox funds) were part of the bankruptcy estate (and not owned by the receivership) up until the closing of the sale. Pursuant to orders of the Bankruptcy Court, the Trustee was permitted to allow the secured creditor GECC access to those funds as an incentive to make cash available to keep the nursing homes operating.

Further, as previously stated, if EF had chosen to fund the operations on its own, not by borrowing against the Line of Credit, it would still have had the obligation to pay the expenses of operating the nursing homes. In that scenario, GECC would retain its lien against the lockbox funds and the balance of the Line of Credit would have not changed. There would have been no need for GECC to pay down the Line of Credit balance from the lockbox funds to make funds available from which EF could borrow.

Appellants argue that under United Savings Ass'n v. Timbers of Inwood Forest Assocs., 484 U.S. 365, 108 S. Ct. 626 (1988), it was improper for GECC to pay itself post-petition interest and fees on a pre-petition claim, where it was undersecured. In Timbers, the undersecured creditor sought compensation in the form of interest where the automatic stay delayed its ability to foreclose on the collateral. Id. at 369, 108 S. Ct. at 629. Unlike Timbers, here there was no issue of the automatic stay delaying GECC's ability to apply the value of the collateral against the debt. Rather, GECC provided post-petition financing for which it was given additional security in the form of a super-priority lien, and was permitted to

collect interest on the post-petition loans. Moreover, there is nothing in the record to support appellants' allegation that GECC was undersecured except its bald assertion that it is so.

Next appellants argue that GECC converted the Medicaid reimbursement funds of approximately $610,000. EF received the reimbursement and deposited it into the lockbox account. As a receivable, EF was required to do so. EF then requested that GECC return the reimbursement funds. As discussed above in detail, the Purchase Agreement, Sale Order, and Substitute Receiver Order provided that accounts receivable were not the property of the substitute receiver. Rather, accounts receivable remained the property of the bankruptcy estate, subject to the secured interest of the creditor, GECC. Thus, EF's argument that GECC improperly refused to return the Medicaid reimbursement fails.

Appellants contend that the Bankruptcy Court improperly based dismissal of the adversary complaint on the timeliness of its filing rather than the merits. The reasoning of the Bankruptcy Court is irrelevant when a *de novo* review is undertaken. Moreover, in any event, timeliness was not considered on this *de novo* review.

Finally, appellants argue that GECC's assertion that a purported release on "borrowing certificates" waived their claims. This argument cannot be considered because no such documents are included in the record on appeal.

## V. **CONCLUSION**

GECC used the lockbox funds in accordance with the loan documents, Purchase Agreement, Foreclosure Court orders, and Bankruptcy Court orders. Pursuant to the loan documents, Purchase Agreement, Foreclosure Court orders, and Bankruptcy Court orders appellants were not entitled to the lockbox funds, including the Medicaid reimbursement. All

of appellants' arguments to the contrary are unfounded.  Therefore, the Bankruptcy Court properly dismissed the adversary complaint.

Accordingly, it is

ORDERED that the February 23, 2011, Order of the Bankruptcy Court dismissing appellants' adversary complaint is AFFIRMED.

IT IS SO ORDERED.

_____
United States District Judge

Dated:  July 12, 2012
        Utica, New York.